## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | |
|---|---|
| In re:<br><br>**ALLIED HEALTHCARE PRODUCTS, INC.,**<br><br>Debtor. | **Chapter 11**<br>**Case No. 23-41607**<br><br>**Hearing Date and Time:**<br>TBD<br>(Prevailing Central Time)<br><br>**Hearing Location:**<br>Courtroom 5 North |

**MOTION FOR ENTRY OF ORDERS: (I) APPROVING (A) BIDDING PROCEDURES, (B) DESIGNATION OF STALKING HORSE BIDDER AND STALKING HORSE BID PROTECTIONS, (C) SCHEDULING AUCTION AND SALE HEARING, (D) FORM AND MANNER OF NOTICE OF SALE, AUCTION, AND SALE HEARING; AND (E) ASSUMPTION AND ASSIGNMENT PROCEDURES AND FORM NOTICE THEREOF; AND (II) AUTHORIZING (A) SALE OF ST. LOUIS ASSETS FREE AND CLEAR OF ALL LIENS, INTERESTS, CLAIMS, AND ENCUMBRANCES; (B) ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND (III) GRANTING RELATED RELIEF**

Allied Healthcare Products, Inc., the above-captioned debtor and debtor-in-possession ("***Debtor***"), by and through its proposed undersigned counsel, submits this Motion for Entry of Orders: (i) Approving (a) Bidding Procedures, (b) Designation of Stalking Horse Bidder and Stalking Horse Bid Protections, (c) Scheduling Auction and Sale Hearing, (d) Form and Manner of Notice of Sale, Auction, and Sale Hearing; and (e) Assumption and Assignment Procedures and Form Notice Thereof; and (ii) Authorizing (a) Sale of St. Louis Assets Free and Clear of All Liens, Interests, Claims, and Encumbrances; (b) Assignment of Executory Contracts and Unexpired Leases; and (iii) Granting Related Relief ("***Motion***"), states and alleges as follows:

## I.    <u>BACKGROUND</u>

### A.    Procedural Posture

1.      On May 8, 2023 ("***Petition Date***"), Debtor filed a voluntary petition for relief pursuant to chapter 11 of Title 11 of the United States Code ("***Bankruptcy Code***").

2.      Debtor continues in the operation and management of its business as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

3.      No trustee, examiner or official committee has been appointed.

4.      This is a core proceeding pursuant to 28 U.S.C. § 157(2)(A), (M), (N) and (O).

5.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.

6.      Venue is proper in this Court pursuant to 28 U.S.C. § 1408.

### B.    Nature of Pre-Petition Date Business Operations

7.      A detailed background of Debtor's business and operations, events leading to the filing of this chapter 11 case, and the pre-Petition Date sale and marketing efforts is more fully set forth in the Declaration of Akash Amin in Support of Debtor's Chapter 11 Proceedings and First Day Motions ("***First Day Declaration***") and incorporated herein by reference.

8.      Debtor is a leading manufacturer and provider of healthcare equipment focusing on patient ventilation and gas delivery components and systems. The products Debtor manufactures, sells, and distributes include, among other things, stationary and portable ventilators, carbon dioxide absorbent, suction regulators and aspirators, patient care devices primarily associated with medical gas delivery, suction systems, home healthcare and emergency products.

9.      Debtor sells its products under a variety of brand names including "Chemetron by Allied", "Shuco by Allied", "Gomco by Allied", "Timeter by Allied", "B&F Medical by Allied", "Life Support Products by Allied", "Lif-O-Gen", "Litholime" and "Carbolime".

2

10.     Debtor operates out of two facilities, with a headquarters and primary manufacturing facility at 1720 Sublette Avenue in St. Louis, Missouri ("*St. Louis Assets*") and a second facility housing Debtor's production of carbon dioxide absorbent pellets (Litholime and Carbolime), which is located at 46 New Street, Stuyvesant, New York ("*New York Assets*").

### C.     Debtor's Pre-Petition and Post-Petition Sale and Marketing Efforts

11.     As detailed in the attached Declaration of Thomas Goldblatt, a true and accurate copy of which is attached hereto as **Exhibit 1** ("*Sale Declaration*"), Debtor and its advisors determined that the best way to maximize the value of Debtor's assets for Debtor's estate was through proposed sale(s) of Debtor's assets and operations as a going concern. Sale Declaration ¶ 3; First Day Declaration ¶ 97.

12.     To initiate a robust sale and marketing process for Debtor's assets ("*Sale Process*"), on January 25, 2023, Debtor entered an "Engagement Letter" with Ravinia Capital, LLC ("*Ravinia*") under which Ravinia would act as Debtor's "*Investment Banker*." First Day Declaration ¶ 98(c); Sale Declaration ¶ 2.

13.     Debtor selected Ravinia based on its experience and expertise in providing investment banking services in advising buyers and sellers in the medical device sector at large. First Day Declaration ¶ 98(c). In addition, Ravinia's investment-banking professionals have experience advising distressed sellers. *Id*.

14.     On the Petition Date, Debtor filed an Application for Order Authorizing Retention and Employment of Ravinia Capital, LLC as Debtor's Investment Banker.

15.     As detailed in the Sale Declaration, Debtor and Investment Banker have engaged in robust sale and marketing efforts pre-petition ("*Prepetition Sale and Marketing Process*"). Sale Declaration ¶¶ 4-15.

16.     The Prepetition Sale and Marketing Process included the following:

3

a.  The sale and marketing efforts for the New York Assets and St. Louis Assets were intended to culminate in the eventual Transactions, tailored to the unique circumstances surrounding Debtor's operations and circumstances. For example, in consultation with Debtor, Investment Banker determined and recommended that the best way to maximize the value of Debtor's assets was to naturally segment the assets between the St. Louis Assets and the New York Assets, with a sale and marketing process tailored to each segment accordingly. Sale Declaration ¶ 3.

b.  Investment Banker engaged in robust pre-bankruptcy sale and marketing efforts, fully exposing the assets to the market to maximize value. First, to maintain and maximize going concern value, Investment Banker wanted to ensure that the public and stakeholders were aware of the positive steps taken to address the Debtor's situation, so Investment Banker engaged a crisis turnaround public relations firm to draft and produce materials detailing Debtor's turnaround spearheaded by MorrisAnderson. This strategy aimed to instill confidence in Debtor's employees, customers, vendors, and the public generally, preserving value of assets pending closing of the Transactions. Sale Declaration ¶ 4.

c.  Investment Banker reached out to approximately 64 potential bidders, both domestic and international, in the medical equipment and healthcare industries. These outreach efforts included initial calls and emails to gauge interest and potential fit, followed by the signing of approximately 17 non-disclosure agreements ("*NDAs*") to facilitate an in-depth examination of Debtor's financials and operations. From those 17 NDAs, Investment Banker conducted five in-person and one virtual site visit to Debtor's St. Louis facility, which included meetings with management, a tour of the factory, and lunch with Debtor's management. This resulted in Debtor receiving three official Indications of Interest ("*IOIs*"). Sale Declaration ¶ 5.

d.  Investment Banker worked closely with potential bidders and Debtor's management as an intermediary to provide potential bidders with the necessary materials to make their decision. This has included putting together a formal, large data room and compiling decades of relevant materials from the Debtor, including financial statements, customer lists, product data sheets, and patents, among others. Investment Banker has also created marketing materials to attract new potential bidders from outreach efforts. These marketing materials include a comprehensive overview of Debtor's products, manufacturing capabilities, and financial performance. Sale Declaration ¶ 6.

e.  Investment Banker spent several weeks going back and forth with potential bidders to maximize offers before Debtor selected a proposed stalking horse purchaser(s) for the St. Louis Assets and the New York Assets. The process of choosing a proposed stalking horse involved a thorough analysis of the IOIs received and a review of each company's apparent financial capability, strategic fit, and cultural compatibility with Debtor. Sale Declaration ¶ 7.

4

17.     Debtor and the Investment Banker received and reviewed several IOIs and determined to continue negotiating terms with Allied Medical, LLC, which is the proposed stalking horse purchaser for the St. Louis Assets ("***Stalking Horse Bidder***"). Sale Declaration ¶ 8. Allied Medical LLC is not affiliated with Debtor, and upon information and belief, was created as a special purpose entity for purposes of the proposed sale process in this case. Sale Declaration ¶ 8. The negotiated terms included potential bid protections related to being the Stalking Horse Bidder that drives the Sale Process. Sale Declaration ¶¶ 9-10. Debtor and the Investment Banker then spent significant time and effort negotiating an asset purchase agreement with the Stalking Horse Bidder, culminating in the execution of an asset purchase agreement on May 7, 2023, a true and accurate copy of which is attached hereto as **Exhibit 2** (the "***Stalking Horse Agreement***"). Sale Declaration ¶ 11.

18.     Although Debtor seeks to establish a Stalking Horse Bidder, the Debtor and the Investment Banker continue tireless efforts to generate interest in the Sale Process and attract additional prospective buyers. Sale Declaration ¶ 12,

**D.     Material Post-Petition Developments**

19.     On the Petition Date, Debtor filed a motion seeking entry of the Interim Order Granting Debtor's Motion for Authorization to Obtain Secured Credit on an Interim and Final Basis ("***DIP Order***" or "***DIP Facility***"), which will be scheduled for final hearing.

20.     The DIP Facility will allow Debtor to continue to purchase inventory, and pay its employees, rent and utility expenses pending the contemplated sales.  Termination of Debtor's operations would jeopardize the Sale Process, injure Debtor's creditors, both unsecured and secured, and could cost numerous employees their jobs. First Day Declaration ¶¶ 65-68.

SL 5985701.3

21.     The DIP Facility not only contemplates the Sale Process, but also identifies specific

"***DIP Milestones***," which if not met, constitute "Events of Default" under the DIP Facility as

follows—

a.      No later than five (5) Business Banking Days after the Petition Date, Borrower shall file a motion in form and substance satisfactory to Lender requesting approval from the Bankruptcy Court to conduct the marketing and sale process for all or substantially all of the assets of Borrower;

b.      No later than thirty (30) days after the filing of the motion required under the foregoing subsection (a), the Bankruptcy Court shall have entered an order on such motion; and

c.      Subject to the terms and conditions of the DIP Facility, the Loan Commitment Period is at most one hundred twenty (120) days following the Petition Date. *See* DIP Facility § 1.3.

22.     The Stalking Horse Agreement contains milestones ("***Sale Milestones***"), which if

not met, jeopardize Debtor's ability to consummate a sale for the St. Louis Assets. The Sale

Milestones include:

a.      on or within five (5) business days of the Petition Date, Debtor shall have filed a motion seeking entry of the Bid Procedures Order ("***Bid Motion***");

b.      Debtor shall seek to have a hearing occur on or within twenty-one (21) days of filing the Bid Motion;

c.      Debtor shall seek to have the Bankruptcy Court enter the Bid Procedures Order on or within thirty (30) days of filing the Bid Motion;

d.      the final date for submitting a qualified bid, as set forth in the approved Bid Procedures Order, shall be no later than thirty (30) days after the Bankruptcy Court's entry of the Bid Procedures Order ("***Bid Deadline***");

e.      Debtor shall hold the Auction, if any, no later than two (2) business days after the Bid Deadline; and

f.      on or within fourteen (14) business days after the conclusion of the Auction, the Bankruptcy Court shall enter the Sale Order.

SL 5985701.3

E.      **The Stalking Horse Agreement and Proposed Sale Process**

23.      Debtor proposes to effectuate a sale of the St. Louis Assets to the highest and best bidder, or bidders, by a form of asset purchase agreement (as amended from time to time, the "***Form APA***") in substantial conformity to the Stalking Horse Agreement attached hereto as **Exhibit 2**, without the proposed Stalking Horse Bid Protections (as defined here). The Form APA provides for, among other things, the sale of the St. Louis Assets free and clear of all liens, claims, encumbrances, and other interests ("***Transaction***").

24.      Debtor proposes to effectuate the Transaction via the procedures outlined in the bid procedures ("***Bid Procedures***") attached as Exhibit A to the proposed Order ("***Bid Procedures Order***") which is attached as **Exhibit 3** hereto, to determine the highest and best bidder or bidders to authorize and approve the Transaction pursuant to the form sale order attached hereto as **Exhibit 4** ("***Sale Order***"). Debtor seeks approval of the form and manner of notice of the Bid Procedures, the Sale Hearing (as defined below), the Objection Deadline, the respective dates, times, and places for an auction, if required under the Bid Procedures, substantially in the form attached as **Exhibit 5** ("***Transaction Notice***"). In connection with a Transaction, the Debtor seeks to assume and assign any known Contracts (as defined herein) that are designated by a Successful Bidder (or its designated assignee(s)), pursuant to the Assumption and Assignment Procedures (defined herein) set forth in the Bid Procedures Order, attached as Exhibit 3 hereto, and pursuant to the proposed manner of notice attached as Exhibit C to Exhibit 3 hereto.

25.      The Bid Procedures provide the Debtor with flexibility to solicit proposals, negotiate transactions, hold an auction, and proceed to consummate a potential Transaction, all while protecting the due process rights of all interested parties and ensuring a full

SL 5985701.3

and fair opportunity to review and consider proposed transactions. The Debtor proposes to establish the following key dates and deadlines for the sale process:

| Key Event | Deadline |
|---|---|
| Hearing to consider approval of Bid Procedures and entry of Bid Procedures Order | **May 30, 2023** |
| Deadline for the Debtor to file with the Bankruptcy Court and provide Counterparties with (i) a schedule of all executory contracts and unexpired leases, including those designated as Proposed Assumed Contracts by the Stalking Horse Bidder, (ii) notice of proposed cure costs for all executory contracts and unexpired leases, and (iii) adequate assurance information for the Stalking Horse Bidder | **June 1, 2023** |
| Deadline to object to (i) the Debtor's proposed cure costs in connection with the proposed assumption and assignment of executory contracts and unexpired leases to the Stalking Horse Bidder, (ii) the assumption and assignment of executory contracts and unexpired leases to the Stalking Horse Bidder, and (iii) adequate assurance of future performance of the Stalking Horse Bidder | **June 15, 2023, at 5:00 p.m. (prevailing Central Time)** |
| Deadline to submit Bids | **June 16, 2023, at 5:00 p.m. (prevailing Central Time)** |
| Deadline for the Debtor to file notice cancelling the Auction and designating the Stalking Horse Bid as the Successful Bid, if no Qualified Bid is received | **June 19, 2023, at 5:00 p.m. (prevailing Central Time)** |
| Deadline for the Debtor to notify Bidders of (i) status as Qualified Bidders and (ii) of selection of Baseline Bid | **June 19, 2023, at 5:00 p.m. (prevailing Central Time)** |
| Auction (if any) to be held if the Debtor receives more than one Qualified Bid, either (i) at the offices of Spencer Fane LLP, 1 North Brentwood Boulevard, Suite 1200, St. Louis, MO 63105 or (ii) virtually pursuant to procedures to be filed by the Debtor on the Bankruptcy Court's docket prior to the Auction | **June 20, 2023, at 9:00 a.m. (prevailing Central Time)** |

SL 5985701.3

| Deadline for the Debtor to (i) file with the Bankruptcy Court the notice of Auction results and designation of the Successful Bid and Back-Up Bid and (ii) to the extent the Successful Bidder is not the Stalking Horse Bidder, (a) provide Counterparties with adequate assurance information for the Successful Bidder and (b) provide notice to Counterparties of Proposed Assumed Contracts designated by the Successful Bidder for assumption and assignment | **June 22, 2023, at 5:00 p.m. (prevailing Central Time)** |
|---|---|
| Deadline to file objections to Transaction(s) | **June 27, 2023, at 5:00 p.m. (prevailing Central Time)** |
| Deadline to reply to objections to (i) Transaction(s), (ii) cure costs, (iii) the assumption and assignment of executory contracts and unexpired leases and/or (iv) adequate assurance of future performance (if the Auction takes place) | **June 29, 2023, at 5:00 p.m. (prevailing Central Time)** |
| Sale Hearing | **June 30, 2023, at [●]:[●] [a/p].m. (prevailing Central Time)** |

## II.    RELIEF REQUESTED

26.    Pursuant to sections 105(a), 363, 365, 503 and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, and 9014, and the United States Bankruptcy Court of Eastern District of Missouri *Chapter 11 Guidelines for Sales and Sale Procedures Motions* ("***Local Guidelines***"), the Debtor seeks entry of the Bid Procedures Order:

a.    authorizing and approving the Bid Procedures substantially in the form attached as Exhibit A to the Bid Procedures Order;

b.    designating and approving the Stalking Horse Bidder and approving the Stalking Horse Bid Protections (as defined herein) for the Stalking Horse Bidder, in accordance with the terms and conditions set forth in the Stalking Horse Agreement, the Bid Procedures, and the Bid Procedures Order;

c.    authorizing and scheduling the deadline for potential bidders to submit a proposal to purchase the St. Louis Assets ("***Bid Deadline***"), an auction ("***Auction***") if necessary, and a hearing with respect to the approval of a proposed Transaction ("***Sale Hearing***");

9

SL 5985701.3

    d.      authorizing and approving notice of the sale of the St. Louis Assets, the Auction, and the Sale Hearing, substantially in the form of the Transaction Notice, attached hereto as **Exhibit 5**;

    e.      authorizing and approving the procedures set forth in the Bid Procedures Order ("***Assumption and Assignment Procedures***") for the assumption and assignment of the Contracts (defined herein) and the determination of the Cure Costs (defined herein); and

    f.      authorizing and approving the form and manner of notice to each non-Debtor counterparty (each, a "***Counterparty***") to a relevant executory contract or unexpired non-residential real property lease of the Debtor (collectively, the "***Contracts***") regarding (a) the Debtor's potential assumption and assignment of Contracts and the Debtor's calculation of the amount necessary to cure any defaults thereunder (the "***Cure Costs***"), and (b) the information supporting the Successful Bidder's ability to comply with the requirements of adequate assurance of future performance under section 365(f)(2)(B) of the Bankruptcy Code (the "***Adequate Assurance Information***") substantially in the form attached as Exhibit C to **Exhibit 3** hereto ("***Assumption and Assignment Notice***").

Following entry of and compliance with the Bid Procedures Order, the Debtor will seek entry of the Sale Order, substantially in the form attached hereto as **Exhibit 4,** authorizing and approving the following:

    a.      the sale of the St. Louis Assets free and clear of all liens, claims, interests, and encumbrances, except certain permitted encumbrances as determined by the Debtor and any purchaser of the St. Louis Assets, with liens, if any, to attach to the proceeds of the applicable Transaction(s);

    b.      the assumption and assignment of proposed assumed Contracts in connection with the Transaction(s); and

    c.      granting related relief.

**A.**      **Bid Procedures**

27.      As a result of the extensive Prepetition Sale and Marketing Process conducted by the Investment Banker and the Debtor, the Debtor and its advisors believe they have adequately tested the marketplace for the purchase of the St. Louis Assets. Sale Declaration ¶ 13. As such, the Debtor intends to implement a streamlined sale and marketing process that contemplates an auction if the Debtor receives a higher or otherwise better bid than the Stalking Horse Bid. *Id*. The Bid

10

Procedures are designed to maximize value for the St. Louis Assets and will enable the Debtor to review, analyze, and compare all bids received to determine which bid is the highest or best offer for the St. Louis Assets. *Id.*

28.     The Bid Procedures describe, among other things, procedures for parties to access due diligence, the way bidders and bids become "qualified," the receipt and negotiation of bids received, the conduct of the Auction (if any), the selection and approval of the ultimately successful bidder (a "***Successful Bidder***") and bid (a "***Successful Bid***"), and the deadlines with respect to the Bid Procedures. The Debtor submits that the Bid Procedures afford it the opportunity to pursue a streamlined sale process that will maximize the value of the St. Louis Assets.

29.     In accordance with the Local Guidelines 3(a), the material terms of the Bid Procedures are summarized below.[1]

| MATERIAL TERMS OF THE BID PROCEDURES | |
|---|---|
| Provisions Governing Qualification of Bidders and Qualified Bids<br><br>Local Guidelines 3(a)(i)-(ii) | 1.  **Bid Deadline** – Deadline to submit a binding and irrevocable offer to acquire the St. Louis Assets is **June 16, 2023, at 5:00 p.m.** (prevailing Central Time) ("***Bid Deadline***").<br><br>2.  **Potential Bidder Requirements** – To access the data room of the Debtor's material documents, a potential bidder ("***Potential Bidder***") must submit:<br><br>    a.  <u>Confidentiality Agreement</u>. An executed confidentiality agreement in form and substance reasonably satisfactory to the Debtor (unless such party is already a party to an existing confidentiality agreement with the Debtor that is acceptable to the Debtor for this due diligence process, in which case such agreement shall govern).<br>    b.  <u>Financial Wherewithal</u>. Sufficient information, as reasonably determined by the Debtor, to allow the Debtor to determine that the interested party (a) has the financial wherewithal to consummate the applicable Transaction and (b) intends to access the data room for a purpose consistent with the Bid Procedures.<br><br>3.  **Qualified Bid Requirements**. The Debtor, in its reasonable judgment, will determine whether any bid qualifies as a Qualified Bid. The Stalking |

---

[1] To the extent that there is any inconsistency between the terms of the Bid Procedures and the summary set forth herein, the terms of the Bid Procedures shall control.

SL 5985701.3

Horse Bid shall be a Qualified Bid. For any other bid to constitute a Qualified Bid, it must contain the following:

a. <u>Identity of Bidder</u>. A Qualified Bid must fully disclose, by its legal names, the identity of the Potential Bidder and each entity that will be participating in its bid (including any equity owners or sponsors, if the Potential Bidder is an entity formed for the purpose of consummating the Sale Transaction, and the complete terms of any such participation).

b. <u>St. Louis Assets Purchased</u>. A Qualified Bid must in the Proposed Purchase Agreement, clearly identify in writing the particular St. Louis Assets the Potential Bidder seeks to acquire from the Debtor, together with a redline comparing the Proposed Purchase Agreement against the Stalking Horse Agreement.

c. <u>Purchase Price</u>; The price ("**_Purchase Price_**") proposed to be paid for the specified New Yor Assets in U.S. Dollars. In addition, (a) a bid must propose a Purchase Price equal to or greater than the sum of (1) the value of Stalking Horse Bid; and (2) the initial overbid ("**_Initial Overbid_**"), consisting of the sum of the Purchaser Reimbursable Expenses plus an additional cash amount such that the total Initial Overbid Amount shall be equal to a sum greater than or equal to 5.5% of the Initial Stalking Horse Purchase Price.

d. <u>Acquired Assets</u>. The St. Louis Assets that the Potential Bidder seeks to acquire.

e. <u>Excluded Assets</u>. The St. Louis Assets that the Potential Bidder does not seek to acquire.

f. <u>Assumed Liabilities</u>. The liabilities the Potential Bidder seeks to assume. For the avoidance of doubt, a Qualified Bid may include assumption of fewer than all or substantially all of Debtor's liabilities.

g. <u>Excluded Liabilities</u>. The liabilities of the Debtor that the Potential Bidder does not seek to assume.

h. <u>Form of Consideration</u>. Each bid must (a) indicate whether it is an all cash offer (including confirmation that the cash component of the bid is based in U.S. Dollars) or consists of certain non-cash components, such as a credit bid pursuant to section 363(k) of the Bankruptcy Code and/or the assumption of liabilities and (b) provide sufficient cash consideration specifically designated for the payment of the Purchaser Reimbursable Expenses.

i. <u>Credit Bid</u>. Persons or entities holding a perfected security interest in any St. Louis Assets of the Debtor may, pursuant to section 363(k) of the Bankruptcy Code, seek to submit a "credit bid" for such St. Louis Assets, to the extent permitted by applicable law, any Bankruptcy Court orders, and the documentation governing the Debtor's prepetition or post-petition secured credit facilities. A credit bid must include a commitment to provide cash consideration sufficient to pay the Purchaser Reimbursable Expenses payable to the Stalking Horse Bidder under the terms of the Stalking Horse Agreement.

j. <u>Unconditional Offer/No Financial Contingencies</u>. A commitment that the bid is formal, binding, and unconditional (except for those

SL 5985701.3

conditions expressly set forth in the applicable Proposed Purchase Agreement), is not subject to any further due diligence or to any financing contingency, and shall be irrevocable until the Debtor notifies such Potential Bidder that such bid has not been designated as a Successful Bid or a Back-Up Bid, or with respect to the Back-Up Bid, until the Back-Up Bid Expiration Date (as defined below).

k.  Proof of Financial Ability to Perform. Each bid must contain such financial and other information that allows the Debtor to make a reasonable determination as to the Potential Bidder's financial and other capabilities to consummate the applicable Transaction, including, without limitation, such financial and other information setting forth adequate assurance of future performance in satisfaction of the requirements under section 365(f)(2)(B) of the Bankruptcy Code, and the Potential Bidder's ability to perform under any contracts that are assumed and assigned to such party. Without limiting the foregoing, such information must include current financial statements or similar financial information certified to be true and correct as of the date thereof, proof of financing commitments (if needed) to close the applicable Transaction (not subject to any unreasonable conditions, in the Debtor's sole discretion), contact information for verification of such information, including any financing sources, and any other information reasonably requested by the Debtor that is necessary to demonstrate that the Potential Bidder has the ability to close the applicable Sale Transaction in a timely manner.

To the extent that a bid is not accompanied by evidence of the Potential Bidder's capacity to consummate the Transaction set forth in its bid with cash on hand (or other immediately available cash), each bid must include committed financing documents that demonstrate to the Debtor's satisfaction that the Potential Bidder has received sufficient debt and/or equity funding commitments to satisfy the Potential Bidder's Purchase Price and other obligations under its bid.

l.  Designation of Contracts and Leases. Each bid must identify with particularity each and every executory contract and unexpired lease (collectively, the "**Contracts**"), the assumption and assignment of which is contemplated by the applicable Transaction (collectively, "**Proposed Assumed Contracts**"); provided, that the Proposed Purchase Agreement may allow the Potential Bidder to add and remove Contracts from the schedule of Proposed Assumed Contracts any time prior to [five (5) business days] prior to entry of an order authorizing the Transaction and may allow for certain contracts to be assumed and assigned following the closing of the Sale Transaction on substantially the terms included in the Stalking Horse Agreement. The Debtor shall provide notice to the applicable non-Debtor Contract and Lease contract counterparties (each a "**Counterparty**") of such removal and/or addition of such

13

Counterparty's Contract and Lease as soon as reasonably practicable.

m. _Required Approvals._ A statement or evidence reflecting (i) the Potential Bidder's plan and ability to obtain all requisite governmental, regulatory, or other third-party approvals and the proposed timing for the Potential Bidder to undertake the actions required to obtain such approvals; and (ii) that the bid is reasonably likely (based on antitrust or other regulatory issues, experience, and other considerations) to be consummated, if selected as the Successful Bid or the Back-Up Bid, within a time frame acceptable to the Debtor. A Potential Bidder further agrees that its attorneys will discuss with and explain to the Debtor's attorneys such Potential Bidder's regulatory analysis, strategy, and timeline for securing all such approvals as soon as reasonably practicable.

n. _Disclosure of Identity and Corporate Authorization._ Each bid must (i) fully disclose, by their legal names, the identity of the Potential Bidder and each entity that will be participating in its bid (including any equity owners or sponsors, if the Potential Bidder is an entity formed for the purpose of consummating the Transaction), and the complete terms of any such participation, and (ii) include evidence of corporate authorization and approval from the Potential Bidder's board of directors (or comparable governing body), if necessary, with respect to the submission, execution, and delivery of a bid, participation in the Auction, and closing of the transactions contemplated by the Potential Bidder's Proposed Purchase Agreement in accordance with the terms of the bid and the Bidding Procedures.

o. _Employee Obligations._ Each bid must specify (i) whether the Qualified Bidder intends to hire some or all of the employees employed by the Debtor and (ii) indicate the treatment of the compensation, incentive, retention, bonus or other compensatory arrangements, plans, or agreements, including, offer letters, employment agreements, consulting agreements, severance arrangements, retention bonus agreements, change in control arrangements, pension plans, retiree benefits, collective bargaining agreements, and any other employment related agreements of the Debtor (collectively, the "***Employee Obligations***").

p. _No Entitlement to Break-Up Fee, Expense Reimbursement, or Other Amounts._ Except for the Stalking Horse Bid, each bid must expressly state that the bid does not entitle the Potential Bidder to any break-up fee, termination fee, expense reimbursement, or similar type of payment or reimbursement, and a waiver of any substantial contribution administrative expense claims under section 503(b) of the Bankruptcy Code related to the bidding process.

q. _Disclosure of Connections._ Each bid must fully disclose any connections or agreements with the Debtor, any other known Potential Bidder and/or any officer or director of the Debtor.

14

r.   Joint Bids. The Debtor will be authorized to approve joint bids, including joint credit bids, in their reasonable discretion on a case-by-case basis.

s.   Representations and Warranties. Each bid must include the following representations and warranties:

   i.   a statement that the Potential Bidder has had an opportunity to conduct any and all due diligence regarding the applicable St. Louis Assets prior to submitting its Bid;

   ii.   a statement that the Potential Bidder has relied solely upon its own independent review, investigation, and/or inspection of any relevant documents, as well as the St. Louis Assets to be purchased and the liabilities to be assumed (as applicable), in making its bid and has not relied on any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express or implied, by operation of law or otherwise, regarding such St. Louis Assets or liabilities or the completeness of any information provided in connection therewith, except as expressly stated in the representations and warranties contained in the Potential Bidder's Proposed Purchase Agreement ultimately accepted and executed by the Debtor;

   iii.   a statement that the Potential Bidder agrees to serve as Back-Up Bidder, if its Bid is selected as the next highest or otherwise best bid after the Successful Bid with respect to the applicable St. Louis Assets;

   iv.   a statement that the Potential Bidder has not engaged in any collusion with respect to the submission of its bid;

   v.   a statement that all proof of financial ability to consummate the applicable Transaction in a timely manner and all information provided to support adequate assurance of future performance is true and correct; and

   vi.   a statement that the Potential Bidder agrees to be bound by the terms of these Bidding Procedures

t.   Additional Requirements. A Potential Bidder must also accompany its bid with

   i.   a good faith cash deposit in the amount of no less than ten percent (10%) of the cash portion of the Purchase Price (a "**Deposit**"), unless otherwise agreed to by the Debtor and a Potential Bidder, which shall be deposited prior to the Bid Deadline with an escrow agent selected by the Debtor (the "**Escrow Agent**") pursuant to an escrow agreement to be entered into between the Debtor and the Escrow Agent; provided, however, that a Potential Bidder submitting a credit bid will not be required to accompany its bid with a Deposit for any portion of the Purchase Price that is a credit bid, but shall be required to provide a Deposit for any portion of its bid that is not a credit bid; provided, further, that to the extent a Qualified Bidder increases the cash portion of the Purchase Price before, during, or after the Auction, the Debtor reserves the right to require that such Qualified Bidder adjust its

15

| | |
|---|---|
| | Deposit so that it equals ten percent (10%) of the increased cash portion of the Purchase Price; |
| | ii.   the contact information of the specific person(s) whom the Debtor or its advisors should contact in the event that the Debtor has any questions or wishes to discuss the bid submitted by the Potential Bidder; |
| | iii.   a covenant to cooperate with the Debtor to provide pertinent factual information regarding the Potential Bidder's operations reasonably required to analyze issues arising with respect to any applicable antitrust laws and other applicable regulatory requirements; and |
| | iv.   a detailed analysis of the value of any non-cash component of the bid, if any, and back-up documentation to support such value. |
| **Provisions Providing Bid Protections to "Stalking Horse" or Initial Bidder**<br><br>Local Guidelines 3(a)(iii)(A)-(D) | 1.   <u>Purchaser Reimbursable Expenses</u>. If the Stalking Horse Bidder terminates the Stalking Horse Agreement due to the Debtor entering into a definitive agreement with respect to a Bidder who is not the Stalking Horse Bidder, and the Debtor subsequently consummates a sale with that same Bidder, the Stalking Horse Bidder shall be entitled to the Purchaser Reimbursable Expenses, which includes, subject to the Stalking Horse Bidder's payment of the Seller Reimbursable Expenses (as defined in the Stalking Horse Agreement), the reasonable, documented actual costs and expenses incurred and paid by the Stalking Horse Bidder with respect to the Stalking Horse Bidder's preparation of the Due Diligence Reports (as defined in the Stalking Horse Agreement), the fees and expenses arising out of or in connection to the preparation and presentation of the said due diligence not to exceed 2.5% of the Aggregate Purchase Price, and the reasonable, documented actual costs and expenses incurred and paid by the Stalking Horse Bidder for solicitor and attorney fees (said solicitor and attorney fees not to exceed 1% of the Aggregate Purchase Price), which said total Purchaser Reimbursable Expenses shall not exceed 3.5% of the Aggregate Purchase Price. For the avoidance of doubt, the Purchaser Reimbursable Expenses shall not include (i) the actual costs and expenses incurred and paid by Stalking Horse Bidder with respect to preparation of any due diligence reports for non-Purchased Assets; and/or (ii) the actual costs and expenses incurred and paid by Stalking Horse Bidder with respect to preparation of any due diligence reports for which Purchaser has already received reimbursement. *See* Stalking Horse Agreement.<br>2.   <u>Initial Overbid Amount</u>. To be considered a Qualified Bid, a bid must be equal to or exceed the value of the Stalking Horse Bid, plus the sum of the Purchaser Reimbursable Expenses, and an additional cash amount such that the total Initial Overbid Amount shall be equal to a sum greater than or equal to 5.5% of the Initial Stalking Horse Purchase Price.[2]<br>3.   <u>Minimum Overbid Amount</u>. Shall be no less than 1.9% of the Initial Stalking Horse Purchase Price. |

---

[2] The Initial Stalking Horse Purchase Price is defined in the Stalking Horse Agreement as "the sum of: (a) Four Million Five Hundred Thousand Dollars ($4,500,000); <u>plus</u> (b) an amount equal to ninety-five percent (95%) of the aggregate total of the Receivables less the Zero-Rated Receivables as of the date of Closing."

SL 5985701.3

| | |
|---|---|
| | 4. <u>Treatment of Purchaser Reimbursable Expenses</u>. The Purchaser Reimbursable Expenses, to the extent triggered by the terms of the Stalking Horse Agreement, shall be paid at the closing of an Alternative Transaction, provided however, if the Purchaser Reimbursable Expenses are, for some reason, not paid at the closing of the Alternative Transaction, the Debtor's obligation to pay the Purchaser Reimbursable Expenses, to the extent triggered by the terms of the Stalking Horse Agreement, shall constitute an allowed super-priority administrative expense against Seller's bankruptcy estate pursuant to Sections 105(a), 363, 364, 503(b) and 507(a)(2) of the Bankruptcy Code, with priority over all other administrative expenses. <br><br> 5. <u>Stalking Horse Credit Bid</u>. If the Stalking Horse Bidder bids at the Auction for the St. Louis Assets that are the subject of its Stalking Horse Bid, such Stalking Horse Bidder will also be entitled to include the amount of the applicable Purchaser Reimbursable Expenses in its bid, such that the cash and other consideration proposed by the Stalking Horse Bidder plus the applicable Purchaser Reimbursable Expenses must exceed the most recent bid by at least the Minimum Overbid Amount. |
| **Modification of Bidding and Auction Procedures** <br><br> **Local Guidelines 3(a)(iii)(E)** | 1. The Debtor may extend the Bid Deadline for all or certain Potential Bidders, without further order of the Bankruptcy Court. <br><br> 2. The Auction may be held virtually pursuant to procedures filed by the Debtor on the Bankruptcy Court's docket or may be held at another time and date as may be determined by the Debtor. <br><br> 3. The Debtor reserves the right to work with any Potential Bidder in advance of the Auction to cure any deficiencies in a bid that is not initially deemed a Qualified Bid and to clarify or otherwise improve such bid that it may be designated a Qualified Bid. <br><br> 4. The Debtor reserves the right to and may increase or decrease the Minimum Overbid Amount at any time during the Auction. <br><br> 5. The Debtor may, in the exercise of its reasonable business judgment, adopt rules for the Auction consistent with the Bid Procedures and the Bid Procedures Order that the Debtor reasonably determines to be appropriate to promote a competitive Auction. <br><br> 6. At the Auction, the Debtor, in its reasonable business judgment will be permitted to request best and final offers from the Qualified Bidders (including the Stalking Horse Bidder). <br><br> 7. The Sale Hearing may be adjourned or continued to a later date by the Debtor by sending notice prior to or making an announcement at the Sale Hearing. No further notice of any such adjournment or continuance will be required to be provided to any party. <br><br> 8. The Debtor may extend the applicable Sale Objection deadline, as the Debtor deems appropriate in the exercise of its reasonable business judgment. |
| **Closing with Alternative Backup Bidders** <br><br> **Local Guidelines 3(a)(iii)(F)** | 1. The Debtor may identify which Qualified Bid(s) constitute the second highest or otherwise best bid(s) and deem each such bid(s) a Back-Up Bid. <br><br> 2. Back-Up Bid(s) shall remain open and irrevocable until the earliest to occur of (such date, the "***Back-Up Bid Expiration Date***"): <br> a. applicable outside date for consummation of the Transaction set forth in the Back-Up Bid; <br> b. consummation of a Transaction with a Successful Bidder; and <br> c. release of such Back-Up Bid by the Debtor in writing. |

SL 5985701.3

| | |
|---|---|
| | 3. If a Transaction with a Successful Bidder is terminated prior to the Back-Up Bid Expiration Date, the Back-Up Bidder shall be deemed the Successful Bidder and shall be obligated to consummate the Back-Up Bid as if it were the Successful Bid. |
| **Provisions Governing the Auction**<br><br>**Local Guidelines 3(b)** | 1. If the Debtor does not receive any Qualified Bids (other than the Stalking Horse Bid,) for any of the St. Louis Assets on the same or better terms as provided in the Stalking Horse Bid by the Bid Deadline, the Debtor will not conduct the Auction and shall publish a notice with the Bankruptcy Court by **June 19, 2023 at 5:00 pm (prevailing Central Time)** indicating that the no Auction will be held and designating the Stalking Horse Bid as the Successful Bid and the Stalking Horse Bidder as the Successful Bidder.<br>2. If the Debtor receives more than one Qualified Bid for any St. Louis Asset (including the Stalking Horse Bid), the Debtor will conduct the Auction on **June 20, 2023, beginning at 9:00 a.m. (prevailing Central Time)** (i) at the offices of Spencer Fane LLP, 1 North Brentwood Boulevard, Suite 1200, St. Louis, MO 63105, (ii) virtually pursuant to procedures to be filed by the Debtor on the Bankruptcy Court's docket prior to the Auction, or (iii) at such other date or location as may be determined by the Debtor.<br><br>**Participants and Attendees at Auction:**<br>1. Only Qualified Bidders are eligible to participate in the Auction.<br>2. Professionals and/or other representatives of the Debtor and Qualified Bidders shall be permitted to attend and observe the Auction.<br>3. Any creditor of the Debtor may attend and observe the Auction; <u>provided</u>, that such creditor provides the Debtor with written notice of its intention to attend the Auction on or before one (1) business day prior to the Auction, which written notice shall be sent to the proposed attorneys for the Debtor via electronic mail.<br><br>**Auction Procedures:**<br>1. <u>Open Auction</u>. The Auction will be conducted openly and shall be transcribed or recorded.<br>2. <u>Baseline Bids</u>. Bidding for the St. Louis Assets will start with the highest or otherwise best offer received, as determined by the Debtor in its sole discretion.<br>3. <u>Minimum Overbid</u>. Bidding shall begin in the amount of the Minimum Overbid Amount. The Debtor has the right to increase or decrease the Minimum Overbid Amount at any time during the Auction.<br>4. <u>No Collusion</u>: Each Potential Bidder must confirm in writing and on the record that it has not engaged in any collusion and that its Bid represents a binding, good faith, bona fide offer.<br>5. <u>Disclosure of Bids</u>. All material terms of each Qualified Bid submitted in response to any successive bids made at the Auction will be disclosed to all other bidders.<br>6. <u>Confidentiality</u>. All parties attending the Auction must keep the proceedings and results of the Auction confidential until the Debtor has closed the Auction; provided, that parties may speak with clients or parties necessary to place their bid or increase it so long as such individuals are advised of the confidentiality restrictions provided hereunder and in the confidentiality agreements. |

SL 5985701.3

30.     The Debtor believes that the time periods set forth in the Bid Procedures are reasonable and appropriate. The Debtor's business has been extensively marketed to strategic and financial investors in recent months and information regarding the Debtor's business has been made available in an electronic data room during such process. Many parties that may have an interest in bidding at the Auction likely already have conducted diligence and evaluated the Debtor's business and will not be bidding in a vacuum. In addition, potential bidders that have not previously conducted diligence on the Debtor's business will have immediate access to, subject to the execution of an appropriate confidentiality agreement, a substantial body of information regarding the Debtor's assets, including information gathered based upon specific due diligence requests of the Stalking Horse Bidder and other prepetition bidders.

31.     In addition, the timeline proposed considers that an efficient timeline will minimize administrative expenses and maximize recoveries ultimately available for unsecured creditors.

**B.     Stalking Horse Agreement**

32.     Pursuant to the Stalking Horse Agreement, the Stalking Horse Bidder is purchasing substantially all of the St. Louis Assets and assuming certain liabilities, as well as certain executory contracts and unexpired leases (collectively, "***Proposed Assumed Contracts***").

33.     The Stalking Horse Agreement does not provide for the payment of a break-up or termination fee. Instead, the Stalking Horse Agreement only provides for the payment of the Stalking Horse Bidder's actual, documented, and reasonable out-of-pocket costs and expenses that are incurred by the Stalking Horse Bidder in connection with the negotiation, documentation, execution, and performance of the Stalking Horse Agreement, the Transaction, and all proceedings incident thereto ("***Purchaser Reimbursable Expenses***" and as specifically defined in the Stalking

19

SL 5985701.3

Horse Agreement).[3] The Purchaser Reimbursable Expenses shall not exceed 3.5% of the Aggregate Purchase Price, and the amount attributable to attorney fees shall not exceed 1% of the Aggregate Purchase Price.

34.     The Purchaser Reimbursable Expenses are payable at the closing of an Alternative Transaction, provided however, that if, for some reason, the Purchaser Reimbursable Expenses are not paid at the closing of an Alternative Transaction, the Purchaser Reimbursable Expenses will be deemed a super-priority administrative expense, with priority over all other administrative expenses in the event that the Stalking Horse Agreement is terminated by the Stalking Horse Bidder as a result of a material breach by the Debtor or the Debtor enters into a definitive agreement with respect to a Bidder that is not the Stalking Horse Bidder, and in each case, the Debtor subsequently consummates a sale with another bidder. The Bid Procedures also provide for initial overbid minimum and subsequent bidding increment requirements for bids submitted for the St. Louis Assets (the Purchaser Reimbursable Expenses and the other bid protections described in this paragraph collectively are referred to as the **"*Stalking Horse Bid Protections*"**). In the event the Auction is held and the Stalking Horse Bidder is not the winning bidder, the Stalking Horse Bidder has agreed to act as a "Back-Up Bidder" and, as such, hold open its binding offer to purchase the St. Louis Assets for a period of time after the Auction in the event the winning bid at the Auction is not consummated.

---

[3] The Stalking Horse Agreement defines Purchaser Reimbursable Expenses as "the reasonable, documented actual costs and expenses incurred and paid by Purchaser with respect to Purchaser's preparation of the Due Diligence Reports (the fees and expenses arising out of or in connection to the preparation and presentation of the said due diligence not to exceed 2.5% of the Aggregate Purchase Price), and the reasonable, documented actual costs and expenses incurred and paid by Purchaser for solicitor and attorney fees [(said solicitor and attorney fees not to exceed 1% of the Aggregate Purchase Price)], which said total Purchaser Reimbursable Expenses shall not exceed 3.5% of the Aggregate Purchase Price. For the avoidance of doubt, the Purchaser Reimbursable Expenses shall not include (i) the actual costs and expenses incurred and paid by Purchaser with respect to preparation of any due diligence reports for non-Purchased Assets; and/or (ii) the actual costs and expenses incurred and paid by Purchaser with respect to preparation of any due diligence reports for which Purchaser has already received reimbursement."

SL 5985701.3

35.    In accordance with the Local Guideline 2(c), the chart below summarizes the significant terms of the Stalking Horse Agreement:

| Material Terms of the Stalking Horse Agreement | |
| --- | --- |
| **Stalking Horse Agreement Provision** | **Summary Description** |
| **Purchase Price** | Equal to the sum of: (a) Four Million Five Hundred Thousand Dollars ($4,500,000); plus (b) in the event there is any Initial Overbid and/or any Subsequent Overbids, but Stalking Horse Bidder is the successful bidder at the Auction, the sum of such overbid amounts (net of the amount of the Purchaser Reimbursable Expenses, less payment of the Seller Reimbursable Expenses); plus (c) an amount equal to ninety-five percent (95%) of the aggregate total of the Receivables less the Zero Rated Receivables as of the date of Closing; minus (d) Customer Credits as of the Closing Date.<br><br>*See* Stalking Horse Agreement § 3.1 |
| **Purchased Assets** | Substantially all the assets and operations of the Debtor related to the business of the Debtor located at 1720 Sublette Avenue in St. Louis, Missouri.<br><br>*See* Stalking Horse Agreement § 2.2 |
| **Assumed Liabilities** | 1.  Liabilities arising under the terms of each Purchased Contract, solely to the extent arising after the Closing Date, but excluding any Liabilities arising out of or related to any breach or default thereof occurring at or prior to the Closing or arising out of any event or circumstance occurring at or prior to the Closing which, with the delivery of notice, lapse of time or both, would constitute a breach or default thereof;<br>2.  all Liabilities of Seller to investigate and remediate the presence of Hazardous Materials in, on, under or below the Owned Real Property to the extent arising under Environmental Laws, whether the disposal or other release of such Hazardous Materials occurred before or after the Closing, including those Liabilities set forth on Section 2.4(b) of Seller's Disclosure Schedule ("Environmental Liabilities"); for the avoidance of doubt, the assumed Environmental Liabilities include only conditions on, in, under and below, or migrating to or from the Owned Real Property, and do not include any Seller's Liabilities, whatever the same may be, to third parties associated with Seller's arrangement at any time for the management and/or off-site treatment, storage and/or disposal of any Hazardous Material;<br>3.  any and all real property taxes and assessments assessed and/or levied upon the Owned Real Property from and after the Closing; and<br>4.  all Liabilities set forth on Section 2.4(d) of Seller's Disclosure Schedule<br><br>*See* Stalking Horse Agreement § 2.4 |
| **Sale to Insider** Local Guidelines 2(c)(i) | The Transaction is not to an insider. |

| | |
|---|---|
| **Agreements with Management** Local Guidelines 2(c)(ii) | There are no agreements with management. |
| **Releases** Local Guidelines 2(c)(iv) | Customary release documentation evidencing the release and termination of all Claims and Liens, if any, associated with all indebtedness owed by Seller to the Secured Lender with respect to the Purchased Assets.<br><br>*See* Stalking Horse Agreement § 8.3(f) |
| **Private Sale/No Competitive Bidding** Local Guidelines 2(c)(iv) | The Stalking Horse Agreement is subject to better or otherwise higher bids at an auction.<br><br>*See* Stalking Horse Agreement § 6.2(c)-(f) |
| **Closing and Other Deadlines** Local Guidelines 2(c)(v) | The Debtor must comply with the following milestones:<br><br>1. on or within five (5) business days of the Petition Date, the Debtor shall have filed a motion seeking entry of the Bid Procedures Order;<br>2. Debtor shall seek to have a hearing occur on or within twenty-one (21) days of filing the Bid Motion;<br>3. Debtor shall seek to have the Bankruptcy Court enter the Bid Procedures Order on or within thirty (30) days of filing the Bid Motion;<br>4. final date for submitting a qualified bid, as set forth in the approved Bid Procedures Order, shall be no later than thirty (30) days after the Bankruptcy Court's entry of the Bid Procedures Order ("***Bid Deadline***");<br>5. Debtor shall hold the Auction, if any, no later than two (2) business days after the Bid Deadline; and<br>6. on or within fourteen (14) business days after the conclusion of the Auction, the Bankruptcy Court shall enter the Sale Order.<br><br>*See* Stalking Horse Agreement § 6.2(d)<br><br>The outside date for closing is October 1, 2023, subject to extension by written mutual consent of Debtor and the Stalking Horse Bidder<br><br>*See* Stalking Horse Agreement § 9.1(d) |
| **Good Faith Deposit** Local Guidelines 2(c)(vi) | Immediately upon execution of the Stalking Horse Agreement, the Stalking Horse Bidder shall pay a deposit of $450,000 to the Escrow Agent.<br><br>The deposit will be (a) applied to the purchase price if the closing occurs, (b) released to the Debtor if the Debtor terminates the Stalking Horse Agreement for the Stalking Horse Bidder's breach or (c) returned to the Stalking Horse Bidder if the Stalking Horse Agreement is terminated for any reason other than by Debtor for the Stalking Horse Bidder's breach.<br><br>*See* Stalking Horse Agreement §§ 3.2; 3.3(a); 3.4; 9.1(e) |
| **Interim Arrangements** | There are no interim arrangements with the Stalking Horse Bidder. |

22

| | |
|---|---|
| with Stalking Horse Bidder Local Guidelines 2(c)(vii) | |
| Use of Proceeds Local Guidelines 2(c)(vii) | Promptly following the Closing, the cash proceeds of the sale shall be paid by the Debtor as follows: (a) Debtor shall apply the net sale proceeds of the sale of the New York Assets, including after payment of any Court-approved commission related to the sale and payment of the Purchaser Reimbursable Expenses (to the extent payable pursuant to the Agreement and the Bid Procedures Order), consistent with the terms of the DIP Order, to pay all outstanding DIP obligations, if any; (b) remainder shall be retained by the Debtor pending further order of the Court.<br><br>Sale Order ¶ 22 |
| Tax Exemption Local Guidelines 2(c)(ix) | Presently under the circumstances, exemption pursuant to 11 U.S.C. Section 1146(a) is not sought under the expectation that the sale will close prior to the confirmation of the Debtor's chapter 11 plan. |
| Record Retention Local Guidelines 2(c)(x) | The books and records and related documentation remaining with the Debtor include all books and records concerning the Excluded Assets and Retained Liabilities, which includes those required by Debtor in connection with administering the Case<br><br>Stalking Horse Agreement §§ 2.3; 2.5 |
| Sale of Avoidance Actions Local Guidelines 2(c)(xi) | The Stalking Horse Agreement provides that Vendor Avoidance Actions related to the Business and the Purchased Assets shall be included in the Purchased Assets. Vendor Avoidance Actions is defined in the Stalking Horse Agreement as "Avoidance Actions pursuant to 11 U.S.C. § 547 against pre-Petition Date vendors of Seller (i) for which such claims have not otherwise been resolved, waived, or settled pursuant to a pre-Closing order of the Court and (ii) for which the Seller has entered into a transaction within 90 days of the Petition Date or after the Petition Date."<br><br>This was requested by the Stalking Horse Bidder to facilitate smooth and efficient transition with vendors going forward on the going-concern basis.<br><br>Avoidance Actions other than the Vendor Avoidance Actions are Excluded Assets.<br><br>Stalking Horse Agreement §§ 2.2(l); 2.2(r); 2.3(p) |
| Requested Findings as to Successor Liability Local Guidelines 2(c)(xii) | The Stalking Horse Agreement proposes a sale free and clear of all claims, liens, and encumbrances, including successor liability, except as specifically assumed or permitted under the Stalking Horse Agreement.<br><br>*See* Stalking Horse Agreement §§ 2.1; 4.7<br><br>The proposed Sale Order provides that all Purchased Assets are being sold free and clear of all claims, liens, and encumbrances, including successor liability, except as specifically assumed or permitted under the Stalking Horse Agreement.<br><br>Sale Order ¶¶ T, DD, 20, 34, 35. |

SL 5985701.3

| | |
|---|---|
| **Sale Free and Clear of Unexpired Leases** Local Guidelines 2(c)(xiii) | The Stalking Horse Agreement proposes a sale free and clear of all claims, liens, and encumbrances, including successor liability, except as specifically assumed or permitted under the Stalking Horse Agreement. *See* Stalking Horse Agreement §§ 2.1; 4.7 The proposed Sale Order provides that all Purchased Assets are being sold free and clear of all claims, liens, and encumbrances, including successor liability, except as specifically assumed or permitted under the Stalking Horse Agreement. Sale Order ¶¶ T, V, X, Y, Z, HH, 12-14, 23. |
| **Credit Bid** Local Guidelines 2(c)(xiv) | Stalking Horse Bidder is authorized to "credit bid" the net value of the Purchaser Reimbursable Expenses after payment of the Seller Reimbursable Expenses as part of any overbid by the Stalking Horse Bidder. See Stalking Horse Agreement § 6.2(f) |
| **Relief from Bankruptcy Rule 6004(h)** Local Guidelines 2(c)(xv) | Relief from Bankruptcy Rule 6004(h) is sought Sale Order ¶ 47. |

C.      **Noticing Procedure**

36.      The Bid Procedures and Bid Procedures Order provide for procedures regarding noticing (the "***Noticing Procedures***"), including:

a.      **Sale Notice**. As soon as practicable, but no later than three (3) business days after entry of the Bid Procedures Order, the Debtor will file with the Bankruptcy Court, serve the Sale Notice which will set forth (i) a description of the St. Louis Assets for sale; (ii) the date, time, and place of the (A) Auction and (B) Sale Hearing; and (iii) the deadlines and procedures for objecting to the proposed Transaction(s).

b.      **Deadline to Cancel the Auction**: If no Qualified Bid is received, the Debtor shall file a notice cancelling the Auction and designating the Stalking Horse Bid as the Successful Bid by no later than **June 19, 2023, at 5:00 p.m. (prevailing Central Time)**.

c.      **Selection of Qualified Bids**. The Debtor will notify Bidders of (i) status as a Qualified Bidder and (ii) selection of Baseline Bid by no later than **June 19, 2023 at 5:00 p.m. (prevailing Central Time)**; <u>provided</u>, that the Debtor shall have the right to extend the Bid Deadline for any reason whatsoever, in its reasonable business judgment, for all or certain Potential Bidders (as defined in the Bidding Procedures), without further order of the Court.

SL 5985701.3

    **d.**    <u>**Notice of Auction Results**</u>. The Debtor shall file with the Court the notice of Auction results and designation of the Successful Bid and Back-Up Bid and, to the extent the Successful Bidder is not the Stalking Horse Bidder (a) provide Counterparties with Adequate Assurance Information for the Successful Bidder and (b) provide notice to Counterparties of Proposed Assumed Contracts designated by the Successful Bidder for assumption and assignment by no later than **June 22, 2023 at 5:00 p.m. (prevailing Central Time)**.

37.    The Noticing Procedures constitute adequate and reasonable notice of the key dates and deadlines for the sale process, including, among other things, the deadline to object to the proposed Transaction(s), the Bid Deadline, and the date, time and location of the Auction, and Sale Hearing. Accordingly, the Debtor requests that the Bankruptcy Court find that the Noticing Procedures are adequate and appropriate under the circumstances, and comply with the requirements of Bankruptcy Rules 2002 and 6004 and Local Rule 2002-1.

    **D.**    **Need for a Timely Sale Process**

38.    The Debtor believes that the time periods set forth in the Bid Procedures are reasonable and will provide parties with sufficient time and information to submit a bid for the St. Louis Assets. In formulating the Bid Procedures and time periods set forth therein, the Debtor balanced (i) on the one hand, the need to provide adequate and appropriate notice to parties in interest and potential bidders to ensure due process and a competitive bidding process that will maximize sale proceeds and (ii) on the other hand, the need to run a quick and efficient sale process to avoid administrative expenses that will decrease the realizable value available to creditors. To that end, the Bid Procedures are designed to encourage all prospective bidders to submit bids at the outset of this chapter 11 case to provide the highest or otherwise best available recoveries to the Debtor's stakeholders. As noted, the Debtor is beginning the post-petition sale and marketing process immediately, weeks prior to the Bid Procedures Hearing, thus ensuring a lengthy post-petition marketing process.

25

39.     The Debtor's formulation of the Bid Procedures was also informed by (i) the breadth of the Prepetition Sale and Marketing Process; (ii) the fact that all likely interested bidders have been contacted and have been provided information with which to formulate an informed and binding bid; and (iii) the transparency and collaboration among the Debtor and key stakeholders, many of which have been fully informed of the Prepetition Sale and Marketing Process. Furthermore, potential bidders have had, and, in accordance with the Bid Procedures, will continue to have access to comprehensive information prepared by the Debtor and their advisors that is compiled in an electronic data room, including information gathered based upon specific due diligence requests of the Stalking Horse Bid and other prepetition potential bidders.

40.     A timely sale process is also necessary because of the DIP Milestones and Sale Milestones, as detailed herein.

41.     Failure to adhere to the time periods set forth in the Bid Procedures and the DIP Milestones and Sale Milestones could jeopardize the closing of the Transaction, which the Debtor believes is the best means of maximizing the value of the St. Louis Assets, maintaining the business as a going concern, and minimizing claims against the Debtor's estate. In light of the foregoing, the Debtor has determined that pursuing the Transaction in the manner and with the procedures proposed is in the best interests of the Debtor's estate and provides interested parties with sufficient opportunity to participate.

     **E.**    **Assumption and Assignment Procedures**

42.     In connection with a Transaction, the Debtor seeks to assume and assign any known Contracts that are designated by a Successful Bidder (or its designated assignee(s)). The Assumption and Assignment Procedures set forth in the Bid Procedures Order are designed, among other things, to provide notice of the assumption/assignment and Cure Costs to relevant

Counterparties and govern the Debtor's provision of Adequate Assurance Information (as defined herein).

43.     The Debtor submits that the Assumption and Assignment Procedures as set forth in the Bid Procedures Order are reasonable and appropriate—they are fair to all non-Debtor Counterparties and comply in all respects with the Bankruptcy Code. The Debtor requests that the Assumption and Assignment Procedures be approved.

44.     As illustrated in the Bid Procedures, the Debtor will serve the Assumption and Assignment Notice on all Counterparties regarding the proposed assumption and assignment Proposed Assumed Contracts. The Assumption and Assignment Notice will identify the Debtor's calculation of any Cure Costs payable if the Debtor ultimately assumes and assigns such Contracts. Each Counterparty will then have ample time to object to the Debtor's calculation of such Cure Costs.

45.     Further, as set forth in the Bidding Procedures, for a bid to qualify as a "Qualified Bid" a Potential Bidder must include with its bid proof of its financial ability to perform (and the ability of its designated assignee, if applicable) in satisfaction of the requirements under section 365(f)(2)(B) with respect to any Contracts to be assumed and assigned ("***Adequate Assurance Information***"). Upon request, the Debtor will make available the Adequate Assurance Information to all Counterparties to the Proposed Assumed Contracts and such Counterparties will have an opportunity to file an objection in advance of the Sale Hearing as set forth in the Assumption and Assignment Procedures.

SL 5985701.3

## III.   RELIEF REQUESTED IS WARRANTED AND IN BEST INTEREST OF THE DEBTOR AND STAKEHOLDERS

### A.   The Bid Procedures are Fair and Reasonable.

46.   The Bid Procedures are designed to promote the paramount goal of any proposed sale of property of a debtor's assets—maximizing the value of sale proceeds received by the estate. *See In re Food Barn Stores, Inc.*, 107 F.3d 558, 564-65 (8th Cir. 1997) (recognizing that main goal of any proposed sale of property of a debtor's estate is to maximize value); *Wintz v. American Freightways, Inc. (In re Wintz Companies)*, 219 F.3d 807, 812-813 (8th Cir. 2000) (sale procedure providing for competitive bidding calculated to maximize value to the estate was deemed valid); *Burtch v. Ganz, et al. (In re Mushroom Co.)*, 382 F.3d 325, 339 (3d Cir. 2004) (finding that debtor had fiduciary duty to maximize and protect value of estate's assets). Courts uniformly recognize that procedures established for the purpose of enhancing competitive bidding are consistent with the fundamental goal of maximizing value of a debtor's estate. *See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 537 (3d Cir. 1999) (noting that bidding procedures that promote competitive bidding provide a benefit to a debtor's estate); *Official Comm. of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res. Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992) (observing that sale procedures "encourage bidding and . . . maximize the value of the debtor's assets").

47.   The Bid Procedures provide for an orderly, uniform, and competitive process through which interested parties may submit offers to purchase the St. Louis Assets. The Debtor, with the assistance of its advisors, have structured the Bid Procedures to promote active bidding by interested parties and to reach the highest or otherwise best offer reasonably available for the St. Louis Assets. Additionally, the Bid Procedures will allow the Debtor to conduct the Auction,

28

SL 5985701.3

if necessary, in a fair and transparent manner that will encourage participation by financially capable bidders with demonstrated ability to timely consummate a Transaction. Moreover, entry into the Stalking Horse Agreement ensures that the Debtor will obtain fair market value for the St. Louis Assets by setting a minimum price for the St. Louis Assets. As such, the Debtor and its creditors can be assured that the consideration obtained will be fair and reasonable.

48.     Courts in this and other districts have approved procedures substantially similar to the proposed Bid Procedures. *See, e.g. In re Briggs & Stratton Corporation, et al.*, No. 20-43597 (BSS) (Bankr. E.D. Mo. August 19, 2020) [Docket No. 505]; *In re Peabody Energy Corporation*, 1642529 (BSS) (Bankr. E.D. Mo. Jan. 12, 2017) [Docket No. 1964]; *In re Abengoa Bioenergy US Holding, LLC*, No. 16-41161 (KSS) (Bankr. E.D. Mo. June 12, 2016) [Docket No. 378]; *see also In re Bumble Bee Parent, Inc.*, Case No. 19-12502 (LSS) (Bankr. D. Del. Dec. 19, 2019) [Docket No. 171]; *In re Fusion Connect, Inc.*, Case No. 19-11811 (SMB) (Bankr. S.D.N.Y. July 3, 2019) [Docket No. 164]; *In re Southcross Energy Partners, L.P.*, Case No. 19-10702 (MFW) (Bankr. D. Del. Jun. 13, 2019) [Docket No. 324]; *In re Ditech Holding Corp.,* Case No. 19-10412 (JLG) (Bankr. S.D.N.Y. Apr. 23, 2019) [Docket No. 456]; *In re Waypoint Leasing Holdings Ltd.*, Case No. 18-13648 (SMB) (Bankr. S.D.N.Y. Dec. 21, 2018) [Docket No. 159]; *In re Sears Holdings Corp.,* Case No. 18-23538 (RDD) (Bankr. S.D.N.Y. Nov. 19, 2018) [Docket No. 816]; *In re Color Spot Holdings, Inc.*, Case No. 18-11272 (LSS) (Bankr. D. Del. Jun. 25, 2018) [Docket No. 134]. Accordingly, the Bid Procedures should be approved.

**B.     Stalking Horse Bid Protections are Reasonable and Appropriate**

49.     The Bid Procedures contain certain Stalking Horse Bid Protections for the Stalking Horse Bidder, such as the Initial Overbid and the Purchaser Reimbursable Expenses. Bid incentives such as these are necessary to incentivize a bidder to provide a floor price for the

29

Debtor's assets based on the bidder's due diligence and investigation pre-auction, which forms the basis for other potential bidders to come in and potentially overbid. Bidding incentives such as these Stalking Horse Bid Protections are commonplace in connection with sales under section 363 of the Bankruptcy Code. Approval of these protections in connection with a sale of assets has become a recognized practice in chapter 11 cases because it enables a debtor to ensure a sale to a contractually committed buyer at a price the debtor believes is fair, while providing the debtor with the potential of obtaining an enhanced recovery through an auction process. *See, e.g.*, *In re Armstrong Energy, Inc.*, No. 17-47541 (KAS) (Bankr. E.D. Mo. Dec. 1, 2017) [Docket No. 208] (no break-up fees were requested and court approved expense reimbursement in an amount not exceeding $1 million); *In re Briggs & Stratton Corporation, et al.*, No. 20-43597 (BSS) (Bankr. E.D. Mo. August 19, 2020) [Docket No. 505] (approving break-up fee and reimbursement fee of $19,250,000); *In re Peabody Energy Corp*., No. 16-42529 (BSS) (Bankr. E.D. Mo. Jan. 30, 2017) [Docket No. 2262] (approving a break-up fee of $200,000 and expense reimbursement in an amount not exceeding $150,000); *In re Noranda Aluminum, Inc*., No. 16-10083 (BSS) (Bankr. E.D. Mo. Oct. 19, 2016) [Docket No. 1306] (approving a break-up fee of $645,000 and expense reimbursement in the amount of $1 million); *In re Noranda Aluminum, Inc.*, No. 16-10083 (BSS) (Bankr. E.D. Mo. June 23, 2016) [Docket No. 898] (approving a break-up fee of $4.32 million, which is 1.5% of the cash purchase price, and expense reimbursement in an amount not exceeding $1.5 million); *In re Total Hockey, Inc.*, No. 16-44815 (CER) (Bankr. E.D. Mo. July 11, 2016) [Docket No. 78] (approving a breakup fee of $250,000); *In re Abengoa Bioenergy US Holding, LLC*, No. 16-41161 (KAS) (Bankr. E.D. Mo. June 15, 2016) [Docket No. 399] (approving a break-up fee equating to 2.5% of the cash purchase price, and expense reimbursement in an amount not exceeding $500,000).

30

50.     Approval of the Stalking Horse Bid Protections is appropriate under the circumstances. Courts in this circuit have stated that "bid procedures should provide a vehicle to enhance the bid." *In re President Casinos, Inc.*, 314 B.R. 784, 786 (Bankr. E.D. Mo. 2004) (citing *In re Food Barn Stores, Inc.*, 107 F.3d 558, (8th Cir. 1997) (discussing bid protections). Here, the Stalking Horse Bidder relied upon the agreement with the Debtor to seek the Stalking Horse Protections. The Stalking Horse Bid Protections are a normal and, indeed, necessary component of a sale outside the ordinary course. Such protections are material inducements to encourage a potential purchaser to invest the requisite time, money, and effort to conduct due diligence and participate in arms-length sale negotiations, despite the inherent risks of a chapter 11 process. *See, e.g., In re Hupp Indus.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1997) (without any reimbursement, "bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's. . . . due diligence"); *In re Marrose Corp.*, 1992 WL 33848, at *5 (Bankr. S.D.N.Y. 1992) (stating that "agreements to provide reimbursement of fees and expenses are meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers").

51.     As illustrated above, the Purchaser Reimbursable Expenses is reasonable and typical in cases such as this one. Furthermore, the remaining Stalking Horse Protections are fair, and reasonably compensate the Stalking Horse Bidder for taking actions that will benefit the Debtor's estate, and should be approved for the following reasons.

52.     First, the Stalking Horse Bid Protections are the product of good faith, arms-length negotiations between the Stalking Horse Bidder and the Debtor, which was acting in the interest of its estate consistent with its fiduciary duty. Sale Declaration ¶ 9. Furthermore, the Stalking Horse Agreement provisions relating to the Stalking Horse Bid Protections (as well as the other

31

SL 5985701.3

Stalking Horse Agreement provisions) were scrutinized by the Debtor's professionals and approved by the Debtor's boards of directors. Sale Declaration ¶ 9.

53.    Second, the Stalking Horse Bid Protections promote competitive bidding by inducing the Stalking Horse Bidder to hold its offer open as a minimum or floor bid for the Purchased Assets on which other bidders—and the Debtor—can rely. The Stalking Horse Bid Protections were a material inducement for, and a condition of, the Stalking Horse Bidder's agreement to enter into the Stalking Horse Agreement. Indeed, the Stalking Horse Agreement increases the likelihood that the price at which the Purchased Assets are sold will reflect their market value, and Stalking Horse Bidder is entitled to be compensated as a result. Sale Declaration ¶ 10.

54.    Third, the Stalking Horse Bid Protections are reasonable relative to the proposed purchase price in view of the substantial benefits that the Debtor will receive from having the Stalking Horse Agreement serve as a floor for bidders that submit a bid for the St. Louis Assets, which will confirm that the Debtor receives the highest or best offer for the St. Louis Assets. The Purchaser Reimbursable Expenses represents three and one-half percent (3.5%) of the Stalking Horse Cash Consideration, which is within the range of what courts in this District have held as reasonable. Moreover, the Stalking Horse Agreement provides the Debtor with a high likelihood of consummation with a contractually committed party at a fair and reasonable purchase price. Accordingly, the Stalking Horse Bid Protections will not deter or chill bidding, are reasonable, and will enable the Debtor to maximize the value of the St. Louis Assets.

## C.    Proposed Transaction Should Be Approved

55.    Ample authority exists for approval of the sale proposed by this Motion. Section 363 of the Bankruptcy Code provides, in relevant part, "[t]he trustee, after notice and a hearing,

SL 5985701.3

may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11

U.S.C. § 363(b)(1). Although section 363 does not specify a standard for determining when it is

appropriate for a court to authorize the use, sale, or lease of property of the estate, courts routinely

authorize a sale of a debtor's assets if such sale is based upon the sound business judgment of the

debtor. *See, e.g., See, e.g. In re Briggs & Stratton Corporation, et al.*, No. 20-43597 (BSS) (Bankr.

E.D. Mo. September 15, 2022) [Docket No. 898]; *In re Channel One Comm., Inc.*, 117 B.R. 493,

496 (Bankr. E.D. Mo. 1990) (citing *Comm. of Equity Sec. Holders* v. *Lionel Corp. (In re Lionel

Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983)); *In re The Landing*, 156 B.R. 246, 249 (Bankr. E.D.

Mo. 1993) (citing *In re George Walsh Chevrolet*, 118 B.R. 99, 102 (Bankr. E.D. Mo. 1990)); *see

also Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *In re Schipper*, 933

F.2d 513 (7th Cir. 1991)); *In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992); *Stephen

Indus., Inc. v. McClung*, 789 F.2d 386 (6th Cir. 1986); *In re Trilogy Dev. Co., LLC*, 2010 Bankr.

LEXIS 5636, at *3-4 (Bankr. W.D. Mo. 2010).

56.     Courts typically consider the following factors in determining whether a proposed

sale satisfies this standard: (i) whether a sound business justification exists for the sale; (ii) whether

adequate and reasonable notice of the sale was provided to interested parties; (iii) whether the sale

will produce a fair and reasonable price for the property; and (iv) whether the parties have acted

in good faith. *See In re George Walsh Chevrolet*, 118 B.R. at 102; *In re The Landing*, 156 B.R. at

249*; In re Decora Indus., Inc.*, Case No. 00-4459, 2002 WL 32332749, at *2 (D. Del. May 20,

2002) (citing *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991)). Where a

debtor demonstrates a valid business justification for a decision, it is presumed that "in making a

business decision the directors of a corporation acted on an informed basis, in good faith and in

the honest belief that the action taken was in the best interests of the company." *Official Comm. of*

33

*Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656

(S.D.N.Y. 1990) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).

### 1.    Debtor Has Demonstrated a Sound Business Justification for the Proposed Transaction

57.     A sound business purpose for the sale of a debtor's assets outside the ordinary

course of business exists where such sale is necessary to preserve the value of the estate for the

benefit of creditors and interest holders. *See, e.g.*, *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143

(3d Cir. 1986); *In re Lionel Corp.*, 722 F.2d at 1063; *see also In re Food Barn Stores, Inc.*, 107

F.3d 558, 564–65 (8th Cir. 1997) (recognizing that paramount goal of any proposed sale of

property of estate is to maximize value); *Crystalin, LLC v. Selma Props. Inc. (In re Crystalin,*

*LLC)*, 293 B.R. 455, 463-64 (B.A.P. 8th Cir. 2003) (quoting *Four B. Corp. v. Food Barn Stores,*

*Inc.,* 107 F.3d at 566 n.16 (emphasis original, internal alterations and quotations omitted)).

58.     As set forth above and in described in the Sale Declaration, a strong business

justification exists for the sale of the St. Louis Assets as described herein. An orderly but

expeditious sale of the St. Louis Assets is critical to preserving and realizing their going concern

value and, in turn, to maximizing recoveries for the Debtor's economic stakeholders and

preserving jobs. The robust Prepetition Sale and Marketing Process lead to the conclusion that a

363 sale is necessary for (i) the Debtor to raise capital so as to operate during the pendency of this

case, and (ii) the Debtor to sell its assets on terms most favorable to the Debtor. After months of

those processes, there has simply been no other option proposed to the Debtor that will enable

them to reorganize, maintain their business as a going concern, and maximize recoveries to

creditors. Those processes inform that without a 363 sale, the Debtor has a genuine risk of

liquidating at distressed prices to the detriment of the Debtor, its creditors, and other key

34

stakeholders. Pursuing the sale of the St. Louis Assets represents a reasonable exercise of the Debtor's business judgment and is in the best interests of all parties.

### 2.    Noticing Procedures are Reasonable and Appropriate.

59.    The notice to third parties that the Debtor proposes to provide, as set forth in the Bid Procedures Order and the Bid Procedures, is more than adequate and reasonable. Such notice will ensure that actual notice of the Auction, the Sale Hearing, and any Transaction will be provided to all known creditors of the Debtor. Such notice will enable the Court to make findings at the Sale Hearing and in the Sale Order that the ultimate purchaser of the St. Louis Assets, whether it be the Stalking Horse Bidder or the Successful Bidder, shall not be liable under theories of successor liability in connection with such St. Louis Assets.

### 3.    Proposed Transaction Will Produce a Fair and Reasonable Purchase Price for the St. Louis Assets.

60.    The Stalking Horse Bid is an offer to purchase the St. Louis Assets for a price that the Debtor, with the advice of its advisors, already has determined to be fair and reasonable. Given that the Stalking Horse Bid will serve as a floor for Qualified Bids for the St. Louis Assets, the Debtor is confident that the sale process will culminate in the Debtor's obtaining the highest or best value for the St. Louis Assets.

61.    The Bid Procedures were carefully designed to facilitate a robust and competitive bidding process. The Debtor is poised to capitalize on the momentum from the prepetition phase of its sale process to maximize the value of the St. Louis Assets. The Bid Procedures provide an appropriate framework for the Debtor to review, analyze, and compare all bids received to determine which bids are in the best interests of the Debtor's estate and its stakeholders. Transactions governed by the Bid Procedures undoubtedly will serve the important objectives of obtaining not only a fair and reasonable purchase price for the St. Louis Assets, but also the highest

SL 5985701.3

or best value for the St. Louis Assets, which will inure to the benefit of all parties in interest in this chapter 11 case. The Debtor's compliance with the Bid Procedures Order and the Bid Procedures will provide the basis for a finding that the purchase price represents reasonably equivalent value and is fair and reasonable.

### 4.    Good Faith Purchaser Protections Are Appropriate.

62.    Section 363(m) of the Bankruptcy Code protects a good faith purchaser's interest in property purchased from a debtor even if approval of a sale conducted under section 363(b) is later reversed or modified on appeal. Specifically, section 363(m) states the following:

> The reversal or modification on appeal of an authorization under [section 363(b)] ... does not affect the validity of a sale ... to an entity that purchased ... such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale ... were stayed pending appeal.

11 U.S.C. § 363(m).

63.    Pursuant to Bankruptcy Code section 363(m), a good faith purchaser is one that purchases assets for value, in good faith, and without notice of adverse claims. *See In re Trism, Inc.*, 328 F.3d 1003, 1008 (8th Cir. 2003) ("Section 363(m) protects a good faith purchaser and lists no other exceptions or any other qualifications to receive the protection of section 363(m)."). Section 363(m) fosters the "'policy of not only affording finality to the judgment of the [B]ankruptcy [C]ourt, but particularly to give finality to those orders and judgments upon which third parties rely.'" *Reloeb Co. v. LTV Corp* (*In re Chateaugay Corp.*, No. 92 Civ. 7054 (PKL), 1993 U.S. Dist. Lexis 6130, at *9 (S.D.N.Y. May 10, 1993) (quoting *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986)); *see also U.S. v. Whitney Design, Inc. (In re Whitney Design, Inc.)*, No. 4:10-CV-441, 2011 WL 13254299, at *2 (E.D. Mo. Jan. 11, 2011) (the purpose

36

of Section 363 is to protect third party purchasers in good faith and "by providing reliability and finality, §363 enhances the value of the debtor's assets sold in bankruptcy").

64.     The Debtor and the Stalking Horse Bidder have agreed to the Stalking Horse Bid Agreement without collusion, in good faith, and through extensive arms-length negotiations. To that end, the Stalking Horse Bidder and the Debtor engaged separate counsel and other professional advisors to represent their respective interests in the negotiation of the Stalking Horse Bid and the Stalking Horse Agreement, and in the sale process generally. To the best of the Debtor's knowledge, information, and belief, no party has engaged in any conduct that would cause or permit the Stalking Horse Bid to be set aside under 363(m) of the Bankruptcy Code.

65.     Further, and as set forth above, the Bid Procedures are designed to produce a fair and transparent competitive bidding process. The Stalking Horse Agreement was negotiated at arms-length and in good faith and any other stock/asset purchase agreement with a Successful Bidder executed by the Debtor will be negotiated at arms-length and in good faith. Accordingly, based upon the record to be made at the Sale Hearing, the Debtor will seek a finding that any Successful Bidder (including the Stalking Horse Bidder if named a Successful Bidder) is a good faith purchaser and is entitled to the full protections afforded by section 363(m) of the Bankruptcy Code.

**D.     Sale Free and Clear of Liens, Claims, Encumbrances, and Interests is Warranted.**

66.     In the interest of attracting the best offers, the St. Louis Assets should be sold free and clear of any and all liens, claims, interests, and other encumbrances, in accordance with section 363(f) of the Bankruptcy Code, with any such liens, claims, interests, and encumbrances to attach to the proceeds of the applicable sale. Section 363(f) of the Bankruptcy Code authorizes a debtor

SL 5985701.3

to sell assets free and clear of liens, claims, interests, and encumbrances if any one of the following conditions is satisfied:

    (a)    applicable non-bankruptcy law permits sale of such property free and clear of such interest;

    (b)    such entity consents;

    (c)    such interest is a lien and the price at which property is to be sold is greater than the value of all liens on such property;

    (d)    such interest is in bona fide dispute; or

    (e)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); *see also In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("Section 363(f) is written in the disjunctive, not the conjunctive, and if any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens."); *The Mutual Life Inc. Co. of New York v. Red Oak Farms, Inc. (In re Red Oak Farms, Inc.)*, 36 B.R. 856, 857–858 (Bankr. W.D. Mo. 1984) (same); *Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (same).

67.    With respect to any party asserting a lien, claim, encumbrance or other interest against the St. Louis Assets, the Debtor will be able to satisfy one or more of the conditions set forth in section 363(f).

68.    It is also appropriate to sell the St. Louis Assets free and clear of successor liability relating to the Debtor's business. Such limitations on successor liability ensure that the Successful Bidder is protected from any claims or lawsuits premised on the theory that the Successful Bidder is a successor in interest to the Debtor. Courts have consistently held that a buyer of a debtor's assets pursuant to a section 363 sale takes free and clear from successor liability relating to the

debtor's business. *See e.g.*, *Cibulka* v. *Trans World Airlines, Inc.*, 92 F. App'x 366, 368 (8th Cir. 2004) (citing *In re Trans World Airlines, Inc.*, 322 F.3d 283, 28890 (3d Cir. 2003) (sale of assets pursuant to section 363(f) barred successor liability claims for employment discrimination and rights under travel voucher program)); *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 585 (4th Cir. 1996) (affirming the sale of debtors' assets free and clear of certain taxes); *In re Ormet*, Case No. 13-10334, 2014 WL 3542133 (Bankr. D. Del. July 17, 2014) (permitting a sale free and clear of successor liability claims relating to an under-funded pension plan); *In re Insilco Techs., Inc.*, 351 B.R. 313, 322 (Bankr. D. Del. 2006) (stating that a 363 sale permits a buyer to take ownership of property without concern that a creditor will file suit based on a successor liability theory).

**E.    Assumption and Assignment of Proposed Assumed Contracts Should Be Approved**.

69.    Section 365(a) of the Bankruptcy Code provides that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Upon finding that a debtor has exercised its sound business judgment in determining to assume an executory contract or unexpired lease, courts will approve the assumption under section 365(a) of the Bankruptcy Code. *See, e.g.*, *In re Market Square Inn.*, *Inc.*, 978 F.2d 116, 121 (3d Cir. 1992) (assumption or rejection of lease "will be a matter of business judgment by the bankruptcy court"); *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (finding that debtor's decision to assume or reject executory contract is governed by business judgment standard and may only be overturned if decision is product of bad faith, whim, or caprice). The "business judgment" test in this context only requires that a debtor demonstrate that assumption or rejection of an executory contract or unexpired lease benefits the estate. *See Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989); *see also In re Noranda Aluminum, Inc.*, 549 B.R. 725, 727–28 (Bankr. E.D. Mo. 2016) (in the Eighth Circuit,

SL 5985701.3

the business judgment test "entails a determination that the transaction is in the best interest of the estate" (quoting *Four B Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 567 n. 16 (8th Cir. 1997)).

70.     The assumption and assignment of the Proposed Assumed Contracts in connection with a Transaction is an exercise of the Debtor's sound business judgment because a bidder may determine that such contracts are necessary to operate the Debtor's business, and as such, are essential to obtaining the highest or otherwise best offer for the St. Louis Assets. Moreover, the Proposed Assumed Contracts will be assumed and assigned in accordance with the Assumption and Assignment Procedures approved by the Court pursuant to the Bid Procedures Order, which will be reviewed by the Debtor's key stakeholders. Accordingly, the Debtor's assumption of Proposed Assumed Contracts is an exercise of sound business judgment and should be approved.

71.     The consummation of a Transaction, which will involve the assignment of the Proposed Assumed Contracts, will be contingent upon the Debtor's compliance with the applicable requirements of section 365 of the Bankruptcy Code. Section 365(b)(1) of the Bankruptcy Code requires that any outstanding defaults under the Proposed Assumed Contracts be cured or that adequate assurance be provided that such defaults will be promptly cured. As set forth above, the Debtor proposes to file with the Court and serve on each contract and lease Counterparty, the Assumption and Assignment Notice indicating the Debtor's calculation of the Cure Cost for each such contracts and leases. The Counterparties will have the opportunity to file objections to the proposed assumption and assignment of the Proposed Assumed Contracts to the Successful Bidder, including the proposed Cure Cost.

72.     Pursuant to section 365(f)(2) of the Bankruptcy Code, a debtor may assign an executory contract or unexpired lease of nonresidential real property if "adequate assurance of

40

future performance by the assignee of such contract or lease is provided." 11 U.S.C. § 365(f)(2)(B). The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc. v. Azzari* (*In re Carlisle Homes, Inc.*), 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (citation omitted); *see also In re Natco Indus., Inc*., 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.,* 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("[a]lthough no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance."). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See In re Bygaph, Inc.*, 56 B.R. 596, 60506 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease has financial resources and expressed willingness to devote sufficient funding to business to give it strong likelihood of succeeding).

73.     As set forth in the Bid Procedures, for a bid to qualify as a "Qualified Bid," a potential bidder must include with its bid Adequate Assurance Information. The Debtor will provide Adequate Assurance Information to all Counterparties to the Proposed Assumed Contracts and Counterparties will have an opportunity to file an Adequate Assurance Objection in advance of the Sale Hearing. Based on the foregoing, the Debtor's assumption and assignment of the Proposed Assumed Contracts, satisfy the requirements under section 365 of the Bankruptcy Code and should be approved.

74.     In addition, to facilitate the assumption and assignment of the Proposed Assumed Contracts, the Debtor further requests that the Court find that all anti-assignment provisions in the

41

SL 5985701.3

Proposed Assumed Contracts, whether such provisions expressly prohibit or have the effect of restricting or limiting assignment of such contract or lease, to be unenforceable under section 365(f) of the Bankruptcy Code. See 11 U.S.C § Section 365(f)(1).

### Waiver of Bankruptcy Rules 6004(a), (h), and 6006(d)

75.     To implement the foregoing successfully, the Debtor requests a waiver of the notice requirements under Bankruptcy Rule 6004(a) and any stay of the order granting the relief requested herein pursuant to Bankruptcy Rules 6004(h) and 6006(d). Considering the Debtor's current financial condition, the Transaction(s) contemplated herein should be consummated as soon as practicable to allow the Debtor to maximize value for its estate and creditors, and to preserve as many jobs as possible for its hard-working employees. Accordingly, the Debtor represents that ample cause exists to justify the waiver of the notice requirements under Bankruptcy Rule 6004(a), and the Debtor requests that the Bid Procedures Order, Sale Order and any order authorizing the assumption or assumption and assignment of a Proposed Assumed Contract in connection with a Transaction be effective immediately upon entry and that the fourteen (14) day stay imposed by Bankruptcy Rules 6004(h) and 6006(d) be waived, to the extent such notice requirements and stay apply.

### Reservation of Rights

76.     Nothing contained herein is intended to be or shall be deemed as (i) an admission as to the validity of any claim against the Debtor, (ii) a waiver or limitation of the Debtor's or any party in interest's rights to dispute the amount of, basis for, or validity of any claim, (iii) a waiver of the Debtor's rights under the Bankruptcy Code or any other applicable non-bankruptcy law, (iv) an agreement or obligation to pay any claims, (v) a waiver of any claims or causes of action which may exist against any creditor or interest holder, or (vi) an approval,

42

SL 5985701.3

assumption, adoption, or rejection of any agreement, contract, lease, program, or policy under

section 365 of the Bankruptcy Code. Likewise, if the Court grants the relief sought herein, any

payment made pursuant to the Court's order is not intended to be and should not be construed as

an admission to the validity of any claim or a waiver of the Debtor's rights to dispute such claim

subsequently.

### Notice

77.    Notice of this Motion will be provided to (i) the Office of the United States Trustee

for the Eastern District of Missouri; (ii) the holders of the 20 largest unsecured claims against the

Debtor; (iii) Blank Rome (Attn: Paige Barr Tinkham, Esq. and Ken Ottaviano, Esq.), as counsel

to STERLING COMMERCIAL CREDIT, LLC., as the DIP Facility Lender; (iv) counsel for the

Stalking Horse Bidder, Scott Davidson, King & Spalding LLP, 1185 Avenue of the Americas,

34th Floor, New York, NY 10036, SDavidson@KSLAW.com;  Armstrong Teasdale LLP (attn:

Erin M. Edelman, Esq. 7700 Forsyth Blvd., Suite 1800, St. Louis, Missouri 63105-1847,

eedelman@atllp.com; Michael A. Petrizzo, Jr., 2005 Market Street, 29th Floor, One Commerce

Square, Philadelphia, PA 19103, mpetrizzo@atllp.com); (v) the Internal Revenue Service; (vi) the

United States Attorney's Office for the Eastern District of Missouri; (vii) all persons and entities

known by the Debtor to have expressed an interest in the Debtor in a transaction involving any

material portion of the St. Louis Assets during the past twelve months; and (viii) any other party

that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "***Notice Parties***").

Notice of this Motion and any order entered hereon will be served in accordance with Local Rule

9013-1.

SL 5985701.3

**No Previous Request**

78.     No previous request for the relief sought herein has been made by the Debtor to this or any other court.

WHEREFORE, Debtor respectfully requests that the Court enter an Order granting the requested relief and granting such other and further relief as is necessary and appropriate in the circumstances.

Date: May 8, 2023

Respectfully submitted,

**SPENCER FANE LLP**

/s/ *Zachary R.G. Fairlie*
Eric C. Peterson MO #62429
Ryan C. Hardy MO #62926
1 North Brentwood Boulevard
Suite 1200
St. Louis, MO 63105
(314) 863-7733
(314) 862-4656 – Fax
epeterson@spencerfane.com
rhardy@spencerfane.com

- and -

Zachary R.G. Fairlie MO #68057
1000 Walnut Street
Suite 1400
Kansas City, MO 64106
(816) 292-8223
zfairlie@spencerfane.com

*Proposed Counsel to the Debtor and*
*Debtor-in-Possession*

44

SL 5985701.3

**EXHIBIT 1**
**Declaration of Thomas Goldblatt**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

In re:

ALLIED HEALTHCARE PRODUCTS,
        INC.,

Debtor.

Chapter 11
Case No. 23-41607

## DECLARATION OF THOMAS GOLDBLATT

Thomas Goldblatt, a managing partner at Ravinia Capital, LLC, makes this Declaration pursuant to 28 U.S.C. § 1746 and states:

1.      I am a managing partner at Ravinia Capital, LLC ("*Ravinia*"), with offices at 60 E. Monroe Street, Suite 2504, Chicago, IL 60603. I am authorized to submit this declaration ("*Declaration*") in support of the proposed sale(s) of Allied Healthcare Products, Inc.'s ("*Debtor*") assets pursuant to a sale(s) under 11 U.S.C § 363.

2.      In January 2023, Debtor engaged Ravinia to assist with sale and marketing efforts relating to potential sale(s) under 11 U.S.C § 363 ("*Transactions*"). Since the engagement, Ravinia has developed and commenced a robust effort to maximize the value of Debtor's assets and operations located at 1720 Sublette Avenue, St. Louis, Missouri 63110 ("*St. Louis Assets*") and 42 New Street, Town of Stuyvesant, Columbia County, New York ("*New York Assets*").

3.      The sale and marketing efforts are intended to culminate in the eventual Transactions, tailored to the unique circumstances surrounding Debtor's operations and circumstances. For example, in consultation with Debtor, Ravinia determined and recommended that the best way to maximize the value of Debtor's assets was to naturally segment the assets

between the St. Louis Assets and the New York Assets, with a sale and marketing process tailored to each segment accordingly.

4.      Ravinia has engaged in robust pre-bankruptcy sale and marketing efforts, fully exposing the assets to the market to maximize value. First, to maintain and maximize going concern value, Ravinia wanted to ensure that the public and stakeholders were aware of the positive steps taken to address the Debtor's situation, so Ravinia engaged a crisis turnaround public relations firm to draft and produce materials detailing Debtor's turnaround spearheaded by MorrisAnderson. This strategy aims to instill confidence in Debtor's employees, customers, vendors, and the public generally, preserving value of assets pending closing of the Transactions.

5.      Second, Ravinia reached out to approximately 64 potential bidders, both domestic and international, in the medical equipment and healthcare industries. These outreach efforts included initial calls and emails to gauge interest and potential fit, followed by the signing of approximately 17 non-disclosure agreements ("***NDAs***") to facilitate an in-depth examination of Debtor's financials and operations. From those 17 NDAs, Ravinia conducted five in-person and one virtual site visit to Debtor's St. Louis facility, which included meetings with management, a tour of the factory, and lunch with Debtor's management. This resulted in Debtor receiving three official Indications of Interest ("***IOIs***").

6.      Third, Ravinia worked closely with potential bidders and Debtor's management as an intermediary to provide potential bidders with the necessary materials to make their decision. This has included putting together a formal, large data room and compiling decades of relevant materials from the Debtor, including financial statements, customer lists, product data sheets, and patents, among others. Ravinia has also created marketing materials to attract new

potential bidders from outreach efforts. These marketing materials include a comprehensive overview of Debtor's products, manufacturing capabilities, and financial performance.

7.     Finally, Ravinia has spent several weeks going back and forth with potential bidders to maximize offers before Debtor selected a proposed stalking horse purchaser(s) for the St. Louis Assets and the New York Assets. The process of choosing a proposed stalking horse involved a thorough analysis of the IOIs received and a review of each company's apparent financial capability, strategic fit, and cultural compatibility with Debtor.

8.     After multiple rounds of negotiations and discussions with the interested parties, Ravinia recommended that Allied Medical, LLC, be selected as the proposed stalking horse purchaser for the St. Louis Assets and New York Assets ("***Stalking Horse Bidder***"). The Stalking Horse Bidder provided the highest and offers for the St. Louis Assets and New York Assets. Allied Medical, LLC is not affiliated with Debtor and believe it was created for purposes of the proposed sale process in this case. Allied Medical LLC and its parent and affiliates ("***AML***") are a leading provider of medical equipment and consumables out of the United Kingdom. AML has a strong global presence and specializes in respiratory and anesthesia products, which aligns with Debtor's core product offerings. AML's purchase will expand their product portfolio and market share in the United States. Ravinia is confident that AML's stalking horse status will provide the most value to Debtor's stakeholders and will help to ensure the continuity of Debtor's operations while preserving as many jobs as possible.

9.     Negotiated terms with the Stalking Horse Bidder included potential bid protections related to being the Stalking Horse Bidder that drives the sale process. ("***Stalking Horse Bid Protections***"). The Stalking Horse Bid Protections are the product of good faith, arms-length negotiations between the Stalking Horse Bidder and the Debtor, with the assistance

-3-

of Ravinia. The Stalking Horse Agreement provisions relating to the Stalking Horse Bid Protections (as well as the other Stalking Horse Agreement provisions) were scrutinized by the Debtor's professionals and ultimately approved by the Debtor's boards of directors.

10.     The Stalking Horse Bid Protections promote competitive bidding by inducing the Stalking Horse Bidder to hold its offer open as a minimum or floor bid for the purchased assets on which other bidders—and the Debtor—can rely. The Stalking Horse Bid Protections were a material inducement for, and a condition of, the Stalking Horse Bidder's agreement to enter into the Stalking Horse Agreement. Indeed, the Stalking Horse Agreement increases the likelihood that the price at which the purchased assets are sold will reflect their market value, and the Stalking Horse Bidder is entitled to be compensated as a result.

11.     Debtor and the Ravinia spent significant time and effort negotiating an asset purchase agreement with the Stalking Horse Bidder, culminating in the execution of an asset purchase agreement on May 7, 2023.

12.     Although the Debtor seeks to establish a Stalking Horse Bidder, the Debtor and the Ravinia continue tireless efforts to generate interest in the Sale Process and attract additional prospective buyers.

13.     As a result of the extensive prepetition sale and marketing process conducted by the Ravinia and the Debtor, I believe we have adequately tested the marketplace for the purchase of the St. Louis Assets and the New York Assets. As such, a streamlined sale and marketing process post-bankruptcy that contemplates an auction if the Debtor receives a higher or otherwise better bid than the Stalking Horse Bid is prudent under the circumstances to maximize the value of the assets. The Debtor's proposed bid procedures are designed to maximize value for the Debtor's assets and will enable the Debtor and its advisors, including Ravinia, to review,

analyze, and compare all bids received to determine which bid is the highest or best offer for the assets.

14.     Debtor's business, including the New York Assets and St. Louis Assets specifically, have been extensively marketed to strategic and financial investors since January 2023, and information regarding the Debtor's business has been made available in an electronic data room during such process. Many parties that may have an interest in bidding at the auctions likely already have conducted diligence and evaluated the Debtor's business and will not be bidding in a vacuum. In addition, potential bidders that have not previously conducted diligence on the Debtor's business will have immediate access to, subject to the execution of an appropriate confidentiality agreement, a substantial body of information regarding the Debtor's assets, including information gathered based upon specific due diligence requests of the Stalking Horse Bidder and other prepetition bidders.

15.     The timelines proposed in the bid procedures and sale process accounts for this substantial pre-petition sale and marketing process and therefore considers that an efficient timeline will minimize administrative expenses and maximize recoveries ultimately available for creditors.

16.     Ravinia will continue sale and marketing efforts after the petition date to further expose the assets to the market. Following the filing of the bankruptcy, Ravinia will reach out to its growing list of over 1000 well-vetted strategic acquirers sourced from prior deals and top-tier industry research software Pitchbook and Cap IQ to further market the St. Louis Assets and New York Assets. This further marketing effort will include information about assets and the proposed bankruptcy auctions. This will result in an additional testing of the market for the assets and is intended to produce a robust auction process, further ensuring a maximization of value.

17.     Prior to the auctions, Ravinia will assist in facilitating access to the data room, coordinating site visits and management meetings, and answering any questions or concerns that arise during the due diligence process. Ravinia is confident in its ability to deliver a successful outcome for all stakeholders involved in the sale process.

18.     During the auction process, Ravinia will assist Debtor in reviewing and analyzing bids received, and will make recommendations regarding bids received.

I certify under penalty of perjury under the laws of the United States that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Dated:  May 5, 2022
St. Louis, Missouri

*tom goldblatt*
_____
Thomas Goldblatt

**EXHIBIT 2**

**Form APA**

ASSET PURCHASE AGREEMENT – ST. LOUIS

BY AND BETWEEN

ALLIED HEALTHCARE PRODUCTS, INC.,
AS SELLER

AND

ALLIED MEDICAL, LLC,
AS PURCHASER

Dated as of May 7, 2023

## TABLE OF CONTENTS

ARTICLE I – DEFINITIONS ................................................................................................ 1
    Section 1.1    Defined Terms. ......................................................................................... 1
    Section 1.2    Other Interpretive Provisions. ................................................................ 10

ARTICLE II – PURCHASE AND SALE ............................................................................ 11

ARTICLE II – PURCHASE AND SALE ............................................................................ 11

    Section 2.1    Purchase and Sale of Assets. ................................................................. 11
    Section 2.2    Purchased Assets. ................................................................................... 11
    Section 2.3    Excluded Assets. .................................................................................... 13
    Section 2.4    Assumed Liabilities. .............................................................................. 15
    Section 2.5    Retained Liabilities. .............................................................................. 15
    Section 2.6    Non-Assignable Assets. ........................................................................ 17

ARTICLE III – PURCHASE PRICE .................................................................................. 17

    Section 3.1    Purchase Price. ....................................................................................... 17
    Section 3.2    Earnest Money. ...................................................................................... 18
    Section 3.3    Closing Payments. ................................................................................. 18
    Section 3.4    Release of Earnest Money Deposit. ...................................................... 18
    Section 3.5    Proration. ............................................................................................... 18
    Section 3.6    Purchase Price Allocation. .................................................................... 18

ARTICLE IV – REPRESENTATIONS AND WARRANTIES OF SELLER............................ 18

    Section 4.1    Organization and Power. ....................................................................... 19
    Section 4.2    Authorization and Enforceability. ......................................................... 19
    Section 4.3    No Conflicts. .......................................................................................... 19
    Section 4.4    Consents and Approvals. ....................................................................... 19
    Section 4.5    Legal Proceedings. ................................................................................ 20
    Section 4.6    Brokers' Fees. ........................................................................................ 20
    Section 4.7    Purchased Assets. .................................................................................. 20
    Section 4.8    FDA Regulatory Compliance and Compliance with Other Laws. ................... 20
    Section 4.9    Financial Statements. ............................................................................ 21
    Section 4.10   Taxes. .................................................................................................... 22
    Section 4.11   Real Property. ........................................................................................ 22
    Section 4.12   Intellectual Property. ............................................................................. 23
    Section 4.13   Contracts. .............................................................................................. 24
    Section 4.14   Permits. ................................................................................................. 24
    Section 4.15   Environmental Matters. ......................................................................... 24
    Section 4.16   Employee Plans. .................................................................................... 25
    Section 4.17   Labor Matters; Employees. ................................................................... 26
    Section 4.18   Product Warranty; Product Recalls. ...................................................... 26
    Section 4.19   Product Liability. ................................................................................... 26
    Section 4.20   Absence of Certain Changes or Events. ................................................ 27
    Section 4.21   Certain Payments. ................................................................................. 27

SL 5923623.1

Section 4.22    Receivables. ........................................................................ 27
Section 4.23    Insurance. ............................................................................ 27
Section 4.24    Inventory. ............................................................................ 27
Section 4.25    No Other Representations or Warranties of Seller. ............ 27

ARTICLE V – REPRESENTATIONS AND WARRANTIES OF PURCHASER ................. 28

Section 5.1     Organization. ....................................................................... 28
Section 5.2     Authorization and Enforceability. ...................................... 28
Section 5.3     No Conflicts. ........................................................................ 28
Section 5.4     Consents and Approvals. ..................................................... 29
Section 5.5     Legal Proceedings. .............................................................. 29
Section 5.6     Brokers' Fees. ...................................................................... 29
Section 5.7     Financing Source. ................................................................ 29
Section 5.8     No Other Representations and Warranties of Seller. .......... 29

ARTICLE VI – COVENANTS ................................................................................ 29

Section 6.1     Certain Bankruptcy Undertakings. ..................................... 29
Section 6.2     Bankruptcy Court Matters. .................................................. 29
Section 6.3     Non-Exclusive Access to Information and the Premises. ... 32
Section 6.4     Conduct of the Business Pending Closing. ......................... 32
Section 6.5     Consents and Permits. ......................................................... 33
Section 6.6     Further Assurances. ............................................................. 33
Section 6.7     Publicity. .............................................................................. 34
Section 6.8     Notification of Certain Matters. .......................................... 34
Section 6.9     Confidentiality. .................................................................... 35
Section 6.10    Employee Matters. ............................................................... 35
Section 6.11    Purchase of Personal Property Subject to Lease. ............... 37
Section 6.12    Tax Matters. ......................................................................... 37
Section 6.13    Collection of Receivables. .................................................. 38
Section 6.14    Due Diligence Reports. ....................................................... 38

ARTICLE VII – CONDITIONS TO CLOSING. ......................................................... 39

Section 7.1     Conditions Precedent to the Obligations of the Parties. ..... 39
Section 7.2     Conditions Precedent to the Obligations of Seller. ............ 39
Section 7.3     Conditions Precedent to the Obligations of Purchaser. ...... 39

ARTICLE VIII – CLOSING ................................................................................... 41

Section 8.1     Closing. ................................................................................ 41
Section 8.2     Proceedings at Closing. ....................................................... 41
Section 8.3     Deliveries by Seller. ............................................................ 41
Section 8.4     Deliveries by Purchaser. ...................................................... 42

ARTICLE IX – TERMINATION ............................................................................. 42

Section 9.1     Termination. ......................................................................... 42
Section 9.2     Notice of Termination. ......................................................... 44
Section 9.3     Effect of Termination. .......................................................... 44

ARTICLE X – MISCELLANEOUS PROVISIONS ...................................................... 44

Section 10.1   Amendments. ....................................................................................... 45
Section 10.2   Assignment. ......................................................................................... 45
Section 10.3   Binding Effect. ..................................................................................... 45
Section 10.4   Counterparts; Electronic Transmission. ............................................... 45
Section 10.5   Entire Agreement ................................................................................. 45
Section 10.6   Equitable Relief. ................................................................................... 45
Section 10.7   Construction. ........................................................................................ 45
Section 10.8   Governing Law. .................................................................................... 46
Section 10.9   Jurisdiction, Venue .............................................................................. 46
Section 10.10  Notices. ................................................................................................ 46
Section 10.11  No Recourse. ........................................................................................ 48
Section 10.12  Remedies. ............................................................................................. 48
Section 10.13  Severability. ......................................................................................... 49
Section 10.14  Survival. ............................................................................................... 49
Section 10.15  No Third-Party Beneficiaries. .............................................................. 49
Section 10.16  Time Is of the Essence. ........................................................................ 49
Section 10.17  Waiver of Bulk Sales Laws .................................................................. 49
Section 10.18  Waiver of Trial by Jury. ....................................................................... 50
Section 10.19  Waivers. ............................................................................................... 50
Section 10.20  Seller's Right to Continue Marketing. .................................................. 50

EXHIBITS AND SCHEDULES

EXHIBIT A – Bid Procedures Order
EXHIBIT B – Sale Order
EXHIBIT C – Bill of Sale
EXHIBIT D – Assignment and Assumption Agreement
EXHIBIT E – IP Assignment Agreement

SCHEDULE 3.6 - Allocation

4869-3241-6847, v. 18

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement") is made and entered into as of May 7, 2023 (the "Execution Date"), by and between Allied Healthcare Products, Inc., a Delaware corporation ("Seller"), and Allied Medical, LLC, a Delaware limited liability company ("Purchaser").

## RECITALS

A.     Seller is engaged in the business of manufacturing and selling healthcare products, equipment and services from its facility located at the St. Louis Facility ("Business").

B.     Shortly after executing this Agreement, Seller intends to file a voluntary petition for relief ("Bankruptcy Case"), under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§101, *et seq.* ("Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Missouri ("Bankruptcy Court"), with such filing date being the "Petition Date".

C.     After the Petition Date, Seller will seek the Bankruptcy Court's authorization and approval for this Agreement and corresponding overbid and auction procedures, as well as the Purchaser Reimbursable Expenses per the conditions provided in the Bid Procedures Order, to be paid to Purchaser in the event Purchaser is not the successful bidder at the Auction, if any, of the Purchased Assets.

D.     Notwithstanding any provisions herein to the contrary, Seller and Purchaser both acknowledge and agree that this Agreement is subject to the Bankruptcy Court's Final authorization and approval, and upon such Final authorized and approved terms and conditions set forth herein, Purchaser desires to purchase from Seller, and Seller desires to sell to Purchaser, the Purchased Assets free and clear of Liens, Claims and other interests (other than Permitted Liens), all as more specifically provided herein and in the Sale Order.

E.     Certain terms used in this Agreement are defined in **Section 1.1**.

NOW, THEREFORE, in consideration of the foregoing premises, the mutual representations, warranties and covenants herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

## ARTICLE I
## DEFINITIONS

*Section 1.1     Defined Terms.* As used in this Agreement, the following terms have the meanings set forth below or in the Sections referred to below:

"Aggregate Purchase Price" has the meaning set forth in **Section 3.1**.

"Agreement" has the meaning set forth in the preamble.

"Allocation" has the meaning set forth in **Section 3.6**.

"Alternative Transaction" means any transaction involving the closing of a sale pursuant to Section 363(b) of the Bankruptcy Code of all or a material portion of the Business by Seller to a purchaser or purchasers other than Purchaser and/or one or more of its affiliates at any time during the pendency of the Bankruptcy Case.

"Ancillary Agreements" has the meaning set forth in **Section 4.2**.

"Assignment and Assumption Agreement" has the meaning set forth in **Section 8.3(c)**.

"Assumed Liabilities" has the meaning set forth in **Section 2.4**.

"Auction" has the meaning set forth in **Section 6.2(c)(i).**

"Avoidance Actions" mean any and all causes of action to avoid a transfer of property or an obligation incurred by Seller arising under Sections 542, 544, 545, and 547 through and including 553 of the Bankruptcy Code or any other federal, state, or foreign law pertaining to actual or constructive fraudulent transfer, fraudulent conveyance, or voidable transactions.

"Back-up Termination Date" means the first to occur of (a) the Outside Date (including, for the avoidance of doubt, any extension thereof pursuant to the terms of this Agreement), (b) consummation of the transaction with the winning bidder at the Auction, (c) the date on which the conditions to Closing set forth in **Article VII** are satisfied or waived, and (d) Purchaser's receipt of notice from Seller of the release by Seller of Purchaser's obligations under **Section 6.2(e)**.

"Bankruptcy Case" has the meaning set forth in the Recitals.

"Bankruptcy Code" has the meaning set forth in the Recitals.

"Bankruptcy Court" has the meaning set forth in the Recitals.

"Bankruptcy Court Milestones" has the meaning set forth in **Section 6.2(d)**.

"Bankruptcy Expenses" has the meaning set forth in **Section 2.5(g)**.

"Bid Deadline" has the meaning set forth in **Section 6.2(d)(iv)**.

"Bid Motion" has the meaning set forth in **Section 6.2(d)(i)**.

"Bid Procedures Order" means an order of the Bankruptcy Court, in form and substance reasonably acceptable to Purchaser and Seller that, among other things, (a) approves and authorizes the payment of the Purchaser Reimbursable Expenses on the terms and conditions set forth in **Section 6.2(a)**, (b) establishes procedures for the Auction process, the form of which is attached hereto as Exhibit A, (c) establishes a date for a hearing on the Sale Order, and (d) approves the other terms and conditions of the bidding procedures attached hereto as Exhibit A.

"Bill of Sale" has the meaning set forth in **Section 8.3(b)**.

"Business" has the meaning set forth in the Recitals.

"Business Products" has the meaning set forth in **Section 4.18(a)**.

"Cash and Cash Equivalents" means all of Seller's cash (including petty cash and checks received on the Closing Date), checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper, security entitlements, securities accounts, commodity Contracts, commodity accounts, government securities and any other cash equivalents, whether on hand, in transit, in banks or other financial institutions, or otherwise held.

2

"<u>Claims</u>" has the meaning ascribed by Section 101(5) of the Bankruptcy Code and includes, without limitation, all rights, claims (including any cross-claim or counterclaim), causes of action, charges, assessments, suits, investigations, litigation, third party actions, arbitral proceedings or proceedings by or before any Governmental Body or any other person, defenses, debts, demands, damages, judgments, sanctions, penalties, costs, expenses (including reasonable, actual, out-of-pocket legal fees and expenses), losses, liabilities, offset rights, setoff rights, recoupment rights, obligations, and liabilities of any kind or nature under contract, at Law or in equity, whatsoever, whether or not reduced to judgment, whether known or unknown, secured, unsecured, fixed, contingent, matured, unmatured, disputed, undisputed, liquidated or unliquidated, whether arising prior to or subsequent to the commencement of the Bankruptcy Case, whether under any theory of successor or transfer liability and whether imposed by agreement, understanding, law or otherwise, and all rights and remedies with respect thereto.

"<u>Closing</u>" has the meaning set forth in **Section 8.1.**

"<u>Closing Date</u>" has the meaning set forth in **Section 8.1.**

"<u>Closing Cash Payment</u>" means the Aggregate Purchase Price less the Deposit.

"<u>COBRA</u>" means the Consolidated Omnibus Budget Reconciliation Act of 1985.

"<u>Code</u>" means the United States Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder.

"<u>Collective Bargaining Agreement</u>" means each Contract with a labor union or labor organization, works council or other similar employee representative, in each case, covering an Employee who works in the Business.

"<u>Competing Bids</u>" has the meaning set forth in **Section 6.2(b)**.

"<u>Contracts</u>" means all purchase orders, sales agreements, sales orders, supply agreements, manufacturing agreements, distribution agreements, insurance policies, employee or consulting agreements, leases, subleases, licenses (including, for the avoidance of doubt, third-party software licenses), sublicenses, product warranty or service agreements and other binding commitments, agreements, contracts, instruments, arrangements, obligations and undertakings of any nature (whether written or oral, and whether express or implied).

"<u>Cure Amounts</u>" means, to the extent applicable, all Liabilities that must be paid and obligations that otherwise must be satisfied under Sections 365 of the Bankruptcy Code, in connection with the assumption by Seller and assignment to Purchaser of any Purchased Contract, Real Property Lease or Permit. For the avoidance of doubt, notwithstanding anything provided herein to the contrary, no provision herein shall be construed as an admission or waiver as to the amount of any potential cure amount, or as a representation that any assumption, rejection, or assignment within the meaning of Section 365 of the Bankruptcy Code has occurred; such assumptions, rejections, or assignments shall be addressed by order of the Bankruptcy Court (including the Final Sale Order) accordingly, to the extent applicable.

"<u>Customer Credits</u>" means (a) payments made by specified customers of the Business for (i) products not yet manufactured or delivered to such specified customers or (ii) services not yet provided to such specified customers; or (b) any credits or amounts due or alleged to be due from Seller to specified customers of the Business, including for refunds, short-shipments, rebates, allowances or otherwise.  For purposes of this definition, "specified customers" means any customers who have ordered or purchased products or services from Seller at any time during the 12-month period immediately preceding the Closing

3

Date, or any customers with respect to whom Seller reasonably believes it will have to issue a credit or refund a payment previously made to Seller.

"Customs and International Trade Laws" means any domestic Law, license, directive, award or other decision or requirement, including any amendments, having the force or effect of Law, of any Governmental Body, concerning the transfer, importation, exportation, reexportation or deemed exportation of products, technical data, technology and/or services, the terms and conduct of transactions, and making or receiving of payment related to such transfer, importation, exportation, reexportation or deemed exportation.

"Deposit" has the meaning set forth in **Section 3.2**.

"Designated Receivables Account" has the meaning set forth in **Section 6.13(c)**.

"Due Diligence Reports" has the meaning set forth in **Section 6.14.**

"Effective Time" has the meaning set forth in **Section 8.1**.

"Employee" has the meaning set forth in **Section 4.17(a)**.

"Employee Benefit Plans" means each plan, fund, program, agreement, arrangement or scheme (and any amendments thereto) that is at any time sponsored or maintained by Seller or to which Seller makes or has an obligation to make, contributions providing benefits to the current or former employees, directors, managers, officers, consultants, independent contractors, contingent workers or leased employees of Seller or the dependents of any of them (whether written or oral), or in respect of which Seller has any liability or obligation, including (i) each deferred compensation, bonus, incentive compensation, pension, retirement, employee stock ownership, stock purchase, stock option, profit sharing or deferred profit sharing, stock appreciation, phantom stock plan and other equity compensation plan, "welfare" plan (within the meaning of Section 3(1) of ERISA, determined without regard to whether such plan is subject to ERISA), (ii) each "pension" plan (within the meaning of Section 3(2) of ERISA, determined without regard to whether such plan is either subject to ERISA or is tax-qualified under the Code), (iii) each severance plan or agreement, and each other plan providing health, vacation, supplemental unemployment benefit, hospitalization insurance, medical, dental, disability, life insurance, death or survivor benefits, fringe benefits or legal benefits and (iv) each other employee benefit plan, fund, program, agreement or arrangement; provided, that, for the avoidance of doubt, in no event shall "Employee Benefit Plans" be deemed to include any regular wages or salary payable to any Employees of Seller.

"Environmental Laws" means any applicable Laws: (a) relating to pollution (or the cleanup thereof) or the protection of natural resources, endangered or threatened species, human health or safety, or the environment (including ambient air (indoor or outdoor), soil, surface water or groundwater, or subsurface strata); or (b) concerning the presence of, exposure to or the management, manufacture, use, containment, storage, recycling, reclamation, reuse, treatment, generation, discharge, transportation, processing, production, handling, disposal or remediation of any Hazardous Materials. The term "Environmental Law" includes, without limitation, the following (including their implementing regulations and any state analogs):  the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, *inter alia*, by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601 *et seq.*; the Solid Waste Disposal Act, as amended, *inter alia*, by the Resource Conservation and Recovery Act of 1976 and the Hazardous and Solid Waste Amendments of 1984, 42 U.S.C. §§ 6901 *et seq.*; the Federal Water Pollution Control Act of 1972, as amended, *inter alia*, by the Clean Water Act of 1977, 33 U.S.C. §§ 1251 *et seq.*; the Toxic Substances Control Act of 1976, as amended, 15 U.S.C. §§ 2601 *et seq.*; the Emergency Planning and Community Right-to-Know Act of 1986, 42 U.S.C. §§ 11001 *et seq.*;

4

the Clean Air Act of 1966, as amended, *inter alia*, by the Clean Air Act Amendments of 1990, 42 U.S.C. §§ 7401 *et seq*.

"ERISA" means the United States Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

"ERISA Affiliate" means all employers (whether or not incorporated) that would be treated together with Seller or any of its affiliates as a "single employer" within the meaning of Section 414 of the Code or Section 4001 of ERISA.

"Escrow Agent" means Morris Anderson & Associates, Ltd., 55 West Monroe Street, Suite 2350, Chicago, IL 60603.

"Excluded Assets" has the meaning set forth in **Section 2.3**.

"Excluded Contracts" has the meaning set forth in **Section 2.3(c)**.

"Execution Date" has the meaning set forth in the preamble.

"FDA" means the U.S. Food and Drug Administration.

"Final" shall mean an order as entered on the docket as to which the time to appeal or petition for certiorari has expired and as to which no appeal or petition for certiorari has been timely filed, or as to which any appeal or petition for certiorari that has been filed has been resolved by the highest court to which the order was timely appealed or from which certiorari was sought.

"Financial Statements" has the meaning set forth in **Section 4.9**.

"GAAP" means United States generally accepted accounting principles in effect on the date hereof.

"Governmental Body" means any domestic or foreign federal, state or local government, governmental or regulatory body thereof, political subdivision thereof, any agency, authority, board, bureau or department thereof or any court or arbitrator thereof, including the Bankruptcy Court.

"Hazardous Material" means (A) any petroleum, waste oil, crude oil, asbestos, urea formaldehyde per- and polyfluoroalkyl substances (PFAS), or polychlorinated biphenyl; (B) any "hazardous substance," "pollutant," "contaminant," "hazardous waste," "regulated substance," "hazardous chemical" or "toxic chemical" as designated, listed or defined in any applicable Environmental Law; (C) any other substance or material (regardless of physical form) that is subject to any applicable Environmental Law.

"Initial Overbid" subject to Final Bankruptcy Court authorization and approval and pursuant to the terms and conditions of the Bid Procedures Order, shall be equal to a sum greater than or equal to 5.5% of the Initial Stalking Horse Purchase Price.

"Initial Stalking Horse Purchase Price" means the sum of: (a) Four Million Five Hundred Thousand Dollars ($4,500,000), plus (b) an amount equal to ninety-five percent (95%) of the aggregate total of the Receivables less the Zero Rated Receivables as of the Closing Date.

"Intellectual Property" means all domestic and foreign letters patent, patents, patent applications, patent licenses, software licenses, know-how licenses, trade secrets, trade names, trademarks, copyrights,

4869-3241-6847, v. 18

service marks, trademark registrations and applications, service mark registrations and applications, and copyright registrations and applications.

"Inventory" has the meaning set forth in **Section 2.2(c)**.

"IP Assignment Agreement" has the meaning set forth in **Section 8.3(d)**.

"Joint Written Direction" means a written direction to the Escrow Agent executed by Purchaser and Seller.

"Law" means any law, statute, regulation, rule or Order of, administered or enforced by or on behalf of, any Governmental Body, or common law.

"Leased Real Property" means the real property subject to the Real Property Leases.

"Legal Proceeding" means any claim, demand, litigation, cause of action, audit, dispute, review, investigation, hearing, charge, indictment, complaint, petition, suit or other judicial or administrative proceeding, at law or in equity, by or before any Governmental Body or arbitration or similar dispute resolution proceeding.

"Liabilities" means any and all debts, indebtedness, Claims, Liens, losses, damages, assessments, commitments, undertakings, deficiencies, fines, fees, expenses, costs, royalties, guaranties, adverse claims, demands, liabilities (including civil fines, and any any liabilities that result from, arise out of, or relate to any tort or product liability claim), charges, obligations, causes of action, penalties, sanctions of every kind and character (including reasonable fees and expenses of attorneys, technical experts and expert witnesses), judgments, proceedings, duties, responsibilities and obligations of any nature whatsoever, whether accrued or unaccrued, fixed, vested, absolute or contingent, known or unknown, disclosed or undisclosed, express or implied, primary or secondary, disputed or undisputed, liquidated or unliquidated, direct or indirect, asserted or unasserted, absolute or contingent, matured or unmatured, due or to become due, or determined or determinable or otherwise, and whenever and however arising, including those arising under any Law, including any Environmental Law, equity, contract, tort, strict liability or voluntary settlement or otherwise and including all costs and expenses relating thereto (including all fees, disbursements and expenses of legal counsel, experts, engineers and consultants and costs of investigation), and in all cases without regard to when sustained, incurred or asserted or when the relevant events occurred or circumstances existed.

"Liens" means, whether imposed by Law, Contract or otherwise, all liens, whether consensual or statutory (including mechanic's, materialman's, carrier's, repairer's, contractor's and other similar liens arising under applicable law), replacement liens, adequate protection liens or other liens granted under Sections 361, 363 or 364 of the Bankruptcy Code, claims, mortgages, deeds of trust, hypothecations, pledges, security interests or similar interests, charges, leases, subleases, options, rights of setoff, netting or deduction, restrictions, and encumbrances of any nature, including without limitation, preemptive rights, rights of first refusal, right of first offer, licenses, sublicenses, right of use or possession, defect or objection liens, conditional and installment sales agreements, title retention agreements or other similar restrictions or liens, voting trusts or agreements, transfer restrictions, easements, restrictive covenants, encroachments, servitudes, or restrictions of any kind and other title or interest retention arrangements, reservations, or limitations of any nature whatsoever, and including without limitation those charges or interests in property within the meaning of "lien" under Bankruptcy Code § 101(37) or any other limitation, restriction or interest that constitutes an "interest" for the purposes of Bankruptcy Code § 363(f).

"M&A Qualified Beneficiaries" has the meaning set forth in **Section 6.10(h)**.

4869-3241-6847, v. 18

"Material Contracts" has the meaning set forth in **Section 4.13**.

"Medical Device" has the meaning set forth in **Section 4.8(a)**.

"Multiemployer Plan" has the meaning set forth in **Section 4.16(b)**.

"Necessary Consent" has the meaning set forth in **Section 2.6**.

"New York Business" means Seller's business of manufacturing and selling carbon dioxide absorbents and other products from its facility located on the Owned Real Property.

"Non-Assignable Asset" has the meaning set forth in **Section 2.6**.

"Offer Employee" has the meaning set forth in **Section 6.10(b)**.

"Order" means any decree, order, injunction, ruling, writ, judgment, and consent of or by any Governmental Body.

"Ordinary Course of Business" means the operation of the Business by Seller in the usual and ordinary course in a manner substantially similar to the manner in which Seller has been operating during the past six (6) months prior to the Petition Date with the assumption that Seller had sufficient cash to operate.

"Organizational Documents" means (i) with respect to any corporation, its certificate or articles of incorporation, its bylaws, and any shareholder or stockholder agreement, (ii) with respect to any limited partnership, its certificate of limited partnership and its partnership agreement, (iii) with respect to any general partnership, any statement of partnership and its partnership agreement, (iv) with respect to any limited liability company, its certificate of formation or articles of organization and its operating agreement, (v) with respect to any other form of entity, any charter or similar document adopted or filed in connection with the creation, formation or organization of a person and any agreement amongst its members, (vi) any documents equivalent to any of the foregoing applicable to non-U.S.jurisdictions, and (vii) any amendments, side letters, modifications, or other arrangements with respect to any of the foregoing.

"Outside Date" has the meaning set forth in **Section 9.1(d)**.

"Owned Real Property" means the real property located at 46 New Street, Columbia County, Stuyvesant, New York 12173.

"Permits" has the meaning set forth in **Section 2.2(g)**.

"Permitted Liens" means (a) Liens for Taxes that are not due and payable so long as all such Liens for Taxes arising prior to Closing shall have been extinguished through payment by Seller on or prior to Closing; (b) all restrictions and encumbrances of record with respect to the Leased Real Property; and (c) all other currently existing Liens that will be removed or released on or prior to Closing, including through the operation of the Sale Order.

"Personal Property" has the meaning set forth in **Section 2.2(d)**.

"Petition Date" has the meaning set forth in the Recitals.

"Prepaid Expenses" means all deposits (including customer deposits and security deposits (whether maintained in escrow or otherwise)) for rent, electricity, telephone bonds or other sureties or other expenses

(including all prepaid rent and all prepaid charges, expenses and rent under any personal property leases), advances, prepaid expenses, prepayments, rights under warranties or guarantees, vendor rebates and other refunds of every kind and nature (whether or not known or unknown or contingent or non-contingent), except that professional fee retainers and prepaid deposits related thereto shall not be included in the definition of "Prepaid Expenses." For the avoidance of doubt, "Prepaid Expenses" shall not include any such deposits, expenses, advancemens, prepaid expenses, prepayments, rights under warranties or guarantees, vendor rebates and other refunds solely applicable to the New York Business.

"<u>Purchased Assets</u>" has the meaning set forth in **Section 2.2**.

"<u>Purchased Contracts</u>" has the meaning set forth in **Section 2.2(f)**.

"<u>Purchased Intellectual Property</u>" has the meaning set forth in **Section 2.2(e)**.

"<u>Purchaser</u>" has the meaning set forth in the preamble.

"<u>Purchaser Material Adverse Effect</u>" means any effect, event, change, condition, state of facts, occurrence or circumstance (regardless of whether such effect, event, change, condition, state of facts, occurrence or circumstance constitutes a breach of any representation, warranty or covenant of Purchaser hereunder) that has had or would reasonably be expected to have, individually or when considered together with any other effect, event, change, condition, state of facts, occurrence or circumstance, a material and adverse effect on the ability of Purchaser to consummate the transactions contemplated by this Agreement and the Ancillary Agreements to which it is a party or to perform its obligations hereunder or thereunder.

"<u>Purchaser Reimbursable Expenses</u>" means, subject to Purchaser's payment of the Seller Reimbursable Expenses, the reasonable, documented actual costs and expenses incurred and paid by Purchaser with respect to Purchaser's preparation of the Due Diligence Reports (the fees and expenses arising out of or in connection to the preparation and presentation of the said due diligence not to exceed 2.5% of the Aggregate Purchase Price), and the reasonable, documented actual costs and expenses incurred and paid by Purchaser for solicitor and attorney fees (said solicitor and attorney fees not to exceed 1% of the Aggregate Purchase Price), which said total Purchaser Reimbursable Expenses shall not exceed 3.5% of the Aggregate Purchase Price. For the avoidance of doubt, the Purchaser Reimbursable Expenses shall not include (i) the actual costs and expenses incurred and paid by Purchaser with respect to preparation of any due diligence reports for non-Purchased Assets; and/or (ii) the actual costs and expenses incurred and paid by Purchaser with respect to preparation of any due diligence reports for which Purchaser has already received reimbursement.

"<u>Real Property Leases</u>" means the leases of real property or interests in real property by Seller listed on <u>Section 1.1</u> of Seller's Disclosure Schedule.

"<u>Receivables</u>" has the meaning set forth in **Section 2.2(a)**.

"<u>Retained Liabilities</u>" has the meaning set forth in **Section 2.5**.

"<u>Retained Records</u>" has the meaning set forth in **Section 2.3(h)**.

"<u>Sale Order</u>"  means one or more orders of the Bankruptcy Court, substantially in the form attached hereto as <u>Exhibit B</u>, with any changes in form and substance reasonably satisfactory to Seller and Purchaser, (a) approving (i) this Agreement and the execution, delivery, and performance by Seller of this Agreement and the Ancillary Agreements; (ii) the sale of the Purchased Assets to Purchaser free and clear of all Claims and Liens, other than any Permitted Liens or any Assumed Liabilities; (iii) the assumption of the Assumed

8

Liabilities by Purchaser on the terms set forth herein; and (iv) the assumption and assignment to Purchaser of the Purchased Contracts that are executory contracts and unexpired leases on the terms set forth herein; (b) determining that Purchaser is a good faith purchaser; and (c) providing that the Closing will occur in accordance with the terms and conditions hereof.

"Secured Lender" shall mean Summit Financial Resources, LLC, a Delaware limited liability company and successor in interest to Summit Financial Resources, L.P., a Hawaiian limited partnership, or its successor in interest, Sterling Commercial Credit, LLC, a Delaware limited liability company, or any other successor financial institution who, at the time, has provided financing to Seller as a secured lender.

"Seller" has the meaning set forth in the preamble.

"Seller Fundamental Representations" means the representations and warranties of Sellers set forth in **Section 4.1** (Organization and Power), **Section 4.2** (Authorization and Enforceability), **Section 4.3** (No Conflicts) and **Section 4.6** (Brokers' Fees).

"Seller Material Adverse Effect" means any effect, event, change, condition, state of facts, occurrence or circumstance (regardless of whether such effect, event, change, condition, state of facts, occurrence or circumstance constitutes a breach of any representation, warranty or covenant of Seller hereunder) that has had or would reasonably be expected to have, individually or when considered together with any other effect, event, change, condition, state of facts, occurrence or circumstance (a) a material adverse effect on or a material adverse change in or to the Business or the Purchased Assets or the condition (financial or otherwise), assets, Liabilities, prospects, or operations of the Business or the Transferred Assets, taken as a whole; (b) a material adverse effect on or a material adverse change in or to the ability of Seller to consummate the transactions contemplated by this Agreement and the Ancillary Agreements to which it is a party or to perform its obligations hereunder or thereunder; or (c) the effect of preventing or delaying the transactions contemplated hereby; provided, that the following effects, events, changes, conditions, state of facts, occurrences or circumstances will not constitute a Seller Material Adverse Effect, (i) actions or omissions taken or not taken by or on behalf of Seller in compliance with the Bankruptcy Code or an order from the Bankruptcy Court or (ii) the fact that Seller will be operating the Business as a debtor-in-possession under the Bankruptcy Code.

"Seller's Disclosure Schedule" means the disclosure letter being delivered by Seller to Purchaser contemporaneously with the execution of this Agreement.

"Seller Reimbursable Expenses" shall mean the reasonable, documented actual costs and expenses incurred and paid by Seller with respect to preparation and production of any of the Due Diligence Reports for the purchase of the Purchased Assets (the reimbursable amount of the fees arising out of or in connection with the Due Diligence Reports not to exceed 2.5% of the Aggregate Purchase Price). The Seller Reimbursable Expenses shall be paid as follows: (i) to Seller from the sale proceeds at Closing; or (ii) to Seller by offset against the Purchaser Reimbursable Expenses to the extent the Purchaser Reimbursable Expenses is triggered pursuant to Section 6.2(a) herein.

"St. Louis Facility" means Seller's facility located at 1720 Sublette Avenue, St. Louis, Missouri 63110.

"Subsequent Overbids" subject to Final Bankruptcy Court authorization and approval and pursuant to the terms and conditions of the Bid Procedures Order, shall mean the bid increments after the Initial Overbid, which shall be no less than 1.9% of the Initial Stalking Horse Purchase Price.

"Tax Return" any return, report or statement required to be filed in respect of any Tax (including any schedule and attachments thereto, and any amendment thereof) including, any information return, election, claim for refund, amended return or declaration of estimated Tax, and including, where permitted or required, combined, consolidated or unitary returns for any group of entities that includes Seller or any of its affiliates.

"Taxes" means (A) any and all federal, state, local or foreign taxes, charges, fees, imposts, levies or other assessments, including, all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property and estimated taxes, customs duties, fees, assessments and charges of any kind whatsoever; (B) all interest, penalties, fines, additions to tax or additional amounts imposed by any taxing authority in connection with any item described in clause (A); and (C) any liability in respect of any items described in clause (A) or (B) payable by reason of contract, assumption, transferee liability, operation of law, Section 1.1502-6(a) of the United States Treasury regulations promulgated under the Code (or any predecessor or successor thereof or any analogous or similar provision under law) or otherwise.

"Transferred Employee" has the meaning set forth in **Section 6.10(b)**.

"Transition Agreement" means a transition agreement in form and substance reasonably acceptable to Purchaser, by and between Purchaser and the purchaser of the New York Business pursuant to which, for a period of six (6) months following the Closing (at actual out-of-pocket costs plus, if warranted, a reasonably allocation of overhead) (a) Purchaser will provide and make available to the purchaser of the New York Business certain manufacturing of inventory, services, technology, properties and assets forming part of the Purchased Assets that are reasonably necessary for the operation of the New York Business in substantially the same manner conducted by Seller immediately prior to the Closing, and if applicable, (b) the purchaser of the New York Business will provide and make available to Purchaser certain services, technology, properties and assets forming part of the assets purchased by the purchaser of the New York Business that are reasonably necessary for the operation of the Business in substantially the same manner conducted by Seller immediately prior to the Closing.

"Vendor Avoidance Actions" mean Avoidance Actions pursuant to 11 U.S.C. § 547 against pre-Petition Date vendors of Seller (i) for which such claims have not otherwise been resolved, waived, or settled pursuant to a pre-Closing order of the Court and (ii)  for which the Seller has entered into a transaction within 90 days of the Petition Date or after the Petition Date.

"WARN Act" means the Worker Adjustment and Retraining Notification Act, as amended, and every state and local Law regarding the same or similar subject matter.

"Workers" has the meaning set forth in **Section 2.2(h)**.

"Zero Rated Receivables" means, without duplication, (i) all Receivables more than 90 days old as of the Closing Date;  (ii) all Receivables less than 90 days old as of the Closing Date but where the Seller does not have a reasonable expectation of payment (howsoever arising); and (iii) all Receivables reserved for bad or doubtful accounts as of the Closing Date.

*Section 1.2      Other Interpretive Provisions.* As used in this Agreement the following words or phrases have the following meanings:  (i) "affiliate" means, in respect of any specified person, any other person that, directly or indirectly through one or more intermediaries, controls, is controlled by or is under common control with, such specified person; (ii) "business day" means any day other than Saturday, Sunday or any day on which The Federal Reserve Bank of St. Louis, Missouri is closed for business; (iii) for

purposes of the definition of "affiliate," "control" when used in respect of any person means the power to direct the management and policies of such person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise (and "controlling" and "controlled" have meanings correlative thereto); (iv) "day" means a calendar day; (v) "dollar" or "$" means lawful currency of the United States; (vi) "hereby," "herein," "hereof," "hereto," "hereunder," and "herewith" and words of similar import refer to this Agreement as a whole and not to any particular provision hereof; (vii) "include," "including" or derivatives thereof means "including without limitation"; (viii) "knowledge of Seller" means the actual knowledge of any one of Dan Dunn, Greg Mueller or Tom Gerhold, in each case after reasonable inquiry; (ix) "knowledge of Purchaser" means the actual knowledge of Hash Poormand; (x) "or" means "and/or"; (xi) "person" means any individual, corporation, joint venture, partnership, limited partnership, limited liability company, trust, unincorporated association or other form of business or legal entity or Governmental Body; and (xii) "U.S." means the United States of America.

**ARTICLE II**
**PURCHASE AND SALE**

Section 2.1    *Purchase and Sale of Assets*. On the terms and subject to the conditions hereof, including Final Bankruptcy Court authorization and approval, at the Closing, Purchaser shall purchase, acquire and accept from Seller, and Seller shall sell, assign, transfer, convey, and deliver, or cause to be sold, assigned, transferred, conveyed and delivered, to Purchaser, free and clear of all Claims, Liens (other than Permitted Liens) and any other interests, the Purchased Assets.

Section 2.2    *Purchased Assets*. The "Purchased Assets" shall consist of all of Seller's right, title and interest in and to the following assets, properties, rights and interests of every kind and description, wherever located, tangible and intangible, whether personal or mixed of Seller  (other than the Excluded Assets):

(a)    as of the Closing Date, all accounts and/or notes receivable and other such claims of Seller for payment against its customers for goods supplied and/or services rendered incident to the operation of the Business (collectively the "Receivables");

(b)    subject to **Section 2.6**, all of Seller's right, title and interest, if any, in and to the fixtures, improvements and other appurtenances located on or appurtenant to Leased Real Property;

(c)    as of the Closing Date, all inventories of goods, equipment, raw materials, components, packaging materials, supplies, and samples related thereto that are used or held for use in the conduct of the Business, in each case wherever located (including any of the foregoing in the possession of manufacturers, suppliers, customers, dealers or others and any of the foregoing in transit and any of the foregoing as set forth on Section 2.2(c) of the Seller's Disclosure Schedule) (collectively, "Inventory");

(d)    all machinery, equipment, tools, dies, jigs, molds, patterns, computer hardware, furniture, furnishings, supplies, spare parts in respect of any of the foregoing and other tangible personal property and movable assets used or held for use in the conduct of the Business that do not constitute Inventory, in each case wherever located (including that which is set forth on Section 2.2(d) of Seller's Disclosure Schedule) (collectively, "Personal Property");

(e)    all right, title, and interest in and to all of Seller's currently existing Intellectual Property that is used or held for use in the operation of the Business by Seller, including those listed in Section 2.2(e) of Seller's Disclosure Schedule, and all trade secrets, technical knowledge, know-how, and other confidential proprietary information and related ownership, use, and other rights of

11

Seller used in the conduct of the Business, including the right to sue for, collect and recover damages, profits and any other remedy in connection therewith, for past, present or future infringement, dilution, misuse, breach, default, misappropriation or other violation related to any of the foregoing assets, but specifically excluding the name "Allied Healthcare Products" and all derivatives thereof that include the name "Allied Healthcare" (collectively, the "Purchased Intellectual Property"); provided, that in the event that the Purchaser purchases all or substantially all of the assets used with the New York Business, prior to, contemporaneous with, or after the Closing Date, the Purchased Intellectual Property in this Agreement and the purchased Intellectual Property under such separate agreement in aggregate shall include any and all of Seller's Intellectual Property currently existing throughout the world used in the conduct of the Business or St. Louis Business, without exclusion, including the name "Allied Healthcare Products" and all derivatives thereof that include the name "Allied Healthcare";

(f)     subject to **Section 2.6**, all Contracts relating to the Business or the Purchased Assets to which Seller is a party (other than Real Property Leases, which are specifically excluded therefrom) that are listed in Section 2.2(f) of Seller's Disclosure Schedule and are specifically assumed by Purchaser (collectively, the "Purchased Contracts"); provided, that (i) Purchaser may amend or revise Section 2.2(f) of Seller's Disclosure Schedule in order to add any Contract (to the extent relating to the Business or the Purchased Assets) to, or eliminate any Contract from, such section at any time during the period commencing on the Execution Date and ending at the date that is two business days before the Closing Date, and  Seller shall within one business day after written notice from Purchaser of its intent to add a Contract to the list of Purchased Contracts set forth on Section 2.2(f) of Seller's Disclosure Schedule serve a supplemental notice of contract assumption on each of the counterparties to such Contracts in accordance with the Bid Procedures Order and provide a copy of the same to Purchaser; (ii) automatically upon the addition of any Contract to Section 2.2(f) of Seller's Disclosure Schedule, such Contract shall be a Purchased Contract for all purposes of this Agreement and (iii) automatically upon the removal of any Contract from Section 2.2(f) of Seller's Disclosure Schedule, such Contract shall be an Excluded Asset for all purposes of this Agreement, and no Liabilities arising thereunder shall be assumed or borne by Purchaser;

(g)     subject to **Section 2.6,** all existing licenses, permits, clearances, registrations, certificates, accreditations, approvals, and similar rights issued by any Governmental Body that are used or held for use in the conduct of the Business, all of which are listed in Section 2.2(g) of Seller's Disclosure Schedule (collectively, "Permits");

(h)     all books and records of Seller to the extent relating to the Business or the Purchased Assets (but excluding the Retained Records), including all books, records, files, data, correspondence and other information relating to employees, consultants, independent contractors, contingent workers and leased employees who have provided services to the Seller (collectively, "Workers"), purchase or sale information, advertising, marketing, inventory, sales, customers, suppliers, vendors, and financial, accounting and operations of the Business;

(i)     the non-exclusive right and irrevocable, worldwide, royalty-free, sub-licensable license (an equivalent license may be granted to the purchaser(s) of Seller's other business segments) to use, make, have made, sell, have sold, import, export, have imported and have exported any and all of Seller's Intellectual Property used or held in the operation of the Business by Seller but not included in the Purchased Intellectual Property, but only to the extent such use is reasonably necessary or beneficial to operate and carry on the Business in the manner currently conducted by Seller;

(j)        the non-exclusive right and irrevocable, worldwide, royalty-free, sub-licensable license (an equivalent license may be granted to the purchaser(s) of Seller's other business segments) to carry on the Business under the name of "Allied Healthcare Products" or any name including the words "Allied Healthcare";

(k)        all Prepaid Expenses related to the Business or the Purchased Assets;

(l)        all rights, claims or causes of action of Seller against any party arising out of events occurring prior to the Closing related to the Business or the Purchased Assets, including, but not limited to, arising out of events occurring prior to the commencement of the Bankruptcy Case, and including, but not limited to, any rights under or pursuant to any and all warranties, licenses, representations and guarantees made by suppliers, (sub)manufacturers and contractors relating to products, components or materials sold, or services provided, to Seller, in each case, relating to the Business or the Purchased Assets; provided, however, that for the avoidance of doubt, all Avoidance Actions other than Vendor Avoidance Actions are Excluded Assets;

(m)        all information technology assets, and related software systems used in the Business, wherever located (including at the Leased Real Property) that are (i) owned or purported to be owned by the Seller for use in the Business; or (ii) licensed to, subscribed to or leased for use by Seller in the Business and governed by any Purchased Contract, or any off the shelf or clickwrap agreement, to the extent assignable;

(n)        to the extent not prohibited by Law and not subject to attorney-client privilege or other work product privilege, all documents and other books and records, correspondence (including electronic mail communications), all vendor files, information and data, and all customer sales, regulatory, marketing, advertising, packaging and promotional materials, files, data, software (whether written, recorded or stored on disk, film, tape or other media, and including all computerized data), drawings, engineering and manufacturing data and other technical information and data, and all other business and other records of Seller, in each case, to the extent related to the Business or any Purchased Asset;

(o)        all telephone and facsimile numbers of the Business and all records of email addresses of customers, suppliers and service providers of the Business;

(p)        except as set forth in **Section 2.3(o)**, all rights, claims and benefits (including all insurance proceeds) under or arising out of all insurance policies relating to the Business or any of the Purchased Assets or Assumed Liabilities, to the extent assignable;

(q)        all goodwill and other intangible assets related to the Purchased Assets or the Business;

(r)        all Vendor Avoidance Actions related to the Business and the Purchased Assets; and

(s)        except to the extent listed as an Excluded Asset, any other assets and properties of Seller, wherever located, used or held for use by Seller to the extent relating to the Business or the Purchased Assets, of every kind and description, whether personal or mixed, tangible or intangible.

*Section 2.3    Excluded Assets.*  Notwithstanding any other provision of this Agreement to the contrary, at the Closing, Seller shall retain, Purchaser shall not acquire, and the Purchased Assets shall not

13

include, any right, title or interest in the following assets, properties and interests of Seller (collectively, "Excluded Assets"):

(a)    all inventory that has been sold, transferred, consumed or otherwise disposed of by Seller prior to the Closing, in each case in the Ordinary Course of Business and **Section 6.4**;

(b)    (i) all inventory solely with respect to the operation of the New York Business, wherever located, (ii) all machinery, equipment, tools, dies, jigs, molds, patterns, computer hardware, furniture, furnishings, supplies, spare parts in respect of any of the foregoing and other tangible personal property and movable assets located at the Owned Real Property and used solely with respect to the operation of the New York Business or as set forth on Section 2.3(b)(ii) of the Seller's Disclosure Schedule, and (iii) all machinery, equipment and other tangible assets located at the St. Louis Facility and used with respect to the operation of the New York Business, all of which is specifically set forth on Section 2.3(b)(iii) of the Seller's Disclosure Schedule;

(c)    all Contracts not identified on Section 2.2(b) or Section 2.2(f) of Seller's Disclosure Schedule as in effect immediately prior to the Closing (collectively, the "Excluded Contracts");

(d)    all Contracts that have terminated or expired prior to the Closing in the Ordinary Course of Business consistent with past practice and **Section 6.4**;

(e)    subject to the provisions of **Section 2.2(j)**, the name of "Allied Healthcare Products" or any name including the words "Allied Healthcare";

(f)    subject to the provisions of the Transition Agreement (if applicable) and **Sections 2.2(j) and 2.2(m)**, all Intellectual Property and other intangible assets (other than the Purchased Intellectual Property) used solely with respect to the New York Business;

(g)    all of Seller's tax deposits, refunds and other similar credits or payments of any kind;

(h)    Seller's Tax Returns and reports, corporate seal, minute books, charter documents, stock ledgers, and such other books and records as pertain to the organization, existence, or share capitalization of Seller, and all books, records, agreements and other documents pertaining solely to the New York Business (collectively, "Retained Records") and duplicate copies of such records included in the Purchased Assets as are necessary to enable Seller to file its Tax Returns and reports, and any other records or materials relating to Seller generally and not involving or relating to the Purchased Assets or the Business;

(i)    all rights, claims, causes of action and credits to the extent relating to any Excluded Asset or Retained Liabilities, including any such item to the extent arising under any warranty, guarantee, indemnity or similar right in favor of Seller in respect of an Excluded Asset or Retained Liabilities;

(j)    Seller's rights arising out of or relating to this Agreement or the transactions contemplated hereby;

(k)    all Employee Benefit Plans of Seller;

(l)    all Cash and Cash Equivalents of Seller;

(m)     all deposits with respect to legal, accounting, financial advisory, valuation and investment banking fees and expenses incurred by or on behalf of Seller;

(n)     the Owned Real Property;

(o)     (i) Seller's insurance policies and any prepaid premiums with respect thereto, specifically including any D&O insurance policies and rights, claims, and benefits under such D&O policies, (ii) any claims for the return of unused premiums, and (iii) all rights, claims, and benefits under Seller's insurance policies to the extent relating to any Excluded Assets or Retained Liabilities;

(p)     all of Seller's interests, rights and obligations under the Real Property Leases;

(q)     any other asset or property of Seller listed on Section 2.3(q) of Seller's Disclosure Schedule;

(r)     all Avoidance Actions other than Vendor Avoidance Actions;

(s)     all workers' compensation deposits and other deposits and retentions with insurance companies; and

(t)     the Zero Rated Receivables.

Section 2.4     *Assumed Liabilities.* Notwithstanding any other provision of this Agreement to the contrary, Purchaser shall not assume any Liabilities of Seller, including, without any limitation, any Liabilities arising out of or otherwise relating to the Business or the Purchased Assets prior to the Closing, except for the following (collectively, "Assumed Liabilities"):

(a)     all Liabilities arising under the terms of each Purchased Contract, solely to the extent arising after the Closing Date, but excluding any Liabilities arising out of or related to any breach or default thereof occurring at or prior to the Closing or arising out of any event or circumstance occurring at or prior to the Closing which, with the delivery of notice, lapse of time or both, would constitute a breach or default thereof; and

(b)     all Liabilities set forth on Section 2.4(b) of Seller's Disclosure Schedule.

Section 2.5     *Retained Liabilities.*  Seller acknowledges and agrees that pursuant to the terms and provisions of this Agreement, Purchaser will not assume, or in any way be liable or responsible to pay, perform or otherwise discharge, any Liability of Seller (including Liabilities relating to the pre-petition or post-petition operation of the Business, the Excluded Assets or to the Purchased Assets), whether relating to or arising out of the Business, the Excluded Assets or the Purchased Assets or otherwise, other than the Assumed Liabilities (collectively, the "Retained Liabilities").  Without limiting the preceding sentence, for the avoidance of doubt, Seller shall remain responsible for, and Purchaser shall not assume and hereby disclaims any Liability to pay, perform or otherwise discharge any of the Retained Liabilities, including all of the following Liabilities of Seller (each of which shall constitute a Retained Liability):

(a)     all Liabilities arising out of or related to the Excluded Assets, specifically including, without limitation, Liabilities arising out of or related to the Real Property Leases and the Owned Real Property;

15

(b)      all Liabilities for Taxes of Seller that are attributable to any period, or portion thereof, before or after the Closing Date or the transfer of the Purchased Assets from Seller to Purchaser;

(c)      all Liabilities for Taxes in respect of the Purchased Assets that are attributable to any period, or portion thereof, before the Closing Date;

(d)      all Liabilities arising under or related to Environmental Laws that are based on or attributable to facts, occurrences or conditions first arising or existing on or prior to the Closing Date;

(e)      all Liabilities arising under or related to pension withdrawal liability that are based on or attributable to Seller's or an ERISA Affiliate's obligation to contribute to a Multiemployer Plan on or prior to the Closing Date, or that are based on or attributable to any other facts, occurrences or conditions first arising or existing on or prior to the Closing Date;

(f)      all Liabilities incurred in respect of or attributable to the Business or ownership or operation of the Purchased Assets prior to the Closing, or Liabilities from which the Purchased Assets and Purchaser are discharged, released or otherwise cleared as of the Closing in accordance with the Sale Order;

(g)      with the exception of Seller Reimbursable Expenses, all Liabilities in respect of any costs, fees and expenses (including all legal, accounting, financial advisory, valuation, investment banking and other third-party advisory or consulting fees and expenses) incurred by or on behalf of Seller in connection with or arising from the Bankruptcy Case or the transactions contemplated by this Agreement, the Ancillary Agreements and each other agreement, document or instrument contemplated hereby and thereby (the "Bankruptcy Expenses");

(h)      all Liabilities (i) existing prior to the filing of the Bankruptcy Case  under the Bankruptcy Case or (ii) incurred subsequent to the filing of the Bankruptcy Case and prior to the Closing;

(i)      all Liabilities of Seller under this Agreement, the Ancillary Agreements and each other agreement, document or instrument contemplated hereby and thereby, or any Contract entered into in connection herewith or therewith;

(j)      all Liabilities to the extent arising out of or related to (i) the breach, performance, or non-performance by Seller prior to the Closing under any Contract, and (ii)  any Cure Amounts resulting from the assumption and assignment of the Purchased Contracts by Seller to Purchaser;

(k)      all Liabilities arising out of, relating to or in respect of any Hazardous Material-containing waste generated prior to the Closing by or in association with Seller's or any bankruptcy trustee's operation or administration of the Business or the Purchased Assets, including any arrangement for the proper management and/or off-site treatment, storage and/or disposal thereof;

(l)      all Cure Amounts;

(m)      all Liabilities arising out of, relating to or in respect of (i) the employment or performance of services, or termination of employment or services of any individual on or before the Closing Date, (ii) Employee Benefit Plans of Seller, and (iii) workers' compensation and

16

unemployment claims against Seller that relate to the period on or before the Closing Date, irrespective of whether such claims are made prior to or after the Closing;

(n)  all Liability under Environmental Laws, whatever the same shall be, arising from or associated with Seller's ownership or operation of the Business, management, including disposal or release, of any Hazardous Materials, and occupancy of the Leased Real Property on or before the Closing Date (for the avoidance of doubt, such Retained Liabilities include Claims first manifested, discovered or asserted after the Closing Date but which arose prior to the Closing Date); and

(o)  any Liabilities arising under or relating to any Collective Bargaining Agreement.

Section 2.6    Non-Assignable Assets.  Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign, sell or transfer and shall not affect the assignment, sale or transfer of any Purchased Asset ("Non-Assignable Asset") if (i) an attempted assignment, sale or transfer thereof, without the approval, authorization or consent of, or granting or issuance of any license or permit by, any Governmental Body or other third person (each such action, a "Necessary Consent"), would constitute a breach, default or violation thereof or of any Law or Order or in any way adversely affect the rights of Purchaser thereunder; and (ii) the Bankruptcy Court has not entered an Order providing that such Necessary Consent is not required.  In the event any assignment, sale or transfer is subject to such Necessary Consent being obtained, then Seller shall use commercially reasonable efforts to obtain the Necessary Consent in respect of any such Non-Assignable Asset or any claim or right or any benefit arising thereunder for the assignment, sale or transfer thereto to Purchaser as Purchaser may reasonably request.  For the avoidance of doubt, any asset that would be a Purchased Asset but is not assigned in accordance with this **Section 2.6** shall not be considered a "Purchased Asset" for purposes hereof unless and until such asset is assigned to Purchaser after the Closing Date upon receipt of any Necessary Consent or approval of the Bankruptcy Court.  If such Necessary Consent is not obtained, or if an attempted assignment, sale or transfer thereof would be ineffective or would adversely affect the rights of Purchaser to such Non-Assignable Asset after the Closing, then Seller shall cooperate with Purchaser in any reasonable arrangement to allow Purchaser to obtain the benefits and assume the obligations thereunder in accordance with this Agreement.  Pending the receipt of such Necessary Consent, the parties shall, at Purchaser's expense, reasonably cooperate with each other to provide Purchaser with all of the benefits of use of such Non-Assignable Asset. Once such Necessary Consent for the sale, transfer, assignment, conveyance or delivery of any such Non-Assignable Asset not sold, transferred, assigned, conveyed or delivered at the Closing is obtained, Seller shall promptly transfer, assign, convey and deliver such asset to Purchaser. To the extent that any such Non-Assignable Asset cannot be transferred or the full benefits or use of any such asset cannot be provided to Purchaser, then as promptly as practicable following the Closing, Purchaser and Seller shall enter into such arrangements (including subleasing, sublicensing or subcontracting), and shall, at Purchaser's expense, reasonably cooperate with each other, to provide Purchaser with all of the benefits of use of such Non-Assignable Asset. Seller shall hold in trust for, and pay to Purchaser, promptly upon receipt thereof, all income, proceeds and other monies received by Seller derived from their use of any Non-Assignable Asset that would be a Purchased Asset in connection with the arrangements under this **Section 2.6.**

**ARTICLE III**
**PURCHASE PRICE**

Section 3.1    Purchase Price.  On the terms and subject to the conditions set forth herein, in consideration of the sale, assignment, conveyance and transfer by Seller of the Purchased Assets to Purchaser at the Closing, Purchaser will pay Seller an amount (the "Aggregate Purchase Price") equal to the sum of: (a) Four Million Five Hundred Thousand Dollars ($4,500,000); plus (b) in the event there is

17

any Initial Overbid and/or any Subsequent Overbids, but Purchaser is the successful bidder at the Auction, the sum of such overbid amounts (net of the amount of the Purchaser Reimbursable Expenses, less payment of the Seller Reimbursable Expenses); plus (c) an amount equal to ninety-five percent (95%) of the aggregate total of the Receivables minus the Zero Rated Receivables as of the Closing Date; minus (d) Customer Credits as of the Closing Date.

Section 3.2    *Earnest Money*.  On the Execution Date, Purchaser shall pay an earnest money deposit (the "Deposit") in the amount of Four Hundred Fifty Thousand Dollars ($450,000) to the Escrow Agent, to be held in their trust account and disbursed in accordance with the provisions of this Agreement.

Section 3.3    *Closing Payments*.  At the Closing, the Aggregate Purchase Price shall be paid to Seller as follows:

(a)    The Deposit shall be paid by the Escrow Agent to Seller; and

(b)    Purchaser shall pay the Closing Cash Payment to Seller, to be distributed pursuant to the Bankruptcy Code and upon final Bankruptcy Court approval.

Section 3.4    *Release of Earnest Money Deposit*.  In the event that the Closing occurs, the Seller and Purchaser shall, at the Closing, send a Joint Written Direction to the Escrow Agent directing the Escrow Agent to pay the Deposit  to Seller at the Closing as set forth in **Section 3.3(a)**.  In the event that this Agreement is terminated prior to the Closing for any reason other than pursuant to **Section 9.1(f)**, then Seller and Purchaser shall send a Joint Written Direction to the Escrow Agent, on the date of such termination, directing the Escrow Agent to pay the Deposit to Purchaser on such date, free of any Claims by Seller with respect thereto.

Section 3.5    *Proration*.  All pro-ratable items (specifically including, without limitation, real estate taxes and assessments for calendar year 2023 for the Leased Real Property) shall be prorated as of the Effective Time.

Section 3.6    *Purchase Price Allocation*.   Purchaser and Seller agree that the Aggregate Purchase Price, applicable Assumed Liabilities and other relevant items treated as purchase price for U.S. federal income tax purposes shall be allocated in accordance with an allocation schedule (the "Allocation Statement"), which shall be prepared in a reasonable manner by Purchaser and delivered by Purchaser to Seller within ninety (90) days following the Closing Date. Purchaser and Seller shall (and shall cause their respective affiliates to) file all Tax Returns (including IRS Form 8954 (as and to the extent applicable)) and other Tax-related information reports in a manner consistent with the Allocation Schedule and not take any position inconsistent with the Allocation Statement in any Tax-Related audit, examination or other proceeding (whether administrative or judicial) unless required by applicable Law. If either party receives any notice from a Governmental Body in respect of an audit, examination or other proceeding (whether administrative or judicial) regarding any allocation of the Aggregate Purchase Price or otherwise proposing an allocation different from the Allocation Statement, such party shall notify the other party of such notice and provide such other party with a copy of such notice, and the parties shall cooperate with each other in good faith regarding the resolution of any such matter.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF SELLER

Except as set forth in the Seller's Disclosure Schedule, Seller hereby represents and warrants to Purchaser that:

18

4869-3241-6847, v. 18

*Section 4.1      Organization and Power*.   Seller is a corporation duly organized, validly existing, and in good standing under the Laws of its jurisdiction of incorporation.  Subject to the limitations imposed on Seller as a result of filing a petition for relief under the Bankruptcy Code, Seller has the requisite corporate power and authority to own, lease, or otherwise hold the assets and properties owned, leased or otherwise held by it and to carry on its business as currently conducted.  Seller is duly qualified and authorized to conduct business as a foreign corporation and is in good standing (or its equivalent) under the Laws of each jurisdiction in which the conduct of its business or the ownership or lease of its assets or properties requires such qualification or authorization.

*Section 4.2      Authorization and Enforceability*.   Subject to the entry of the Final Sale Order and such other authorization and approval as is required by the Bankruptcy Court, Seller has the requisite corporate power to execute and deliver this Agreement, any bill of sale, assignment and assumption agreement and such other agreements, documents or instruments to be executed in connection with the transactions contemplated hereby or thereby (collectively, the "Ancillary Agreements") to which Seller is or will be a party,  to perform the obligations to be performed by it hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby.  Subject to the entry of the Final Sale Order and such other authorization and approval as is required by the Bankruptcy Court, the execution and delivery by Seller of this Agreement and each Ancillary Agreement to which Seller is or will be a party and the performance by it of the obligations to be performed by it hereunder and thereunder, and the consummation of the transactions contemplated hereby and thereby, have been (or, in the case of any such Ancillary Agreement, at the Closing, will be) duly authorized by all necessary corporate action on the part of Seller.  Subject to the entry of the Final Sale Order and such other authorization and approval as is required by the Bankruptcy Court, this Agreement has been, and the Ancillary Agreements to which Seller is or will be a party will at the Closing be, duly executed and delivered by Seller and, assuming the due execution and delivery of this Agreement and the Ancillary Agreements by the other parties hereto and thereto (other than any affiliate of Seller), constitute valid and binding obligations of Seller enforceable against Seller in accordance with their respective terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar Laws affecting the enforcement of creditors' rights in general and subject to general principles of equity (regardless of whether such enforceability is considered in a proceeding at law or in equity).

*Section 4.3      No Conflicts*.   Except as set forth on Section 4.3 of Seller's Disclosure Schedule, the execution and delivery by Seller of this Agreement and each Ancillary Agreement to which Seller is or will be a party, the performance by Seller of the obligations to be performed by it hereunder and thereunder, and the consummation of the transactions contemplated hereby and thereby, will not, with or without notice, lapse or time or both, (i) conflict with any Organizational Document of Seller, (ii)  subject to the entry of the Final Sale Order and such other authorization and approval as is required by the Bankruptcy Court, result in a breach of, conflict with, or result in any violation of, or constitute a default (with or without notice, lapse of time, or both) under, or give rise to a right of termination, cancellation, or acceleration of any obligation or to loss of a benefit under, or result in the creation or imposition of any Lien (other than a Permitted Lien) on, any Purchased Asset (including any Purchased Contract or any Permit listed or required to be listed in Section 2.2(g) of Seller's Disclosure Schedule), or (iii) subject to the entry of the Final Sale Order and such other authorization and approval as is required by the Bankruptcy Court, conflict with or violate any Law or Order applicable to Seller or violate any Law applicable to Seller, the Business, the Purchased Assets or the Assumed Liabilities.

*Section 4.4      Consents and Approvals*.   Except as set forth on Section 4.4 of Seller's Disclosure Schedule and except to the extent required by the Bankruptcy Court, no consent, approval, Order, Permit or authorization of, or registration, or filing with, any Governmental Body or other person is required to be obtained or made on the part of Seller in connection with the execution and delivery of this Agreement or any Ancillary Agreement to which Seller is or will be a party, the performance by Seller of the obligations

19

to be performed by it hereunder or thereunder, or the consummation of the transactions contemplated hereby or thereby, other than the entry of the Sale Order.

Section 4.5      Legal Proceedings.   Except for the general pendency of the Bankruptcy Case or as listed on Section 4.5 of Seller's Disclosure Schedule, there is no, and since January 1, 2020 there has not been any Legal Proceeding pending or, to the knowledge of Seller, threatened that involves or affects any of Seller, the Purchased Assets or the Business or that could reasonably be expected to give rise to any Liability of Purchaser or adversely affect Purchaser's ability to conduct the Business after the Closing or the ownership or use of the Purchased Assets in the operation of the Business after the Closing.  Neither Seller nor any of the Purchased Assets are, nor since January 1, 2020 have been, subject to any Order.

Section 4.6      Brokers' Fees.   Except as listed on Section 4.6 of Seller's Disclosure Schedule, neither Seller nor any person acting on its behalf has agreed to pay a fee, commission or similar payment in connection with this Agreement, any Ancillary Agreement or any of the transactions contemplated hereby or thereby to any person for which Purchaser might be liable.

Section 4.7      Purchased Assets; Sufficiency.

(a)      Seller has, in all material respects, indefeasible title to, and owns and possesses all rights and interests in, including the right to use, each of the Purchased Assets, or with respect to leased Purchased Assets, valid leasehold interests in, or with respect to licensed Purchased Assets, valid licenses to use, in each case free and clear of all Claims and Liens (other than Permitted Liens).

(b)      This Agreement and the instruments and documents to be delivered by Seller to Purchaser at Closing shall be adequate and sufficient to transfer (i) Seller's entire right, title and interest in and to the Purchased Assets to Purchaser and (ii) to Purchaser, good and valid title to the Purchased Assets, free and clear of all Claims and Liens (other than Permitted Liens and Assumed Liabilities).

(c)      Subject to the entry of the Sale Order, at the Closing, Purchaser will own or have the right to use all of the assets used in, held for use or necessary to conduct in all material respects the Business as conducted as of the Execution Date, other than the Excluded Assets.

(d)      The Purchased Assets to be conveyed to Purchaser in the aggregate hereunder at Closing (together with the services, properties and assets to be provided to and made available for use by Purchaser and its affiliates pursuant to the Transition Agreement (if applicable)) constitute all the properties (tangible and intangible), rights and other assets necessary, and are, without reference to cash historically spent by Seller in the Ordinary Course of Business, sufficient, to carry on the Business immediately following the Closing as it is currently conducted by Seller.

(e)      Except as set forth in Section 4.7(e) of Seller's Disclosure Schedule, Seller owns or has valid rights to use the Purchased Assets, free and clear of all Claims and Liens (other than Permitted Liens).

Section 4.8      FDA Regulatory Compliance and Compliance with Other Laws.

(a)      Except as disclosed in Section 4.8(a) of Seller's Disclosure Schedule, each product manufactured or sold by Seller in the Business that is subject to the U.S. Food, Drug and Cosmetic Act (including the rules and regulations of the FDA promulgated thereunder), or comparable applicable Laws in any non-U.S. jurisdiction (each such product, a "Medical Device"), is being or

20

has been developed, manufactured, sold, tested, labeled, stored, distributed and marketed in material compliance with all necessary Permits and other applicable Laws and requirements under the FDA, applicable industry-standards, including ISO, and applicable comparable Laws in any non-U.S. jurisdiction.  Seller is in material compliance with all applicable Laws and requirements of the FDA relating to the maintenance of technical and clinical data generated prior to the Closing Date by Seller with respect to Medical Devices.

(b)     Except as set forth in Section 4.8(b) of Seller's Disclosure Schedule, all material product issues, incidents and complaints with respect to the Business have been suitably investigated, documented and managed.

(c)     All reports, documents, claims, Permits and notices required to be filed, maintained or furnished with or to the FDA by Seller for the Business have been so filed, maintained or furnished.  All such reports, documents, claims, Permits and notices were complete and accurate in all material respects on the date filed (or were corrected in or supplemented by a subsequent filing).

(d)     Except as disclosed in Section 4.8(d) of Seller's Disclosure Schedule, Seller has not, with respect to the Business, received any written notice that the FDA has (i) commenced, or threatened to initiate, any action to withdraw its premarket clearance or premarket approval or request the recall of any Medical Devices, (ii) commenced, or threatened to initiate, any action to enjoin manufacture or distribution of any Medical Devices or (iii) commenced, or threatened to initiate, any action to enjoin the manufacture or distribution of any Medical Devices, or (iv) identified any non-compliance with reporting, registration, labeling, good manufacturing practices, advertising and other requirements under the FDA regulations.

(e)     Except as listed in Section 4.8(e) of Seller's Disclosure Schedule: (i) the Business is being conducted, and at all times since January 1, 2021 has been conducted, in compliance with, and Seller is in compliance, and at all times since January 1, 2021 has been in compliance, with all applicable Laws relating to the operation of the Business and the Purchased Assets, in each case in all material respects, and (ii) there are no pending or, to the knowledge of Seller, threatened (and since January 1, 2021 there have been no pending, or to the knowledge of Seller, threatened), Legal Proceedings by any Governmental Body relating to any non-compliance of the Business or the Purchased Assets in any material respect.

(f)     Seller, in relation to the Purchased Assets, is (and at all times since January 1, 2021 has been) in compliance with all applicable material Customs and International Trade Laws, and at no time has Seller or any person on behalf of the Business committed any material violation of the Customs and International Trade Laws of those countries in which Seller is engaged in the Business. The conduct of the Business is, and since January 1, 2021 has been, in all material respects, in compliance with all Laws governing or concerning the payment of all customs duties, countervailing duties, Taxes, fees and charges applicable to and due with respect to all import transactions, including any countervailing or antidumping duties. To the knowledge of Seller, no products, goods, parts, or accessories imported in the course of engaging in the Business are or have been subject to any countervailing or antidumping duty investigation, Order, notice or other Legal Proceeding by any Governmental Body. There are no material unresolved questions or claims concerning any Liability of any conduct in furtherance of the Business with respect to Customs and International Trade Laws applicable to the import or export of goods.

Section 4.9     Financial Statements.  Seller has delivered to Purchaser copies of (i) the audited balance sheet of Seller as at June 30, 2022 and the related audited income statement and statement of retained earnings for the year then ended, and (ii) the unaudited balance sheet of Seller as at March 31,

21

2023 and the related unaudited income statement and statement of retained earnings for the year then ended (such audited and unaudited statements, including the related notes and schedules thereto, are referred to herein as the "Financial Statements").  Each of the Financial Statements is true, complete and correct in all material respects, has been accurately derived from the books and records of Seller as of the dates and for the periods indicated therein, has been prepared in accordance with GAAP consistently applied without modification of the accounting principles used in the preparation thereof throughout the periods presented and presents fairly in all material respects the financial position, results of operations, and stockholders' equity of Seller as at the dates and for the periods indicated (subject to normal year-end adjustments, none of which are material, with respect to the unaudited statements).

Section 4.10    *Taxes.*

(a)    Except as set forth on Section 4.10(a) of Seller's Disclosure Schedule, (i) Seller has timely filed, or obtained extensions of time to file, all Tax Returns required to be filed with the appropriate taxing authorities in all jurisdictions in which such Tax Returns are required to be filed (taking into account any extension of time to file granted or to be obtained on behalf of Seller) and all such Tax Returns are correct and accurate; and (ii) all Taxes due from Seller, regardless of whether shown to be payable on such Tax Returns, have been paid.  Seller is not a foreign person within the meaning of Section 1445 of the Code.

(b)    Except as set forth on Section 4.10(b) of the Seller's Disclosure Schedule, all deficiencies asserted or assessments made as a result of any examinations by any Governmental Body with respect to any Taxes due from Seller have been paid in full to the extent that the underpayment or non-payment of such Taxes would result in a Lien on the Purchased Assets after the Closing Date. No audit or other Claim by any Governmental Body is pending or, to the knowledge of Seller, threatened in writing with respect to any Taxes due from Seller the underpayment or nonpayment of which would result in a Lien on the Purchased Assets after the Closing Date.

(c)    None of the assets of Seller: (i) constitutes "tax-exempt bond financed property" within the meaning of Code Section 168; (ii) is subject to a lease, safe harbor lease or other arrangement as a result of which such assets are required for federal Income Tax purposes to be treated as owned by a Person other than Seller; or (iii) is subject to the limitations on "amortizable section 197 intangibles" described in Section 197(f)(9) of the Code or any similar comparable limitation under state, local or foreign Law.

Section 4.11    *Real Property.*

(a)    Section 4.11(a) of Seller's Disclosure Schedule sets forth the address and legal description of all Owned Real Property, which said Owned Real Property is not included in the Purchased Assets.

(b)    Section 4.11(b) of Seller's Disclosure Schedule sets forth a complete list of all real property leases with respect to the Business that Seller is a party to as lessee or lessor, sublessee or sublessor, licensee or licensor, or sublicensee or sublicensor, including all amendments, extensions and renewals with respect thereto.  Seller has made available to Purchaser true, complete and correct copies of all Real Property Leases.  Seller has a valid, binding and enforceable leasehold interest under each of the Real Property Leases, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar Laws affecting creditors' rights and remedies generally and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).  Except as listed on Section 4.11(b) of Seller's

22

Disclosure Schedule, other than a breach or default arising from Seller's insolvency or Seller having filed the Bankruptcy Case, Seller is not in breach or default under any of the Real Property Leases and, to the knowledge of Seller, no event has occurred or circumstance exists which, with the delivery of notice, lapse of time or both, would constitute a breach or default by Seller under the Real Property Leases. Notwithstanding the foregoing, interests in the Real Property Leases are not included in the Purchased Assets.

(c)     The Leased Real Property and its current use, and the location of all buildings, structures, fixtures, building systems and equipment improvements on the Leased Real Property, are in material compliance with all applicable Laws. In the past three (3) years, Seller has not received any written notice of (i) violations of building codes or zoning ordinances or other governmental or regulatory Laws affecting the Leased Real Property, (ii) existing, pending or threatened condemnation or eminent domain proceedings affecting the Leased Real Property, or (iii) existing, pending or threatened zoning, building code or other moratorium proceedings, or similar matters which could reasonably be expected to adversely affect the ability to operate on the Leased Real Property as currently operated.

(d)     To the extent not payable over time as shown on a real estate or similar municipal bill, and to the extent the responsibility of Seller (as contrasted with a landlord, for example), all connection fees, "tie-in" charges and other fees, if any, due and payable with respect to the utilities or facilities now serving the Leased Real Property have been fully paid.

(e)     (i) all certificates of occupancy, permits, licenses, franchises, approvals and authorizations of all Governmental Bodies, board of fire underwriters, association or any other entity having jurisdiction over the Leased Real Property, which are required to use or occupy the Leased Real Property or own and operate the Business as currently conducted thereon, have been issued and are in full force and effect; and (ii) Seller has not received any notices of actual or threatened cancellation or suspension of any right of occupancy for any portion of any building located on the Leased Real Property.

(f)     Seller has not received any written notice indicating that any contractor, subcontractor, materialman or supplier has filed or intends to file a mechanic's lien against the Leased Real Property, and no contractor, subcontractor, materialman or supplier has provided written notice to Seller indicating that money is due and owing for construction, alteration or repair work on any Leased Real Property that will not be paid for (in full) on or before the Closing Date.

*Section 4.12     Intellectual Property*. Except as listed on <u>Section 4.12</u> of Seller's Disclosure Schedule (a) Seller owns and possesses all right, title and interest in and to (or has the right to use pursuant to a license or other permission) the Purchased Intellectual Property and Seller's Intellectual Property licensed to Purchaser under **Section 2.2(i)** and **2.2(j)**; (b) Seller has no obligation to compensate, and Purchaser will have no obligation to compensate, any person for the right to use any of the Purchased Intellectual Property or Seller's Intellectual Property that is licensed to Purchaser under **Section 2.2(i)** and **2.2(j)**; (c) Seller has not granted to any person any exclusive license, option or other similar rights in or to any of the Purchased Intellectual Property or Intellectual Property licensed to Purchaser under **Section 2.2(i)** and **2.2(j)**; (d) Seller has not in the past three (3) years received any written notice from any person that challenges the validity or enforceability of any of the Purchased Intellectual Property or Intellectual Property licensed to Purchaser under **Section 2.2(i)** and **2.2(j)**; (e) Seller has not in the past three (3) years received any notice from any person challenging Seller's ownership of, or right to use, any of the Purchased Intellectual Property or Intellectual Property licensed to Purchaser under **Section 2.2(i)** and **2.2(j)**; and (f) to the knowledge of Seller, no person is infringing upon or has misappropriated any of the Purchased Intellectual Property and Seller's Intellectual Property licensed to Purchaser under **Section 2.2(i)** and **2.2(j)**.

For the avoidance of doubt, no representation or warranty is being made with respect to off-the-shelf or clickwrap Intellectual Property utilized by Seller in the operation of its Business. Seller does not collect the Personal Information (meaning, any information that identifies, relates to, or could reasonably be linked with an individual, including, but not limited to, a consumer's name, physical address, email address, IP address, internet browsing history, geolocation data, biometric information, social security number, or payment information) of consumers. Seller has hired an outside consultant to review its policies, procedures and safeguards with respect to protecting its material confidential information and the security of its information technology and data used or held for use in connection with the Business. <u>Section 4.12</u> of Seller's Disclosure Schedule sets forth the consultant's recommendations and any actions taken by Seller with respect to such recommendations.

Section 4.13    *Contracts*.    The contracts listed in <u>Section 4.13</u> of Seller's Disclosure Schedule constitute a true and accurate list of all Contracts material to the Business to which Seller is a party or by which it is bound with respect to the Business (collectively, the "<u>Material Contracts</u>"); for the avoidance of doubt, Material Contracts do not include Contracts which taken individually, or in the aggregate, are not material to the Business. Subject to requisite Bankruptcy Court approvals, and assumption by Seller of the applicable Contract in accordance with applicable Law and except as a result of the commencement of the Bankruptcy Case, each Purchased Contract is in full force and effect and is a valid, binding and enforceable obligation of Seller and, to the knowledge of Seller, each of the other parties thereto, except as may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar Laws affecting the enforcement of creditors' rights in general and subject to general principles of equity (regardless of whether such enforceability is considered in a proceeding at law or in equity). Except as set forth on <u>Section 4.13</u> of Seller's Disclosure Schedule Seller is not in default, or is alleged by any counterparty thereto to have breached or to be in default, under any Purchased Contract, and, to the knowledge of Seller, each other party to each Purchased Contract is not in default thereunder. No Purchased Contract has been canceled or otherwise terminated, and Seller has not received any written notice from any person regarding any cancellation or termination thereto (actual or proposed). As of the Execution Date, Seller has made available to Purchaser copies of all Purchased Contracts and such copies are true, complete and accurate in all material respects and include all amendments thereto.

Section 4.14    *Permits*.    Seller is in possession of, and in good standing with respect to, all Permits necessary for it to own, lease and operate its assets and properties, to employ or engage officers, workers and employees who are not citizens of the country where they are carrying out their duties or performing their services and to carry on the Business as currently conducted and possess and use the Purchased Assets as currently possessed and used, all of which Permits are set forth in <u>Section 4.14</u> of Seller's Disclosure Schedule and constitute all of the Permits required of Seller to lawfully operate the Business, possess and use the Purchased Assets, and own and occupy the Leased Real Property. All such Permits disclosed, or required to be disclosed, in <u>Section 4.14</u> of Seller's Disclosure Schedule: (i) are valid and in full force and effect and Seller is not in default under, or in violation of, any such Permit, except for such defaults or violations which would not reasonably be expected, individually or in the aggregate, to materially restrict or interfere with Purchaser's ability to operate the Business as currently operated or possess and use the Purchased Assets as currently possessed and used, and no suspension or cancellation of any such Permit is pending (other than pursuant to its terms) or, to the knowledge of Seller, threatened and (ii) subject to entry of the Sale Order, except as set forth on <u>Section 4.14</u> of Seller's Disclosure Schedule, each such Permit may be transferred or reissued to Purchaser in accordance with this Agreement and without the approval of any Person (other than the Bankruptcy Court).

Section 4.15    *Environmental Matters*.    Except as set forth on <u>Section 4.15</u> of Seller's Disclosure Schedule, (i) there is no suit, claim, action, settlement, investigation, proceeding or notice of investigation relating to or arising under Environmental Laws that is pending or, to the knowledge of Seller, threatened against Seller with respect to the Leased Real Property; (ii) in the past five (5) years, Seller has not received

any written notice from any Governmental Body alleging that Seller has failed in any material respect to comply with any Environmental Law or that Seller is liable for any injury or damages to any person or property because of the release of any Hazardous Materials at or from the Leased Real Property; (iii) Schedule 4.15(iii) contains a complete list of all permits, licenses and approvals required of the Seller to lawfully operate the Business and occupy the Leased Real Property in compliance with Environmental Laws, and Seller is in compliance in all material respects with such each such permits, licenses and approvals, and each remains active and in good standing with the issuing Government Body; and (iv) in the past ten (10) years, Seller has not received any written notice, claim, demand, or written request for information from the any Governmental Body related to any past arrangements Seller or persons acting on Seller's behalf allegedly made for the off-site treatment, storage and/or disposal of any Hazardous Material generated in association with Seller's Business or operations.

Section 4.16    Employee Plans.

(a)    Section 4.16(a) of Seller's Disclosure Schedule sets forth a true, correct and complete list of all Employee Benefit Plans of Seller with respect to the Business.

(b)    Except as described in Section 4.16(b) of Seller's Disclosure Schedule, neither Seller nor any ERISA Affiliate has sponsored, maintained, contributed to or withdrawn from: (i) any "employee pension plan" as defined in Section 3(2) of ERISA, that is subject to Title IV of ERISA or Section 412, 430 or 436 of the Code; (ii) any "multiemployer plan," as defined in Section 3(37) of ERISA ("Multiemployer Plan"); or (iii) any post-termination retiree medical or life insurance benefits, other than as required under COBRA.

(c)    Except as set forth on Section 4.16(c) of Seller's Disclosure Schedule, there is no suit, action, claim, order, charge, complaint, investigation, audit or other proceeding pending or, to the knowledge of Seller, threatened in writing against Seller related to such Employee Benefit Plans of Seller (other than routine claims for benefits) that would reasonably be expected to result in any liability to Purchaser.

(d)    Except as described in Section 4.16(d) of Seller's Disclosure Schedule, neither the Seller nor any ERISA Affiliate has (i) failed to comply with the requirements under COBRA; (ii) failed to timely make any required contributions to any Employee Benefit Plan, including any Multiemployer Plan; (iii) incurred any withdrawal liability (including any contingent or secondary withdrawal liability) within the meaning of ERISA Sections 4201 or 4204 to any Multiemployer Plan, and nothing has occurred that presents a material risk of the occurrence of any withdrawal from or the partition, termination, reorganization, or insolvency of any such Multiemployer Plan that could result in any liability of the Seller, any ERISA Affiliate, or Purchaser to any such Multiemployer Plan. With respect to any Multiemployer Plan, Seller has furnished a copy of the most recent withdrawal liability estimate, if any, received by Seller or any ERISA Affiliate and all documentation provided to Seller or any ERISA Affiliate by such plan with respect to such plan for the current plan year and prior two full plan years (including any notices or calculations, statements or estimates of potential withdrawal liability) and historical base units, contribution rates and annual contributions to such plan for 2012 through 2022.

(e)    Except as set forth on Section 4.16(e) of Seller's Disclosure Schedule, neither the execution of this Agreement, nor the consummation of any of the transactions contemplated hereby will (either alone or upon the occurrence of any additional or subsequent events): (i) entitle any current or former director, officer, employee, independent contractor or consultant of Seller to severance pay, post-termination retiree medical or life insurance benefits or any other payment; (ii) accelerate the time of payment, funding or vesting, or increase the amount of compensation

25

(including stock-based compensation) due to any such individual; (iii) increase the amount payable under or result in any other compensatory obligation to a service provider of the Seller; (iv) result in "excess parachute payments" within the meaning of Section 280G(b) of the Code; or (v) require a "gross-up" or other payment to any "disqualified individual" within the meaning of Section 280G(c) of the Code.

Section 4.17    *Labor Matters; Employees*.

(a)    Section 4.17(a) of Seller's Disclosure Schedule contains a list of all of Seller's employees at the St. Louis Facility as of the Execution Date, which such schedule shall be updated to provide any and all employment or service hirings or terminations occurring prior to the Closing Date ("Employees"). Except as set forth on Section 4.17(a) of Seller's Disclosure Schedule, all Employees are employed at will.

(b)    Seller is, as of the date hereof, and has been for the past three (3) years, in compliance in all material respects with all applicable Laws respecting employment of its employees and engagement of all other Workers and with all contracts between Seller and any employee or other Worker of Seller. Except as set forth on Section 4.17(b) of Seller's Disclosure Schedule, there has been no "mass layoff" or "plant closing" within the meaning of the WARN Act, or any similar state or local "mass layoff" or "plant closing" Law with respect to Seller within the six month period prior to the date hereof.

(c)    Except as set forth on Section 4.17(c) of Seller's Disclosure Schedule, Seller is not a party to or otherwise bound by any labor or collective bargaining agreement, Contract or other agreement or understanding with a labor union or labor organization in respect of the Business.

Section 4.18    *Product Warranty; Product Recalls*.

(a)    All products manufactured by Seller in the operation of the Business (the "Business Products") and all services rendered by Seller in the operation of the Business, for the past five (5) years, have been in conformity in all material respects with all applicable contractual commitments, Law, and all express and implied warranties. Seller does not have any Liability in connection with any Business Product or services rendered, or for other damages related to any Business Product or services rendered, other than Liabilities for warranty claims arising in the Ordinary Course of Business or Liabilities that would not be reasonably expected to be material to the Business. To the knowledge of Seller, there exist no facts or circumstances that would reasonably be expected to result in or form the basis of any claim against Seller for Liability on account of any express or implied warranty to any third party in connection with the Business Products or services rendered by Seller in the operation of the Business, other than Liabilities that would not be reasonably expected to be material to the Business.

(b)    To the knowledge of Seller, no Business Product is or has been, since January 1, 2018, subject to any recall (howsoever arising) or post-sale warnings by Seller, or to the knowledge of Seller, any recall or post-sale warning by any third party retained by Seller or any distributor or wholesaler of such Business Products other than, in each case, recalls that would not be reasonably expected to be material to the Business. To the knowledge of Seller, there exist no facts or circumstances that would reasonably be expected to result in or form the basis of any such recalls or post-sale warnings with respect to Business Products.

Section 4.19    *Product Liability*.  All Business Products are and have been, since January 1, 2018, without design defects or manufacturing defects. Seller does not have any Liability in connection with the

Business arising out of the presence or alleged presence of Hazardous Materials in any Business Product or any injury to individuals or property as a result of the ownership, possession or use of any Business Product, other than Liabilities that would not be reasonably expected to be material to the Business.

Section 4.20    *Absence of Certain Changes or Events*.  Since June 30, 2022, except as disclosed in Section 4.20 of Seller's Disclosure Schedule, through the Execution Date, there has not been any event, change, condition, occurrence or effect that, individually or in the aggregate, has had, or would be reasonably expected to have, a Seller Material Adverse Effect. Except for (i) discussions, negotiations and activities related to this Agreement or other potential strategic transactions; (ii) the solicitation of, discussions and negotiations with, presentations and provision of other diligence to and similar engagement with other potential bidders for the Purchased Assets, or the negotiation and execution of this Agreement; (iii) the preparation and commencement of the Bankruptcy Case; or (iv) as set forth on Section 4.20 of the Seller's Disclosure Schedule or as expressly contemplated by this Agreement, from June 30, 2022 until the Execution  Date, Seller has not taken any action or failed to take any action, as applicable, that would be prohibited by Section 6.4, if taken, failed to be taken or proposed to be taken, except for the execution and delivery of this Agreement.

Section 4.21    *Certain Payments*. Since January 1, 2018, neither Seller nor, to the knowledge of Seller, any of its representatives has (a) used or is using any corporate funds for any illegal contributions, gifts, entertainment or other unlawful expenses relating to political activity; (b) used or is using any corporate funds for any direct or indirect unlawful payments to any foreign or domestic governmental officials or employees; (c) violated or is violating any provision of the Foreign Corrupt Practices Act of 1977; (d) established or maintained, or is maintaining, any unlawful fund of corporate monies or other properties; or (e) made any bribe, unlawful rebate, payoff, influence payment, kickback or other unlawful payment of any nature.

Section 4.22    *Receivables*.  Seller has not entered into any agreement to discount or accelerate the payment of Receivables. The Receivables have arisen from bona fide, arms-length transactions entered into by Seller in the Ordinary Course of Business, have been recorded in accordance with GAAP, and are not subject in any material respect to claims, offsets or other defenses or counterclaims other than normal cash discounts accrued in the Ordinary Course of Business.

Section 4.23    *Insurance*.  Each insurance policy maintained by Seller on the properties, assets, products, business or personnel of Seller is legal, valid, binding, enforceable by Seller, and in full force and effect, and all premiums with respect thereto covering all periods up to and including the date hereof have been paid, and no notice of cancellation or termination has been received with respect to any such insurance policy since June 30, 2022.

Section 4.24    *Inventory*.   The Inventory (i) is not materially damaged in any way that would prevent it from being used for its intended purpose; (ii) is not part of or subject to a current or past recall (including, to the knowledge of Seller, any threatened recall), nor have any such recalls been pending at any time; (iii) was manufactured, and has been shipped, stored, and otherwise maintained in accordance with, to the extent applicable, Good Manufacturing Practice requirements of the FDA and any other applicable Law in all material respects; and (iv) is free of any defect or deficiency and is in working condition.  Seller does not hold any Inventory on consignment.

Section 4.25    *No Other Representations or Warranties of Seller*. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS **ARTICLE IV**, THE PURCHASED ASSETS ARE BEING PURCHASED "AS IS, WHERE IS" AND NEITHER SELLER NOR ANY PERSON ACTING ON BEHALF OF SELLER MAKES ANY OTHER EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY WITH RESPECT TO SELLER, ANY AFFILIATE OF

27

SELLER, THE BUSINESS, THE PURCHASED ASSETS, OR WITH RESPECT TO ANY OTHER INFORMATION PROVIDED TO PURCHASER OR ANY OF ITS AFFILIATES OR REPRESENTATIVES IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.  WITHOUT LIMITING THE FOREGOING, EXCEPT AS SET FORTH IN THE REPRESENTATIONS AND WARRANTIES OF SELLER CONTAINED IN THIS **ARTICLE IV**, SELLER MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, WITH RESPECT TO (A) MERCHANTABILITY, FITNESS FOR ANY PARTICULAR PURPOSE OR USE, TITLE OR NON-INFRINGEMENT OF THE PURCHASED ASSETS, (B) ANY INFORMATION WRITTEN OR ORAL AND IN ANY FORM PROVIDED OR MADE AVAILABLE TO PURCHASER OR ANY OF ITS AFFILIATES OR REPRESENTATIVES, ON THE ONE HAND, AND SELLER, ITS AFFILIATES, OR ANY OF ITS REPRESENTATIVES, ON THE OTHER HAND, OR ON THE ACCURACY OR COMPLETENESS OF ANY SUCH INFORMATION, OR ANY PROJECTIONS, ESTIMATES, BUSINESS PLANS OR BUDGETS DELIVERED TO OR MADE AVAILABLE TO PURCHASER OR ANY OF ITS AFFILIATES OR REPRESENTATIVES OR (C) FUTURE REVENUES, EXPENSES OR EXPENDITURES, FUTURE RESULTS OF OPERATIONS (OR ANY COMPONENT THEREOF), FUTURE CASH FLOWS OR FUTURE FINANCIAL CONDITION (OR ANY COMPONENT THEREOF) OF SELLER'S BUSINESS OR THE PURCHASED ASSETS.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Seller that:

*Section 5.1    Organization*.  Purchaser is a limited liability company, duly organized, validly existing, and in good standing under the Laws of the state of Delaware.

*Section 5.2    Authorization and Enforceability*.  Purchaser has the requisite corporate power to execute and deliver this Agreement, the Ancillary Agreements to which Purchaser is a party and to perform the obligations to be performed by it hereunder and thereunder.  The execution and delivery by Purchaser of this Agreement and each Ancillary Agreement to which Purchaser is a party and the performance by it of the obligations to be performed by it hereunder and thereunder have been (or, in the case of any such Ancillary Agreement, at the Closing, will be) duly authorized by all necessary action on the part of Purchaser.  This Agreement has been, and the Ancillary Agreements to which Purchaser is a party will at the Closing be, duly executed and delivered by Purchaser and, assuming the due execution and delivery of this Agreement and the Ancillary Agreements by the other parties hereto and thereto, constitute valid and binding obligations of Purchaser enforceable against Purchaser in accordance with their respective terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar Laws affecting the enforcement of creditors' rights in general and subject to general principles of equity (regardless of whether such enforceability is considered in a proceeding at law or in equity).

*Section 5.3    No Conflicts*.  The execution and delivery by Purchaser of this Agreement and each Ancillary Agreement to which Purchaser is a party, the performance by Purchaser of the obligations to be performed by it hereunder and thereunder, and the consummation of the transactions contemplated hereby and thereby, will not, (i) conflict with the Organizational Documents of Purchaser, (ii) conflict with, or result in any violation of, or constitute a default (with or without notice, lapse of time, or both) under, or give rise to a right of termination, cancellation, or acceleration of any obligation or to loss of a benefit under, any material Contract or Permit to which Purchaser is a party or by which any of its assets or properties are bound, or (iii) violate any Order or Law applicable to Purchaser, other than such conflicts, violations, defaults, terminations, cancellations or accelerations or loss of a benefits that would not reasonably be expected to have, individually or in the aggregate, a Purchaser Material Adverse Effect.

Section 5.4    *Consents and Approvals*.   No consent, approval, waiver, Order, Permit or authorization of, or registration, declaration or filing with, any Governmental Body or other person is required to be obtained or made on the part of Purchaser in connection with the execution and delivery of this Agreement or any Ancillary Agreement to which Purchaser is a party by Purchaser, the performance by Purchaser of the obligations to be performed by it hereunder or thereunder, or the consummation of the transactions contemplated hereby or thereby, other than (i) the entry of the Sale Order and (ii) such consents, approvals, waivers, Orders, Permits, authorizations, registrations, declarations or filings, that would not reasonably be expected to have, individually or in the aggregate, a Purchaser Material Adverse Effect.   Purchaser acknowledges and agrees that this Agreement is subject to Final authorization and approval by the Bankruptcy Court.

Section 5.5    *Legal Proceedings*.   There is no Legal Proceeding pending or, to the knowledge of Purchaser, threatened against Purchaser or to which Purchaser is otherwise a party before any Governmental Body, which, if adversely determined, would reasonably be expected to have, individually or in the aggregate, a Purchaser Material Adverse Effect.   Purchaser is not subject to any Order, except to the extent the same would not reasonably be expected to have, individually or in the aggregate, a Purchaser Material Adverse Effect.

Section 5.6    *Brokers' Fees*.   Neither Purchaser nor any person acting on its behalf has agreed to pay a fee, commission or similar payment in connection with this Agreement, any Ancillary Agreement or any of the transactions contemplated hereby or thereby to any person for which Seller might be liable.

Section 5.7    *Financing Source*.   Purchaser has sufficient available cash on hand necessary to make all of the payments required to be made by Purchaser pursuant to this Agreement.

Section 5.8    *No Other Representations and Warranties of Purchaser*.   Except for the representations and warranties expressly set forth in this **Article V**, neither Purchaser nor any other Person on behalf of Purchaser makes (and Purchaser, on behalf of itself and its affiliates, and their respective representatives, hereby disclaims), and Seller has not relied on, any express or implied representation or warranty with respect to Purchaser, its affiliates or any of their respective businesses, operations, properties, assets, liabilities or otherwise in connection with this Agreement or the transactions contemplated hereby, including as to the accuracy or completeness of any information.

## ARTICLE VI
## COVENANTS

Section 6.1    *Certain Bankruptcy Undertakings*.    This Agreement and the sale of the Purchased Assets and the assumption and/or assignment of the Purchased Contracts are subject to approval by the Bankruptcy Court. Subject to the terms of the Final Bid Procedures Order and Final authorization and approval of this Agreement, Seller and Purchaser each agree to use commercially reasonable efforts to do such acts and things as may reasonably be required to obtain the Bankruptcy Court's approval of the Sale Order, the sale of the Purchased Assets to Purchaser in accordance with this Agreement, the assumption and/or assignment or transfer of the Real Property Leases, Purchased Contracts and Permits, or any other agreement contemplated hereby and the consummation of the transactions contemplated hereby.

Section 6.2    *Bankruptcy Court Matters*.

(a)    *Approval of Purchaser Reimbursable Expenses*. In the event that Purchaser terminates this Agreement pursuant to **Section 9.1(h)**, and Seller consummates an Alternative Transaction, following the termination of this Agreement, in consideration for Purchaser having expended considerable time and expense in connection with this Agreement and the negotiation

thereof and the identification and quantification of assets of Seller, subject to Purchaser's payment of the Seller Reimbursable Expenses, Seller shall pay Purchaser, in accordance with the terms hereof and the Bid Procedures Order, the Purchaser Reimbursable Expenses. Subject to Purchaser's payment of the Seller Reimbursable Expenses, payment of the Purchaser Reimbursable Expenses shall be paid to Purchaser at the closing of the Alternative Transaction. Subject to Purchaser's payment of the Seller Reimbursable Expenses, and only to the extent that the Purchaser Reimbursable Expenses are not paid at the closing of the Alternative Transaction, Seller's obligation to pay the Purchaser Reimbursable Expenses shall constitute an allowed superpriority administrative expense against Seller's bankruptcy estate pursuant to Sections 105(a), 363, 364, 503(b) and 507(a)(2) of the Bankruptcy Code, with priority over all other administrative expenses.

(b)     *Competing Transaction*. This Agreement is subject to approval by the Bankruptcy Court and the consideration by Seller of higher or better competing bids in respect of the Purchased Assets (each, a "Competing Bid").  From the date of this Agreement (and any prior time) and until the sale contemplated herein is consummated, Seller is permitted to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any person (in addition to Purchaser and its affiliates and representatives) in connection with a Competing Bid.  In addition, Seller shall have the authority to respond to any inquiries or offers for a Competing Bid and perform any and all other acts related thereto which are required under the Bankruptcy Code, the Bid Procedures Order or other applicable Law, including supplying information relating to the Business and the Purchased Assets to prospective purchasers.

(c)     *Bankruptcy Court Filings*.

(i)     As soon as reasonably practicable following the Execution Date and the commencement of the Bankruptcy Case, Seller shall file with the Bankruptcy Court a motion seeking entry of the Bid Procedures Order (which shall, among other things, approve and authorize payment of the Purchaser Reimbursable Expenses, and shall establish procedures for the conduct of the auction with respect to the Purchased Assets ("Auction")).

(ii)     Provided Purchaser is selected as the winning bidder at the Auction, if any, or if no Competing Bid is submitted with respect to the Purchased Assets, Seller shall seek entry of the Sale Order by the Bankruptcy Court in accordance with the terms and conditions of the Bid Procedures Order; provided that any revisions to the Sale Order are subject to Purchaser's prior written consent (which shall not be unreasonably withheld, conditioned, or delayed) if there are material changes to the form of Sale Order attached hereto as Exhibit B. Seller agrees that all filings by Seller with respect to this Agreement, including any reply in support thereof or any filing relating to the assignment or assumption of contracts, shall be provided to Purchaser no later than two (2) business days prior to filing or otherwise as soon as reasonably practicable, for review.  Purchaser and Seller understand and agree that the transactions contemplated by this Agreement are subject to approval by the Bankruptcy Court.

(iii)     Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Bid Procedures Order and Sale Order, including a finding of adequate assurance of future performance by Purchaser, including by furnishing witnesses, affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code.  In the event the

4869-3241-6847, v. 18

entry of the Bid Procedures Order or Sale Order shall be appealed (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or re-argument shall be filed with respect to the Bid Procedures Order or Sale Order), Seller and Purchaser (and with respect to the Purchaser, at least until the Outside Date)  shall use their respective commercially reasonable efforts to defend such appeal, petition or motion. Seller shall waive their rights to appeal (or file any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or re-argument) with respect to the Sale Order, and such waivers shall be explicitly set forth in the Sale Order.

(iv)      Seller shall file such motions or pleadings as may be reasonably appropriate or necessary to assume and assign the Purchased Contracts and to determine the amount of the Cure Amounts; provided, however, that nothing herein shall preclude Seller from filing motions, including upon commencement of the Bankruptcy Case, to reject any Contracts that are not Purchased Contracts.

(d)      *Bankruptcy Court Milestones*. The following milestones ("Bankruptcy Court Milestones") shall apply, which may be extended by Purchaser, in Purchaser's reasonable discretion:

(i)      on or within five (5) business days of the Petition Date, Seller shall have filed a motion seeking entry of the Bid Procedures Order ("Bid Motion");

(ii)      Seller shall seek to have a hearing occur on or within twenty-one (21) days of filing the Bid Motion;

(iii)      Seller shall seek to have the Bankruptcy Court enter the Bid Procedures Order on or within thirty (30) days of filing the Bid Motion;

(iv)      the final date for submitting a qualified bid, as set forth in the approved Bid Procedures Order, shall be no later than thirty (30) days after the Bankruptcy Court's entry of the Bid Procedures Order ("Bid Deadline");

(v)      Seller shall hold the Auction, if any, no later than two (2) business days after the Bid Deadline; and

(vi)      on or within fourteen (14) business days after the conclusion of the Auction, the Bankruptcy Court shall enter the Sale Order.

(e)      *Back-up Bidder*.  Seller and Purchaser agree that, in the event that Purchaser is not the winning bidder at the Auction, if and only if (i) Purchaser submits the second highest or second best bid at the Auction for the Purchased Assets and (ii) Seller gives written notice to Purchaser on or before the Back-up Termination Date, stating that Seller (A) failed to consummate the sale of the Purchased Assets with the winning bidder, and (B) terminated the purchase agreement with the winning bidder, Purchaser shall promptly consummate the transactions contemplated by this Agreement upon the terms and conditions as set forth herein, or as set forth on the record of the Auction, including the Purchase Price, subject to any increase to the Purchase Price made by Purchaser, if any, at the Auction.

(f)    *Auction Overbids*. During the Auction, pursuant to the terms of the Final Bid Procedures Order, if any qualified bidder submits a topping bid with respect to the Purchaser's bid, Purchaser is authorized to "credit bid" the net value of the Purchaser Reimbursable Expenses after payment of the Seller Reimbursable Expenses as part of any overbid by the Purchaser.

Section 6.3    *Non-Exclusive Access to Information and the Premises*.    From the Execution Date through the Closing Date, Purchaser shall be entitled, through its officers, employees and representatives (including, its legal counsel, accountants and other advisors), to make such investigation of the assets, properties, operations, businesses and affairs of Seller with respect to the Business, and such examination of the books and records and financial condition of Seller with respect to the Business and the Purchased Assets as it reasonably requests and to make extracts and copies of such books and records.  From the Execution Date through the Closing Date, Seller shall provide the representatives of Purchaser (one such representative at a time, as designated by Purchaser from time to time) with non-exclusive reasonable access during normal business hours to the St. Louis Facility and to Seller's employees at the St. Louis Facility, to ensure that the Business is being operated in the Ordinary Course of Business, and offer reasonable suggestions (which may be ignored by Seller, at Seller's sole discretion) as to the operations of the Business. Seller shall reasonably cooperate, and shall cause its officers, employees, consultants, agents, accountants, attorneys and other representatives to reasonably cooperate, with Purchaser and its representatives in connection with such access, investigation and examination as herein set forth.

Section 6.4    *Conduct of the Business Pending Closing*.    Except as required by applicable Law or by the Bankruptcy Court, or as otherwise expressly provided by this Agreement, or as otherwise disclosed in <u>Section 6.4</u> of Seller's Disclosure Schedule, from the Execution Date until the Closing Date, Seller shall, subject to the availability of necessary funds: (a) use commercially reasonable efforts to preserve intact the Business, to keep available the services of its current employees and all other Workers and agents, and to maintain its relations and goodwill with its suppliers, customers, distributors and any others with whom or with which it has business relations, in accordance with the Ordinary Course of Business in each case; (b) maintain and operate the Business and the Purchased Assets in the Ordinary Course of Business; (c) continue to operate the Business in all material respects in compliance with all Laws applicable to Seller or the Business; (d) keep, observe, and perform its material obligations as tenant under the Real Property Leases; (e) review its Customer Credits and update its books and records to only include "specified customers" (as defined in the definition of Customer Credits); and (f) not (i) sell, transfer, mortgage, lease, sublease, license, abandon, encumber, or otherwise dispose of any Purchased Assets other than immaterial dispositions thereof and Inventory sold or disposed of in the Ordinary Course of Business; provided that in no event shall Seller sell or dispose of Inventory  for less than the actual cost thereof or in a bulk sale; (ii) acquire any corporation, partnership, limited liability company, other business organization or division thereof related to or affecting the Business or the Purchased Assets or any material assets, except acquisitions of raw materials in the Ordinary Course of Business; (iii) merge or consolidate with or into any legal entity, dissolve, liquidate or otherwise terminate its existence, or issue, transfer, sell, pledge, dispose or encumber any shares or capital stock or other equity interests; (iv) authorize, declare, set aside or pay any dividend or other distribution; (v) enter into any joint venture agreement that involves a sharing of profits, cash flows, expenses or losses with other persons related to or affecting the Business or the Purchased Assets; (vi)  (1) reject, terminate (other than by expiration in accordance with its terms), or materially amend any Purchased Contract or Real Property Leases, or seek Bankruptcy Court approval to do so, or (2) fail to use commercially reasonable efforts to oppose any action by a third party to so terminate (including any action by a third party to obtain Bankruptcy Court approval to terminate) any Purchased Contract; (vii) make any loans, advances or capital contributions to, or investments in, any other person; (viii) subject any of the Purchased Assets to any Lien other than Permitted Liens; (ix) except as set forth in <u>Section  6.4(e)(ix)</u> of Seller's Disclosure Schedule, incur, guarantee or assume any indebtedness for borrowed money, enter into any capital lease or guarantee any such indebtedness; (x) modify, amend, terminate or waive any rights under any Purchased Contract or contract necessary for the services

32

contemplated under the Transition Agreement; (xi) change or modify any material accounting practice, policy or procedure, except as required by GAAP or applicable Law; (xii) except as required by applicable Law, (1) make, revoke or change any material Tax election or method of accounting with respect to Taxes, (2) file any amended Tax Return, (3) enter into any closing agreement or settle or compromise any material Tax claim or assessment, (4) request or obtain any ruling or determination from any taxing authority, or (5) consent to any extension or waiver of the limitation period applicable to any claim or assessment with respect to Taxes; in each case to the extent such action relates to the Purchased Assets and could have any effect on Purchaser or its affiliates; (xiii) enter into any agreement to discount or accelerate the payment of the Receivables; or (xiv) agree or commit to any of the foregoing. Without in any way limiting any party rights or obligations under this Agreement, the parties understand and agree that nothing contained in this Agreement shall give Purchaser, directly or indirectly, the right to control or direct the operations of Seller, or the Business prior to the Closing and prior to the Closing, Seller shall exercise, consistent with, and subject to, the terms and conditions of this Agreement, complete control and supervision over the Business and its operations.

Section 6.5    *Consents and Permits*. Seller shall use commercially reasonable efforts, and Purchaser shall cooperate with Seller, to obtain at the earliest practicable date all consents and approvals contemplated hereby, including, the consents and approvals referred to in **Section 4.4** and the Necessary Consents.  Purchaser and Seller shall use their commercially reasonable efforts to obtain the issuance, or transfer of, all Permits required to be issued, transferred or reissued to Purchaser in connection with the acquisition of the Purchased Assets and the operation of the Business by Purchaser after the Closing Date. Seller and Purchaser shall use commercially reasonable efforts to give and make all notices and reports that Seller or Purchaser is required to make to the appropriate Governmental Body and other persons in respect of the Permits that may be necessary for the sale of the Purchased Assets to Purchaser at the Closing.

Section 6.6    *Further Assurances*.

(a)    Upon the terms and subject to the conditions set forth in this Agreement, each of the parties shall use its commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other party in doing, all things necessary, proper, or advisable to consummate and make effective, in the most expeditious manner practicable (and in any event prior to the Outside Date), the transactions contemplated by this Agreement on the terms set forth in this Agreement, including the conditions to the Closing set forth in **Article VII**. Without limiting the generality of the foregoing, (i) Seller shall use its commercially reasonable efforts to cause the conditions set forth in **Section 7.1** that are within its control or influence to be satisfied or fulfilled, and (ii) Purchaser shall use its commercially reasonable efforts to cause the conditions set forth in **Section 7.2** that are within its control or influence to be satisfied or fulfilled.

(b)    From time to time, whether at or following the Closing, Seller and Purchaser shall execute, acknowledge and deliver all such further conveyances, notices, assumptions and releases and such other instruments, and shall take such further actions, as may be necessary or appropriate to vest in Purchaser all the right, title, and interest in, to or under the Purchased Assets, to provide Purchaser and Seller all rights and obligations to which they are entitled and subject pursuant to this Agreement and the Ancillary Agreements, and to otherwise make effective as promptly as practicable the transactions contemplated by this Agreement and the Ancillary Agreements. Each of the parties will take, or cause to be taken, all actions, and do, or cause to be done, all things necessary, proper or advisable under applicable Laws to cause all of the obligations imposed upon it in this Agreement to be duly complied with and to cause all conditions precedent to such obligations to be satisfied. Notwithstanding the foregoing, nothing in this **Section 6.6(b)** shall (i) require Seller or Purchaser or any of their affiliates to make any expenditure or incur any obligation

33

on their own or on behalf of any other party (unless funds in the full amount thereof are advanced by such other party in cash) or (ii) prohibit Seller from ceasing operations or winding up its affairs following the Closing.

(c)     Following the Closing, Seller shall cooperate with Purchaser's reasonable requests with respect to the investigation and prosecution of any Legal Proceeding related primarily to the Business or the Purchased Assets (other than in connection with disputes between the parties), including taking, or causing to be taken, all actions, and doing, or causing to be done, all things necessary, proper or advisable under applicable Laws to furnish all reasonably available information and testimony, to arrange discussions with, and the calling as witnesses of, officers, directors, employees, agents and other representatives, and to provide other reasonable assistance in connection with any such Legal Proceedings, with such cooperation to be at the cost and expense of Purchaser.  Notwithstanding the foregoing, nothing in this **Section 6.6(c)** shall prohibit Seller from ceasing operations, winding up its affairs or terminating its existence and all of its employees following the Closing.

*Section 6.7     Publicity*.  Except as set forth in **Section 10.20** or otherwise required by Law, neither Purchaser nor Seller will make any public announcement regarding the proposed purchase without the consent of the other party, which consent will not be unreasonably withheld or delayed; provided, however, that Purchaser and Seller acknowledge and agree that the transactions contemplated by this Agreement require the approval of the Bankruptcy Court and in no event shall it be deemed to be a violation of the terms and conditions of this **Section 6.7** for Purchaser to file the appropriate pleadings in the Bankruptcy Case to approve the transactions contemplated by this Agreement and the attachment of this Agreement to such pleadings and the content of such pleadings shall not be deemed to be a violation of the terms and conditions of this **Section 6.7**.  Notwithstanding the foregoing, nothing set forth herein shall limit or restrict Seller's right to (i) publicize the sale of the Business, the terms of the proposed transaction or the identity of Purchaser or other interested buyers as deemed necessary by Seller for the auction of Seller's business segments; or (ii) make any filings or public disclosures required by the Securities and Exchange Commission.

*Section 6.8     Notification of Certain Matters*.

(a)     From time to time prior to the Closing, Seller shall promptly deliver written notice to Purchaser of (i) any event, change, effect, condition, state of facts or occurrence that comes to the knowledge of Seller that (A) would reasonably be expected to (1) cause a breach of Seller's covenants or agreements contained herein, (2) render the satisfaction of the conditions in **Section 7.1** or **Section 7.3** reasonably unlikely to be fulfilled, or (3) prevent, prohibit or delay the Closing; (B) would reasonably be expected to have a Seller Material Adverse Effect; or (C) if occurring or arising or in existence before or on the Execution Date would have caused a representation or warranty of Seller to be inaccurate or deficient; (ii) any notice or other written communication from any person alleging that the consent of such person is or may be required in connection with the consummation of the transactions contemplated hereby; and (iii) the commencement of any Legal Proceeding relating to the Business or the Purchased Assets.  The delivery of any notice pursuant to this **Section 6.8(a)** shall not have any effect on the satisfaction of the condition to Closing set forth in **Section 7.3(a)** or Purchaser's right to terminate the Agreement pursuant to **Section 9.1(d)**, and shall not be deemed to amend or supplement Seller's Disclosure Schedule or limit or otherwise affect any remedy available to Purchaser or prevent or cure any breach of any representation or warranty.

(b)     From time to time prior to the Closing, Purchaser shall promptly deliver written notice to Seller of (i) any event, change, effect, condition, state of facts or occurrence that comes

34

to the knowledge of Purchaser that (A) would reasonably be expected to (1) cause a breach Purchaser's covenants or agreements contained herein, (2) render the satisfaction of the conditions in **Section 7.1** or **Section 7.2** reasonably unlikely to be fulfilled, or (3) prevent, prohibit or delay the Closing; (B) would reasonably be expected to constitute a Purchaser Material Adverse Effect; or (C) that, if occurring or arising or in existence before or on the Execution Date would have caused a representation or warranty of Purchaser to be inaccurate or deficient; and (ii) any notice or other written communication from any person alleging that the consent of such person is or may be required in connection with the consummation of the transactions contemplated hereby. The delivery of any notice pursuant to this **Section 6.8(b)** shall not have any effect on the satisfaction of the condition to Closing set forth in **Section 7.2(a)** or Seller's right to terminate this Agreement pursuant to **Section 9.1(f)** and shall not be deemed to limit or otherwise affect any remedy available to Seller or prevent or cure any breach of any representations or warranty.

Section 6.9    *Confidentiality*. Purchaser acknowledges and understands that this Agreement may be publicly filed in the Bankruptcy Court and used or referenced in Alternative Transactions, and that such disclosure shall not be deemed to violate any confidentiality obligations owing to Purchaser, whether pursuant to this Agreement or otherwise. Seller acknowledges and agrees that from and after the Closing, all non-public information relating to the Business, including the Purchased Assets, shall be valuable and proprietary to Purchaser and its affiliates. From and after the Closing, Seller shall not disclose to any person any information relating to Purchaser and its affiliates, or the Business, including the Purchased Assets, except as required by applicable Law, by the Bankruptcy Court or as otherwise becomes available in the public domain other than through any action by Seller in violation of its obligations under this **Section 6.9**. Notwithstanding the foregoing, Seller is expressly permitted to disclose and discuss the information protected by and subject to this paragraph with its professional advisors with a legitimate need to know such information; provided, however, that such professional advisors shall be subject to confidentiality obligations with respect to such information disclosed by Seller at least as protective as the confidentiality obligations set forth in this **Section 6.9**. Notwithstanding the foregoing, Purchaser acknowledges and understands that after the Closing, Seller may be required to report certain information related to its possession and use of the Purchased Assets prior to the Closing to the Bankruptcy Court in connection with the Bankruptcy Case, and that such reporting and disclosures shall not be deemed to be a violation of the terms and conditions set forth in this **Section 6.9**. Notwithstanding the foregoing, nothing set forth in this **Section 6.9** or elsewhere in this Agreement will prevent Seller from (i) disclosing the information set forth in Due Diligence Reports or the bids and names of other potential buyers of Seller's assets, (ii) promoting the sale of the Business or any other business segment(s) of Seller, or (i) soliciting competing offers from third parties for the purchase of the Purchased Assets or any other assets of Seller pursuant to the Bid Procedures Order.

Section 6.10    *Employee Matters*.

(a)    Seller shall provide Purchaser, no later than five business days after the Closing Date, with a true, correct and complete list of any and all employment losses (within the meaning of the WARN Act) incurred by Seller during the 180-day period prior to and including the Closing Date.

(b)    Purchaser, or one of its affiliates, may (but is not obligated to) offer employment to those Employees it identifies in its sole discretion (each, an "Offer Employee") an offer of employment on terms and conditions as determined by Purchaser in its sole discretion, in each case with such employment to commence following the Closing. Each Offer Employee who receives and accepts Purchaser's (or an affiliate of Purchaser's) offer of employment and who commences employment with Purchaser or an affiliate thereof on or following the Closing shall be a "Transferred Employee." From the date of this Agreement until the Closing Date or earlier

35

termination of this Agreement, Seller shall reasonably cooperate with Purchaser in effecting Purchaser's identification of Offer Employees and their potential transfer of employment from Seller to Purchaser or an affiliate of Purchaser as contemplated hereby, including by providing Purchaser and its affiliates from and after the Execution Date with an unredacted census file identifying each Employee's name, position/title, job description, current rate of pay, and contact information (solely to the extent permitted by Law, and Seller shall have no obligation to disclose any personally identifiable information to the extent prohibited by Law), and reasonable access to Employees and other Seller personnel, during normal business hours, and upon reasonable advance notice, subject to reasonable denials of access or delays to the extent any such access would unreasonably interfere with the operations of Seller, the Business or the duties of such Employees, to allow Purchaser to identify those Employees to whom it would like to offer employment, conduct job interviews, and otherwise plan for the transition of Employees contemplated by this Agreement. For the avoidance of doubt, Seller shall only be required to disclose Employee information to the extent permitted by Law.

(c)     Notwithstanding anything in this Agreement to the contrary, neither Purchaser nor any of its Affiliates shall (i) assume any Liabilities relating to or arising under any Collective Bargaining Agreement (including, without limitation, any pension obligations or retirement benefits), or (ii) be bound by or required to adhere to any past practice of any of Seller included in writing in any Collective Bargaining Agreement.

(d)     Seller shall retain all Liabilities accrued on or before the Closing Date relating in any way to its Workers, including all Liabilities relating to unpaid wages, salaries, commissions and other amounts earned or accrued on or before the Closing Date by or in respect of all of its current and former employees, including but not limited to the Transferred Employees.

(e)     Nothing express or implied in this **Section 6.10** or elsewhere in this Agreement shall (i) confer upon any Transferred Employee, or legal representative or beneficiary thereof, any rights or remedies, including any right to employment or benefits for any specified period, of any nature or kind whatsoever, under or by reason of this Agreement, (ii) be treated as an amendment to, or prevent or otherwise restrict the amendment or termination of any Employee Benefit Plan or any employee benefit plan, program, arrangement or agreement sponsored or maintained by Purchaser, Seller or their respective affiliates, as applicable, or (iii) obligate Purchaser, Seller or any of their respective affiliates to maintain any particular employee benefit plan, program or arrangement.

(f)     Seller shall be solely responsible for any and all Liabilities arising under the WARN Act and relating to any of its employees whose employment is terminated by Seller prior to, upon, or following the Closing, including any Employees who do not receive offers of employment from Purchaser or its affiliates.

(g)     To the extent not prohibited by Law and not subject to attorney-client privilege or other work product privilege, Seller shall provide Purchaser, at Purchaser's expense, with copies of all records relating to Transferred Employees promptly following the date on which Purchaser notifies Seller of the identity of any Offered Employee; provided, however, that Seller have the right to retain original files.

(h)     Seller and its "selling group" (as defined in Treasury Regulation Section 54.4980B-9, Q&A-2(a) (the "Selling Group")) shall be solely responsible for providing continuation coverage under COBRA, if required by Law, to those individuals who are M&A qualified beneficiaries (as defined in Treasury Regulation Section 54.4980B-9, Q&A-4(a)) with

respect to the transactions contemplated by this Agreement ("M&A Qualified Beneficiaries"). In the event that no member of the Selling Group maintains any group health plan at any time after the Closing Date, and Purchaser is deemed to be a successor employer (as defined in Treasury Regulation Section 54.4980B-9, Q&A-8(b)(i)) to the Selling Group for the purposes of the continuation of coverage requirements under COBRA, Seller shall immediately notify Purchaser in the event that the Selling Group ceases to provide continued COBRA coverage to M&A Qualified Beneficiaries for any reason other than the failure by the M&A Qualified Beneficiary to pay applicable premiums or the expiration of the required period of coverage under COBRA.

Section 6.11    *Purchase of Personal Property Subject to Lease.* With respect to any Contract for the lease of Personal Property, if (a) such Contract is recharacterized by a Final Order of the Bankruptcy Court as a secured financing or (b) Purchaser, Seller and the counterparty to such Contract agree, then Purchaser shall have the option to purchase such Personal Property by paying to Seller for the benefit of the counterparty to such Contract an amount equal to the amount, as applicable (i) of such counterparty's allowed secured Claim arising in connection with the recharacterization of such Contract as determined by such Order or (ii) agreed to by Purchaser, Seller and such counterparty, subject to any required Bankruptcy Court authorization or approval.

Section 6.12    *Tax Matters.*

(a)    All transfer, documentary, sales, use, stamp, registration and other Taxes and fees (including any penalties and interest), incurred in connection with the transactions consummated pursuant to this Agreement with respect to the Purchased Assets conveyed by Seller will be paid by Seller.  Any Tax returns that are required to be filed in connection with transfer Taxes shall be prepared by Seller, at its own expense.  Without limiting the foregoing, Purchaser and Seller will cooperate in all reasonable respects to prepare and file all necessary returns, reports and estimates and other documentation with respect to all such transfer, documentary, sales, use, stamp, registration and other Taxes and fees.

(b)    Seller shall be liable for and shall pay all applicable federal, state and local taxes (other than income taxes of Purchaser and, to the extent attributable to the period of time after Closing, gross receipts taxes), duties and other like charges properly payable by Seller upon and in connection with the conveyance and transfer of the Purchased Assets to Purchaser, the income of Seller or sales made by Seller.  Seller shall, at its own expense, timely file any tax return or other document with respect to such Taxes or fees (and Purchaser shall cooperate with respect thereto as necessary). Prior to Closing, Seller shall deliver a completed certification of non-foreign status pursuant to Section 1.1445-2(b)(2) of the Treasury regulations duly executed by Seller and an IRS Form W-9 claiming a complete exemption from backup withholding each in form reasonably satisfactory to Purchaser.  For the avoidance of doubt, Purchaser shall pay all taxes with respect to the Purchased Assets for all periods after Closing, including sales, use and personal property taxes. Purchaser hereby acknowledges and agrees that Purchaser shall not withhold any Taxes from the Purchase Price payable to Seller. Seller agrees to indemnify and hold harmless Purchaser for any and all Tax liability that may be imposed on Purchaser by any Tax Authority for any failure to properly withhold any Tax amount under applicable Tax law.

(c)    Seller and Purchaser shall cooperate fully, as and to the extent reasonably requested by the other party, in connection with the filing of Income Tax Returns and any proceeding relating to Taxes.

(d)    The parties hereby waive compliance with the provisions of any bulk sales, bulk transfer or similar Laws of any jurisdiction that may otherwise be applicable with respect to the

37

sale of any or all of the Purchased Assets to Purchaser. Seller agrees to indemnify and hold harmless Purchaser from and against any and all Liabilities that may be asserted by third parties against Purchaser as a result of noncompliance with any such bulk sales or transfer Law.

*Section 6.13    Collection of Receivables.*

(a)    As of the Closing Date, Seller hereby (i) authorizes Purchaser to open any and all mail addressed to Seller relating to the Business or the Purchased Assets and delivered to the offices of the Business or otherwise to Purchaser if received on or after the Closing Date and (ii) appoints Purchaser its attorney-in-fact to endorse, cash and deposit any monies, checks or negotiable instruments received by Purchaser after the Closing Date with respect to Receivables made payable or endorsed to Seller or Seller's order, for Purchaser's own account.

(b)    As of the Closing Date, Seller agrees that any monies, checks or negotiable instruments received by Seller after the Closing Date with respect to Receivables shall be held in trust by Seller for Purchaser's benefit and account, and promptly upon receipt by Seller of any such payment, Seller shall pay over to Purchaser the amount of such payments without any right of set off or reimbursement.

(c)    Without limiting the foregoing, Seller will deposit into the bank account designated by Purchaser (the "Designated Receivables Account") within three (3) business days after receipt all amounts received by Seller constituting Receivables. Seller will deliver written instructions no later than three (3) business days following the Closing to all customers with Receivables to deliver all payments with respect thereto directly to the Designated Receivables Account. Seller will maintain its bank accounts to accept any Receivables for 120 days following the Closing.

*Section 6.14    Due Diligence Reports.*    Purchaser and Seller shall cause the preparation of the due diligence reports below, and Purchaser shall pay, or reimburse Seller as the case may be, for the reasonable, documented actual cost (up to a maximum amount equivalent to 2.5% of the Aggregate Purchase Price) of the following due diligence reports related to the Business and the Purchased Assets (the "Due Diligence Reports"), which shall be conducted by the following third party independent advisors mutually agreed upon by the parties and to be engaged by Seller:

(a)    due diligence reports prepared by Forvis, LLP, which shall include accounting and other material information related to Seller;

(b)    a Regulatory Diligence Report prepared by the Hogan Lovells law firm;

(c)    an inventory appraisal (work-in-progress, raw material and finished goods) prepared by 1st Star Alacer LLC;

(d)    a fair market value appraisal of the equipment prepared by 1st Star Alacer LLC;

(e)    an intellectual property summary memorandum prepared by Forvis, LLP; and

(f)    a zoning compliance letter issued by the City of St. Louis, Missouri.

Such Due Diligence Reports shall be for the benefit of, and made available to, Seller, and Seller may share such Due Diligence Reports with other prospective bidders of the Business under the supervision of the Bankruptcy Court. The Seller Reimbursable Expenses shall be paid as follows: (i) to Seller from

38

the sale proceeds at Closing; or (ii) to Seller by offset against the Purchaser Reimbursable Expenses to the extent the Purchaser Reimbursable Expenses is triggered pursuant to Section 6.2(a) herein.

# ARTICLE VII
## CONDITIONS TO CLOSING

*Section 7.1    Conditions Precedent to the Obligations of the Parties*.    The respective obligations of the parties hereto to consummate the transactions contemplated hereby are subject to the satisfaction, at or prior to the Closing, of each of the following conditions:

(a)    there shall not be in effect any Order issued, or legislation enacted, by any Governmental Body of competent jurisdiction restraining, enjoining, delaying, or otherwise prohibiting the consummation of the transactions contemplated hereby or the Ancillary Agreements;

(b)    there shall not be any Claims or investigations commenced by any person, organization, or Governmental Body for the purpose of restraining, enjoining, delaying, or otherwise prohibiting the consummation of the transactions contemplated hereby or the Ancillary Agreements; and

(c)    the Bankruptcy Court shall have entered the Final Sale Order, the Final Sale Order shall be in full force and effect and not stayed and shall not have been reversed or modified since the date of its entry.

*Section 7.2    Conditions Precedent to the Obligations of Seller*.    Subject to the entry of the Final Sale Order and such other authorization and approval as is required by the Bankruptcy Court, the obligation of Seller to consummate the transactions contemplated hereby is subject to the satisfaction, at or prior to the Closing, of each of the following conditions (any or all of which may be waived by Seller, in whole or in part, to the extent permitted by applicable Law):

(a)    the representations and warranties of Purchaser contained herein shall be true and correct in all material respects at and as of the Closing, except to the extent expressly made as of a specified date or with respect to a specific period of time, in which case such representations and warranties shall be true and correct in all material respects as of such specified date or with respect to such period of time, and Seller shall have received a certificate signed by an authorized officer of Purchaser (in such capacity and without personal liability of any kind), dated the Closing Date, to such effect;

(b)    Purchaser shall have performed and complied in all material respects with all agreements and covenants required by this Agreement to be performed or complied with by it on or prior to the Closing Date, and Seller shall have received a certificate signed by an authorized officer of Purchaser (in such capacity and without personal liability of any kind), dated the Closing Date, to such effect; and

(c)    Purchaser shall have delivered, or caused to be delivered, to Seller all of the items required to be delivered to Seller in **Section 8.4**.

*Section 7.3    Conditions Precedent to the Obligations of Purchaser*.    Notwithstanding any other provision of this Agreement to the contrary, the obligation of Purchaser to consummate the transactions

39

contemplated hereby is subject to the satisfaction, at or prior to the Closing, of each of the following conditions (any or all of which may be waived by Purchaser, in whole or in part, to the extent permitted by applicable Law):

(a)     (i) the Seller Fundamental Representations shall be true and correct in all respects at and as of the Execution Date and at and as of the Closing Date, with the same force and effect as though such representations and warranties had been made at and as of the Closing Date (except to the extent that any such representation or warranty is expressly made as of a specified date or with respect to a specific period of time, in which case it shall be true and correct in all respects as of such specified date or with respect to such period of time) and (ii) the other representations and warranties set forth in **Article IV** of this Agreement shall be true and correct in all material respects at and as of the Execution Date and at and as of the Closing Date, as if made at and as of the Closing Date, other than those representations and warranties that are made as of a specific date or with respect to a specific period of time, which representations and warranties need not be true and correct in all material respects as of the Closing Date but must be true and correct in all material respects as of such specific date or with respect to such period of time (provided, that, in each case, for purposes of this **Section 7.3(a)(ii)**, in determining whether such representations and warranties are true and correct, all qualifications in such representations or warranties as to "material," "in all material respects," Seller Material Adverse Effect or similar materiality qualifiers shall be disregarded),  and Purchaser shall have received a certificate signed by an authorized officer of Seller (in such capacity and without personal liability of any kind), dated the Closing Date, to such effect;

(b)     Seller shall have performed and complied in all material respects with all agreements and covenants required by this Agreement to be performed or complied with by it on or prior to the Closing Date, and Purchaser shall have received a certificate signed by an authorized officer of Seller (in such capacity and without personal liability of any kind), dated the Closing Date, to such effect;

(c)     Seller shall have delivered, or caused to be delivered, to Purchaser all of the items required to be delivered to Purchaser in **Section 8.3**;

(d)     a Final Sale Order duly rendered by the Bankruptcy Court;

(e)     Seller shall have removed, or caused to be removed, from the Leased Real Property all regulated waste generated by or in association with the Business or the  sale thereof prior to the Closing and shall deliver to Purchaser at Closing a certificate (satisfactory in form and substance to Purchaser and its counsel) confirming that all such regulated waste has been removed (for purposes of this covenant and certification, the term "regulated waste" shall not be construed to include "waste" or Hazardous Materials previously spilled or released into soil or groundwater on or below any real property).  For the avoidance of doubt, nothing set forth herein shall require Seller to remove, or cause to be removed, from the Leased Real Property, any regulated waste from the underlying land or groundwater;

(f)     in the event Purchaser is not the purchaser of the New York Business, Purchaser shall have received the Transition Agreement, duly executed by the purchaser of the New York Business; and

(g)     since the Execution Date the Business has been conducted in the Ordinary Course of Business (except as disclosed in Section 4.20 of Seller's Disclosure Schedule) and no Seller Material Adverse Effect shall have occurred.

## ARTICLE VIII
## CLOSING

Section 8.1      Closing.  Subject to the entry of the Final Sale Order and such other authorization and approval as is required by the Bankruptcy Court, the closing of the purchase and sale of the Purchased Assets provided for in Article II (the "Closing") shall take place remotely via electronic exchange of executed documents and other deliverables within seven (7) business days after the Final Sale Order or, if the conditions set forth in **Article VII** (other than the conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at Closing) are not satisfied or waived on or prior to such date, on the date that is five (5) business days after the satisfaction or waiver in writing of all of the conditions to the obligations of the parties set forth in **Article VII** (other than the conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at Closing) or at such other time, date or place as may be mutually agreed to in writing by Purchaser and Seller.  The date on which the Closing is held is referred to herein as the "Closing Date." The transfer of the Purchased Assets shall be deemed to take place and be effective at 12:01 A.M. St. Louis, Missouri time (the "Effective Time") on the Closing Date.

Section 8.2      Proceedings at Closing.  Subject to the entry of the Final Sale Order and such other authorization and approval as is required by the Bankruptcy Court, at the Closing, (i) Seller shall take the actions and deliver the documents referred to in **Section 8.3** and (ii) Purchaser shall take the actions and deliver the documents referred to in **Section 8.4**.  All actions to be taken and all documents to be executed and delivered by Seller in connection with the consummation of the transactions contemplated at the Closing shall be reasonably satisfactory in form and substance to Purchaser and its counsel, and all actions to be taken and all documents to be executed and delivered by Purchaser in connection with the consummation of the transactions contemplated at the Closing shall be reasonably satisfactory in form and substance to Seller and its counsel.  All actions to be taken and all documents to be executed and delivered by all parties hereto at the Closing shall be deemed to have been taken and executed and delivered simultaneously, and no action shall be deemed taken nor any document executed or delivered until all have been taken, executed, and delivered.

Section 8.3      Deliveries by Seller.  At the Closing, Seller shall deliver, or cause to be delivered, to Purchaser (or such other person as may be indicated below):

(a)      a true and correct copy of the Sale Order duly rendered by the Bankruptcy Court;

(b)      one or more bills of sale duly executed by Seller in the form attached hereto as Exhibit C (except for dates and other relevant information needed to complete and effectuate such bills of sale) evidencing the transfer of the Purchased Assets to Purchaser (each a "Bill of Sale");

(c)      one or more assignment and assumption agreements duly executed by Seller in the form attached hereto as Exhibit D (except for dates and other relevant information needed to complete and effectuate such assignment and assumption agreements) evidencing the transfer of certain of the Purchased Assets to Purchaser (each, an "Assignment and Assumption Agreement");

(d)      one or more Intellectual Property assignment agreements duly executed by Seller in the form attached hereto as Exhibit E (except for dates and other relevant information needed to complete and effectuate such assignment  agreements) (each, an "IP Assignment Agreement");

(e)      a certificate of the Secretary or an Assistant Secretary (or equivalent officer) of Seller certifying that attached thereto are true and complete copies of all resolutions adopted by the board of directors of Seller authorizing the execution, delivery and performance of this Agreement

41

and the Ancillary Agreements and the consummation of the transactions contemplated hereby and thereby, and that all such resolutions are in full force and effect and are all the resolutions adopted in connection with the transactions contemplated hereby and thereby;

(f)       evidence of the release and termination of all Claims and Liens, if any, associated with all indebtedness owed by Seller to the Secured Lender with respect to the Purchased Assets;

(g)       (i) copies of the management accounts for the period from April 1, 2023 to the end of the month immediately preceding the Closing Date (provided, however, if the Closing Date is on or before the 15th day of a month, then the period will be from April 1, 2023 through the end of the month prior to the month immediately preceding the Closing Date), (ii) a Receivables aging report as of the Closing Date, and (iii) a Customer Credits report as of the Closing Date, in each case, in form and substance reasonably acceptable to Purchaser;

(h)       such other endorsements, assignments and instruments of conveyance, transfer and release, in form and substance reasonably acceptable to Purchaser, as Purchaser may reasonably request to assign and convey the Purchased Assets to Purchaser and vest title therein in Purchaser (in each case free and clear of all Claims and Liens other than Permitted Liens) and effectuate or consummate the other transactions contemplated hereby or any Ancillary Agreement; and

(i)       Seller's most recent sales and use tax return evidencing payment of all pre-Closing sales and use taxes then due.

Section 8.4     Deliveries by Purchaser.   At the Closing, Purchaser shall deliver, or cause to be delivered, to Seller (or such other person as may be indicated below):

(a)       The Closing Cash Payment as set forth in **Section 3.3**;

(b)       one or more Bills of Sale duly executed by Purchaser evidencing the transfer of the Purchased Assets to Purchaser;

(c)       one or more Assignment and Assumption Agreements duly executed by Purchaser evidencing the transfer of certain of the Purchased Assets to, and the assumption of the Assumed Liabilities by, Purchaser;

(d)       In the event Purchaser is not the purchaser of the New York Business, the Transition Agreement duly executed by Purchaser; and

(e)       such other documents, instruments and other agreements as Seller may reasonably request to carry out the transactions contemplated by this Agreement.

## ARTICLE IX

## TERMINATION

Section 9.1     Termination.   This Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time prior to the Closing as follows:

(a)       At any time on or before the Closing by the mutual consent in writing of Seller and Purchaser;

4869-3241-6847, v. 18

(b)      By either Purchaser or Seller if this Agreement is not approved by the Bankruptcy Court within sixty (60) days after the Petition Date, unless extended by mutual consent in writing of Seller and Purchaser;

(c)      By either Purchaser or Seller if the Sale Order is not entered and becomes a Final order within fourteen (14) days after the Auction, unless extended by mutual consent in writing of Seller and Purchaser;

(d)      By either Purchaser or Seller if the Closing shall not have occurred prior to October 1, 2023 ("Outside Date"), unless extended by mutual consent in writing of Seller and Purchaser; provided, that a party shall not be permitted to terminate this Agreement pursuant to this **Section 9.1(d)** if the failure of the Closing to have occurred by the Outside Date was caused by the breach of such party with respect to any obligation or condition of this Agreement;

(e)      By Purchaser, if Seller breaches any representation, warranty, covenant or agreement contained in this Agreement, and such breach (i) would result in a failure of a condition set forth in **Section 7.1** or **7.3** and (ii)(A) cannot be cured by the Outside Date or (B) if capable of being cured, has not been cured by the earlier of (1) ten business days after the giving of written notice by Purchaser to Seller of such breach (which notice shall specify in reasonable detail the nature of such breach and Purchaser's intention to terminate this Agreement if such breach is not cured) and (2) one business day prior to the earlier of the Outside Date and the date on which this Agreement may otherwise be terminated by Purchaser in accordance with this **Section 9.1**; provided, however, that Purchaser is not then in breach of any representation, warranty, covenant or agreement contained in this Agreement that would result in a failure of a condition set forth in **Section 7.1** or **7.2**;

(f)      By Seller, if Purchaser breaches any representation, warranty, covenant or agreement contained in this Agreement, and such breach (i) would result in a failure of a condition set forth in **Section 7.1** or **7.2** and (ii)(A) cannot be cured by the Outside Date or (B) if capable of being cured, has not been cured by the earlier of (1) ten business days after the giving of written notice by Seller to Purchaser of such breach (which notice shall specify in reasonable detail the nature of such breach and Seller's intention to terminate this Agreement if such breach is not cured) and (2) one business day prior to the earlier of the Outside Date and the date on which this Agreement may otherwise be terminated by Seller in accordance with this **Section 9.1**; provided, however, that Seller is not then in breach of any representation, warranty, covenant or agreement contained in this Agreement would result in a failure of a condition set forth in **Section 7.1** or **7.3**;

(g)      By Seller or Purchaser if there is in effect a Final, non-appealable Order of a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement or the Ancillary Agreements, it being agreed that the parties hereto shall promptly appeal any adverse determination which is not non-appealable and pursue such appeal with reasonable diligence unless and until this Agreement is terminated pursuant to this **Section 9.1**; provided, that a party may not terminate this Agreement pursuant to this **Section 9.1(g)** if such party's breach of any of its representations, warranties, covenants or agreements contained herein resulted in such Order.

(h)      By Seller in the event of a successful Initial Overbid or Subsequent Overbid pursuant to the Bid Procedures Order;

(i)      By Purchaser if any Bankruptcy Court Milestones are not met;

43

(j)     By Purchaser if a Seller Material Adverse Effect has occurred; or

(k)     by Purchaser, if, prior to the Closing, the Bankruptcy Case is converted into a case under Chapter 7 of the Bankruptcy Code or dismissed or if a trustee is appointed in the Bankruptcy Case.

*Section 9.2     Notice of Termination.*  If this Agreement is terminated pursuant to **Section 9.1** (other than a termination under **Section 9.1(a)**, which shall not require notice), then the terminating party shall forthwith give written notice of termination to the other party specifying the subsection of **Section 9.1** pursuant to which such termination is made.

*Section 9.3     Effect of Termination.*

(a)     In the event of a termination of this Agreement due to an Initial Overbid or Subsequent Overbid or an Alternative Transaction, and subject to the Bid Procedures Order, and subject to Purchaser's payment of the Seller Reimbursable Expenses, Seller shall pay the Purchaser Reimbursable Expenses to Purchaser following the closing of any Alternative Transaction, and Seller and Purchaser shall send a Joint Written Direction to the Escrow Agent, on the date of the closing of such Alternative Transaction, directing the Escrow Agent to pay the  Deposit to Purchaser on such date.

(b)     In the event of any other termination of this Agreement and the abandonment of the proposed transaction without breach by any party hereto, the inability to obtain Bankruptcy Court approval in a Sale Order, or the conversion of the case to Chapter 7, this Agreement shall (except as otherwise expressly provided herein) become void and have no effect, without any liability on the part of any party or the managers, directors, officers, shareholders, or members of any party and Seller and Purchaser shall send a Joint Written Direction to the Escrow Agent, on the date of such termination, directing the Escrow Agent to pay the Deposit  to Purchaser on such date.

(c)     In the event of termination of this Agreement and the abandonment of the proposed transactions by the non-breaching party due to a breach of this Agreement by the other party, this Agreement shall (except as otherwise expressly provided herein) become void and have no effect, without any liability on the part of the other party or its directors, officers or shareholders.

(d)     In the event Seller terminates this Agreement due to a breach on the part of Purchaser pursuant to **Section 9.1(f)**, Seller and Purchaser shall send a Joint Written Direction to the Escrow Agent, on the date of such termination, directing the Escrow Agent to pay the Deposit to Seller on such date, and in the event of any other termination of this Agreement (including by Purchaser pursuant to Section **9.1(e)**), Seller and Purchaser shall send a Joint Written Direction to the Escrow Agent, on the date of such termination, directing the Escrow Agent to pay the Deposit to Purchaser on such date.

(e)     In the event of termination of this Agreement as provided in **Section 9.1**, this Agreement shall forthwith become void and there shall be no liability on the part of either party except (i) for the provisions of Section 6.7, this **Article IX**, and **Article X** and (ii) that no such termination shall relieve either party from liability for any willful and material breach of this Agreement.

**ARTICLE X**
**MISCELLANEOUS PROVISIONS**

44

4869-3241-6847, v. 18

Section 10.1    *Amendments*.  This Agreement may be amended, modified or supplemented only pursuant to a written instrument making specific reference to this Agreement and signed by each of the parties hereto.

Section 10.2    *Assignment*.  Neither this Agreement nor any right or obligation hereunder shall be assigned, delegated or otherwise transferred (whether voluntarily, by operation of law, by merger or otherwise), without the prior written consent of the other party hereto; provided, however, that (a) Purchaser may, without obtaining the prior written consent of, but after notice to, Seller, assign, delegate, or otherwise transfer its rights and obligations hereunder to any affiliate or affiliates of Purchaser; provided, however, that any such assignment, delegation, or other transfer shall not relieve Purchaser of its obligations hereunder; and (b) the rights and interests of Seller hereunder may be assigned (i) by the Bankruptcy Court, or (ii) to a trustee appointed under chapter 11 or chapter 7 of the Bankruptcy Code (if this Agreement has not otherwise been terminated pursuant to **Section 9.1(i)**).  Each party shall execute such acknowledgements of such assignments and collateral assignments in such forms as the other party may from time to time reasonably request.  Any attempted assignment, delegation or transfer in violation of this **Section 10.2** shall be void and of no force or effect.

Section 10.3    *Binding Effect*.  Subject to Final authorization and approval as is required by the Bankruptcy Court, this Agreement shall be binding upon the parties hereto and their respective legal representatives, successors and permitted assigns.

Section 10.4    *Counterparts; Electronic Transmission*.  This Agreement may be executed in multiple counterparts, all of which shall constitute one and the same instrument.  Any counterpart may be executed by facsimile signature or other electronic transmission and such facsimile signature or other electronic transmission shall be deemed an original.

Section 10.5    *Entire Agreement*.  This Agreement (including the Exhibits and Schedules attached hereto), constitutes the entire agreement between the parties hereto in respect of the subject matter hereof and supersedes any prior agreement or understanding between them in respect of such subject matter.

Section 10.6    *Equitable Relief*.  Each party acknowledges and agrees that irreparable damage would occur if any of the obligations to be performed by such party hereunder were not performed in accordance with their specific terms or were otherwise breached, and that damages at law may be an inadequate remedy for breach of any of such party's agreements and covenants contained in this Agreement.  Accordingly, the other party shall be entitled to injunctive relief to prevent any such breach, and to enforce specifically the terms of this Agreement, including specific performance of such agreements and covenants or an Order enjoining the breaching party from any threatened, or from continuation of any actual, breach of the agreements and covenants contained in this Agreement.  The rights set forth in this **Section 10.6** shall be in addition to any other rights that a party may have at law or in equity pursuant to this Agreement.

Section 10.7    *Construction.*

(a)    General.  The Article and Section headings in this Agreement are for convenience of reference only and shall not be deemed to alter or affect the meaning or interpretation of any provision hereof.  Unless the context otherwise requires, (i) all references to Articles, Sections, Schedules or Exhibits contained in this Agreement are references to articles, sections, schedules and exhibits of or to this Agreement, (ii) words in the singular include the plural and *vice versa*, and (iii) words of any gender include each other gender.  Any agreement, instrument or Law defined or referred to herein means such agreement, instrument or Law as from time to time amended, qualified or supplemented, including (in the case of agreements and instruments) by waiver or

45

consent and (in the case of Laws) by succession of comparable successor Laws.  References to a person or entity are also to its successors and permitted assigns.  Each party hereto acknowledges that it participated in, or had a meaningful opportunity to participate in, the negotiations and drafting of this Agreement.  If an ambiguity or question of intent or interpretation arises in respect of this Agreement, then this Agreement shall be construed to be the product of meaningful individualized negotiations between the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party hereto by virtue of the authorship of any of the provisions of this Agreement.

(b)      Time Periods.  If any time period set forth herein expires on a day that is not a business day, then such time period shall automatically be extended to the first business day immediately after the non-business day on which such time period would have otherwise expired.

Section 10.8    Governing Law.  **THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE (WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS THAT WOULD REQUIRE THE APPLICATION OF THE LAWS OF A JURISDICTION OTHER THAN THE STATE OF DELAWARE), EXCEPT TO THE EXTENT SUCH LAWS ARE SUPERSEDED BY THE BANKRUPTCY CODE OR OTHER APPLICABLE FEDERAL LAW.**

Section 10.9    Jurisdiction; Venue.  Without limiting any party's right to appeal any order of the Bankruptcy Court, the Bankruptcy Court shall retain sole jurisdiction over any claim, controversy or dispute relating to this Agreement or any of the transactions contemplated hereby; provided, however, if the Bankruptcy Court is unwilling or unable to hear any such claim, controversy or dispute, then the courts of the State of Missouri in St. Louis County and the United States District Court for the Eastern District of Missouri and the appellate courts having jurisdiction of appeals in such courts shall have sole exclusive jurisdiction over any such claim, controversy or dispute.  Each of the parties hereto hereby irrevocably and unconditionally (i) submits and consents for itself and its property in any action, suit, proceeding or investigation relating to this Agreement or for recognition of and enforcement of any judgment in respect thereof, to the exclusive jurisdiction of such courts and that all claims in respect of any such action, suit, proceeding or investigation shall be heard and determined only in such courts, (ii) waives any objection that it may now or hereafter have to the venue or jurisdiction of any such action, suit, proceeding or investigation in such courts or that any such action, suit, proceeding or investigation was brought in an inconvenient forum (and agrees not to plead or claim the same) and (iii) agrees that service of process in any such action, suit, proceeding or investigation may be effected by mailing a copy of such process by certified mail, postage prepaid, to such party at its address set forth in **Section 10.10**.  The parties intend that all foreign jurisdictions will enforce any order of the Bankruptcy Court in any litigation arising out of or relating to this Agreement or any Ancillary Agreement.

Section 10.10  Notices.  All notices, requests, demands, or other communications required or permitted to be given hereunder by any party hereto to any other party shall be in writing and delivered (i) in person, (ii) by a nationally recognized overnight courier service requiring acknowledgment of receipt of delivery, (iii) by United States certified or registered mail, postage prepaid and return receipt requested, or (iv) by electronic mail, as follows:

If to Seller, to:

Allied Healthcare Products, Inc.
1720 Sublette Avenue
St. Louis, MO 63110
Attention:  Akash Amin

46

E-Mail: akash.amin@morrisanderson.com

with a copy to (which shall not constitute notice):

Greensfelder, Hemker & Gale, P.C.
10 S. Broadway, Suite 2000
St. Louis, MO 63102
Attention: Edward A. Chod
E-Mail: eac@greensfelder.com

and to:

Spencer Fane LLP
1 North Brentwood Boulevard, Suite 1000
St. Louis, MO 63105
Attention: Eric C. Peterson
E-Mail: epeterson@spencerfane.com

and to:

Spencer Fane LLP
1000 Walnut, Suite 1400
Kansas City, MO 64106
Attention: Zach Fairlie
E-mail: zfairlie@spencerfane.com

and to:

Ravinia Capital LLC
125 South Wacker Dr., Suite 300
Chicago, IL 60606
Attention: Tom Goldblatt, Managing Partner
E-mail: tgoldblatt@raviniacapitalllc.com

*If to Purchaser, to:*

Allied Medical, LLC
c/o Flexicare Inc.
15281 Barranca Pkwy, Unit D
Irvine, CA 92618
Attention: Hash Poormand
Email: hash.poormand@flexicare.com

with a copy to (which shall not constitute notice):

Armstrong Teasdale LLP
1007 North Market Street
Wilmington, DE 19801
Attention: Eric M. Sutty
E-mail: esutty@atllp.com

and to:

Armstrong Teasdale LLP
2005 Market Street, 29th Floor
One Commerce Square
Philadelphia, PA 19103
Attention: Michael A. Petrizzo, Jr.
E-mail: mpetrizzo@atllp.com

and to:

King & Spalding LLP
1185 Avenue of the Americas
34th Floor
New York, NY  10036
Attention: Scott Davidson
E-mail: sdavidson@kslaw.com

Notice shall be deemed given, received, and effective on:  (i) if given by personal delivery or courier service, the date of actual receipt by the receiving party, or if delivery is refused on the date delivery was first attempted; (ii) if given by certified or registered mail, the third day after being so mailed if posted with the United States Postal Service; and (iii) if given by e-mail, the date on which the e-mail is electronically confirmed if confirmed by transmission report during the transmitter's normal business hours, or at the beginning of the next business day after transmission if confirmed at any time other than the transmitter's normal business hours.  Any person entitled to notice may change any address or e-mail address to which notice is to be given to it by giving notice of such change of address or e-mail address as provided in this **Section 10.10**.  The inability to deliver notice because of changed address or e-mail address of which no notice was given shall be deemed to be receipt of the notice as of the date such attempt was first made.

*Section 10.11  No Recourse*.  Notwithstanding any other provision of this Agreement to the contrary, no past, present or future officer, director, partner, member, manager, equity holder, controlling person, employee, contractor, agent or representative of the parties hereto shall have any liability for any liability or obligation of Seller or Purchaser, as applicable, under this Agreement or any other agreement or document contemplated hereby for any claim based on, arising out of, or relating to the transactions contemplated hereby and thereby.  Any claim or cause of action based upon, arising out of or relating to this Agreement or any agreement or document contemplated hereby may only be brought against persons that are expressly named as parties hereto or thereto, and then only in respect of the specific obligations set forth herein or therein.  Other than the parties hereto, no other party shall have any liability or obligation for any of the liabilities or obligations of any party under this Agreement or any other agreement or document contemplated hereby or thereby or for any action, suit or proceeding based upon, arising out of or relating to the transactions contemplated hereby or thereby (including the breach, termination or failure to consummate such transactions).

*Section 10.12  Remedies*.

(a)    Notwithstanding anything to the contrary in this Agreement, if Purchaser breaches this Agreement (whether willfully, intentionally, unintentionally or otherwise) or fails to perform hereunder (whether willfully, intentionally, unintentionally or otherwise), then, except for the right to seek specific performance in accordance with **Section 10.6**, the sole and exclusive remedies (whether at law, in equity, in contract, in tort or otherwise) against the Purchaser for any breach, loss, damage or failure to perform under this Agreement or other document delivered in connection herewith or otherwise or in respect of any

48

oral representation made or alleged to have been made in connection herewith or therewith shall be for Seller to receive payment of the Deposit as provided in **Section 9.3(d)**. For the avoidance of doubt, Seller shall be permitted or entitled to receive both a grant of specific performance to cause the Closing to occur and payment of the Deposit pursuant to **Section 3.3(a)**.

(b)      Notwithstanding anything to the contrary in this Agreement, if Seller breaches this Agreement (whether willfully, intentionally, unintentionally or otherwise) or fails to perform hereunder (whether willfully, intentionally, unintentionally or otherwise), then, except for the right to seek specific performance in accordance with **Section 10.6**, the sole and exclusive remedies (whether at law, in equity, in contract, in tort or otherwise) against the Seller for any breach, loss, damage or failure to perform under this Agreement or any document delivered in connection herewith or otherwise or in respect of any oral representation made or alleged to have been made in connection herewith or therewith shall be for Purchaser to receive payment of the Purchaser Reimbursable Expenses as provided in **Section 6.2(a)** or **Section 9.3(a)** and return of the Deposit as provided in **Section 9.3(d)**. For the avoidance of doubt, while Purchaser may concurrently seek (i) specific performance or other equitable relief, subject in all respects to **Section 10.6** and (ii) payment of the Purchaser Reimbursable Expenses as provided in **Section 6.2(a)** or **Section 9.3(a)** and return of the Deposit as provided in **Section 9.3(d)**, under no circumstances shall the Purchaser be permitted or entitled to receive both a grant of specific performance to cause the Closing to occur and return of the Deposit.

(c)      Except as otherwise expressly set forth herein, the rights, powers and remedies provided hereunder are cumulative and are not exclusive of any rights, powers and remedies provided by applicable Law.

*Section 10.13  Severability*.  Each provision of this Agreement shall be deemed severable.  If any provision of this Agreement, or the application of such provision to any person or circumstance, shall be held invalid, illegal or unenforceable by a court of competent jurisdiction, then the remainder of this Agreement or the application of such provision to other persons or circumstances or in other jurisdictions shall not be affected thereby.

*Section 10.14  Survival*.  Except for any covenant that by its terms is to be performed (in whole or in part) by any party following the Closing, the representations and warranties contained in this Agreement or in any document delivered in connection with the transactions contemplated hereby shall not survive the Closing and none of the parties shall have any liability or obligation to any other party, including any indemnity obligations of any kind, after Closing for any breach thereof or any other provision of this Agreement.  For the avoidance of doubt, nothing set forth herein shall restrict or prevent Seller from liquidating after the Closing.

*Section 10.15  No Third-Party Beneficiaries*.  This Agreement and the covenants made herein are made expressly and solely for the benefit of the parties hereto, and no other person shall be entitled or be deemed to be entitled to any benefits or rights hereunder, nor be authorized or entitled to enforce any rights, claims or remedies hereunder or by reason hereof.

*Section 10.16  Time Is of the Essence*.  Time is of the essence in the performance of this Agreement.

*Section 10.17  Waiver of Bulk Sales Laws*.   To the maximum extent not prohibited by applicable Law, the parties hereto hereby waive compliance by Purchaser and Seller with the terms of any bulk sales or similar Laws in any applicable jurisdiction in respect of the transactions contemplated by this Agreement. The Sale Order shall exempt Purchaser and Seller from compliance with any such Laws.

*Section 10.18  Waiver of Trial by Jury*.  **TO THE MAXIMUM EXTENT NOT PROHIBITED BY APPLICABLE LAW, EACH PARTY HERETO, HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY ACTION, SUIT OR PROCEEDING, DIRECTLY OR INDIRECTLY, AT ANY TIME ARISING OUT OF, OR RELATING TO, THIS AGREEMENT.**

*Section 10.19  Waivers*.  No waiver of any provision hereof, or consent required hereunder, or any consent or departure from this Agreement, shall be valid or binding unless expressly and affirmatively made in writing and duly executed by the party to be charged with such waiver.  No waiver shall constitute or be construed as a continuing waiver or a waiver in respect of any subsequent breach or default, either of similar or different nature, unless expressly so stated in such writing.  No delay, forbearance or neglect by any party hereto, whether in one or more instances, in the exercise of any right, power, privilege or remedy hereunder or in the enforcement of any provision of this Agreement shall constitute or be construed as a waiver thereof.  The single or partial exercise of any right, power, privilege or hereunder or under applicable Law shall not preclude any other or further exercise of any other right, power, privilege or remedy.

*Section 10.20  Seller's Right to Continue Marketing*. Notwithstanding anything in this Agreement to the contrary, Seller has the right to continue to solicit competing offers for the purchase of the Purchased Assets from third parties pursuant to the Bid Procedures Order, and this Agreement is subject to Overbids as set forth in the Bid Procedures Order.

\* \* \* \* \*

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

50

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement as of the Execution Date.

PURCHASER:

ALLIED MEDICAL, LLC

By: _____

Name: _KHASHAYAR POORMAND_

Title: _PRESIDENT_

SELLER:

ALLIED HEALTHCARE PRODUCTS, INC.

By: _____

Name: _____

Title: _____

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement as of the Execution Date.

PURCHASER:

ALLIED MEDICAL, LLC

By: _____
Name: _____
Title: _____


SELLER:

ALLIED HEALTHCARE PRODUCTS, INC.

By: _____
Name: _____Akash Amin_____
Title: _____President_____

[*Signature Page to Asset Purchase Agreement – St. Louis*]

4869-3241-6847

**EXHIBIT 3**

**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | |
|---|---|
| In re:<br><br>**ALLIED HEALTHCARE PRODUCTS, INC.,**<br><br>Debtor. | **Chapter 11**<br>**Case No. 23-41607** |

**ORDER APPROVING (A) BIDDING PROCEDURES, (B) DESIGNATION OF
STALKING HORSE BIDDER AND STALKING HORSE BID PROTECTIONS,
(C) SCHEDULING AUCTION AND SALE HEARING, (D) FORM AND MANNER OF
NOTICE OF SALE, AUCTION, AND SALE HEARING; AND (E) ASSUMPTION AND
ASSIGNMENT PROCEDURES AND FORM AND MANNER OF NOTICE THEREOF;
<u>AND GRANTING RELATED RELIEF</u>**

Upon the motion of the above-captioned debtor ("*Debtor*") for entry of an order pursuant to sections 105(a), 363, 365, 503 and 507 of title 11 of the United States Code ("*Bankruptcy Code*"), Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure ("*Bankruptcy Rules*"), and the United States Bankruptcy Court of Eastern District of Missouri *Chapter 11 Guidelines for Sales and Sale Procedures Motions* ("*Local Guidelines*") (i) authorizing and approving the bidding procedures substantially in the form attached hereto as **Exhibit A** ("*Bid Procedures*"), in connection with the sale of any or substantially all of Debtor's St. Louis Assets; (ii) designating and approving Allied Medical, LLC, as the stalking horse bidder ("*Stalking Horse Bidder*"); (iii) approving the Stalking Horse Bid Protections for the Stalking Horse Bidder, in accordance with the terms and conditions set forth in that certain *Asset Purchase Agreement*, effective as of May 7, 2023 (together with the schedules and exhibits thereto, and as it may be amended,

modified, or supplemented from time to time in accordance with the terms thereof, the "***Stalking Horse Agreement***"), attached hereto as **Exhibit  D**, and the Bid Procedures; (iv) authorizing and scheduling an auction for the St. Louis Assets ("***Auction***"), and scheduling a hearing ("***Sale Hearing***") with respect to the approval of a proposed sale transaction or transactions for the St. Louis Assets ("**Transaction**"); (v) authorizing and approving the form and manner of (a) notice of the sale of St. Louis Assets, the Auction, and the Sale Hearing, substantially in the form attached hereto as **Exhibit B** ("***Sale Notice***"); and (b) notice to each non-Debtor counterparty (each a "***Counterparty***") to an executory contract or unexpired non-residential real property lease of the Debtor (each a "***Contract***") regarding the Debtor's potential assumption and assignment of Contracts and the Debtor's calculation of the amount necessary to cure any monetary defaults under such Contracts ("***Cure Costs***"), substantially in the form attached here to as **Exhibit C** ("***Assumption and Assignment Notice***"); (vi) authorizing and approving the procedures set forth herein ("***Assumption and Assignment Procedures***") for the assumption and assignment of Contracts to the Successful Bidder ("***Proposed Assumed Contracts***"); and (vii) granting related relief, all as more fully set forth in the Motion; and upon consideration of the Thomas Goldblatt Declaration; and this Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b) as to which the Bankruptcy Court has the power to enter a final judgment; and it appearing that venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided; and such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and this Court having reviewed the Motion; and this Court having held a hearing to consider the relief requested in the Motion; and this Court having determined that the legal and

2

factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the relief requested in the Motion is in the best interests of the Debtor and its estate and creditors; and upon all of the proceedings had before this Court and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY FOUND AND DETERMINED THAT[1]**

A.    <u>Jurisdiction</u>. This Court has jurisdiction to hear and determine the Motion and to grant the relief requested herein pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.    <u>Statutory and Legal Predicates</u>. The statutory and legal predicates for the relief requested in the Motion are sections 105(a), 363, 365, 503, and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, and 9014.

C.    <u>Prepetition Marketing Process</u>. Debtor and its advisors, including Ravinia Capital, LLC, engaged in a robust and extensive marketing and sale process before and after the commencement of the chapter 11 case to solicit and develop the highest or best offer for the St. Louis Assets.

D.    <u>Bid Procedures</u>. Debtor has articulated good and sufficient business reasons for the Court to approve the Bid Procedures. The Bid Procedures are fair, reasonable, and appropriate under the circumstances and designed to maximize the recovery on, and realizable value of, the St. Louis Assets, as determined by the Debtor's sound business judgment. The Bid Procedures were negotiated in good faith and at arms-length and are reasonably designed to promote a

---

[1] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

SL 5985701.3

competitive and robust bidding process to generate the greatest level of interest in the Debtor's business resulting in the highest or otherwise best offer.

E.      <u>Designation of Stalking Horse Bid</u>. Selection of the Stalking Horse Bidder as a "stalking horse" is in the best interest of Debtor and its estate, and reflects a sound exercise of the Debtor's business judgment. The Stalking Horse Agreement provides the Debtor with the opportunity to sell the St. Louis Assets to preserve and realize their going concern value. Without the Stalking Horse Bid, the Debtor would likely realize a lower price for the St. Louis Assets. As such, the contributions of the Stalking Horse Bidder to the process have indisputably provided a substantial benefit to the Debtor, its estate, and creditors in this chapter 11 case. The Stalking Horse Bid will provide the Debtor with the opportunity to secure a fair and adequate baseline price for the St. Louis Assets at the Auction, if any, and, accordingly, will provide a clear benefit to the Debtor's estates, creditors, and all other parties in interest.

F.      <u>Designation of Stalking Horse Bidder</u>. The Stalking Horse Bidder shall act as the "stalking horse bidder" pursuant to the Stalking Horse Agreement, and the Stalking Horse Bid shall be subject to higher or better offers in accordance with the Bid Procedures. The Stalking Horse Bidder is not an "insider" or "affiliate" of the Debtor, as those terms are defined in section 101 of the Bankruptcy Code, and no common identity of incorporators, directors or controlling stockholders exists between the Stalking Horse Bidder and the Debtor. Pursuit of the Stalking Horse Bid as a "stalking-horse" purchase agreement is in the best interests of the Debtor, its estate, and creditors, and it reflects a sound exercise of the Debtor's business judgment.

G.      <u>Stalking Horse Bid Protections</u>. The Stalking Horse Bid Protections (as defined in the Motion) (i) have been negotiated by the Stalking Horse Bidder and the Debtor and their respective advisors at arms-length and in good faith and (ii) are necessary to ensure that the

4

Stalking Horse Bidder will continue to pursue its Stalking Horse Agreement and the Transaction contemplated thereby. The Purchaser Reimbursable Expenses (as defined in the Stalking Horse Agreement), to the extent payable under the Stalking Horse Agreement, (a)(i) are actual and necessary costs and expenses of preserving the Debtor's estates within the meaning of section 503(b) of the Bankruptcy Code and (ii) shall be treated as allowed administrative expense claims against the Debtor's estate pursuant to sections 105(a), 503(b), and 507(a)(2) of the Bankruptcy Code (if not otherwise paid at the closing of an Alternative Transaction); (b) are commensurate to the real and material benefits conferred upon the Debtor's estate by the Stalking Horse Bidder; and (c) are fair, reasonable, and appropriate, including in light of the size and nature of the Transaction and the efforts that have been and will be expended by the Stalking Horse Bidder. The Stalking Horse Bid Protections are a material inducement for, and condition of, the Stalking Horse Bidder's execution of the Stalking Horse Agreement. Unless it is assured that the Stalking Horse Bid Protections will be available, the Stalking Horse Bidder is unwilling to remain obligated to consummate the Stalking Horse Agreement or otherwise be bound under the Stalking Horse Agreement (including the obligations to maintain its committed offer while such offer is subject to higher or otherwise better offers as contemplated by the Bidding Procedures).

H.      Sale Notice. The Sale Notice, the form of which is attached hereto as **Exhibit B**, is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Bid Procedures, the Assumption and Assignment Procedures, the Auction, the Sale Hearing, and the Transaction (including the sale of the St. Louis Assets as set forth under the Stalking Horse Agreement) free and clear of any liens, claims, encumbrances, or interests pursuant to sections 363(f) of the Bankruptcy Code, and any and all objection deadlines related thereto, and

SL 5985701.3

no other or further notice shall be required for the Motion, the Sale Transaction, or the assumption and assignment of the Proposed Assumed Contracts except as expressly required herein.

I.    <u>Assumption and Assignment Provisions</u>. Debtor has articulated good and sufficient business reasons for the Court to approve the Assumption and Assignment Procedures. The Assumption and Assignment Procedures provide an adequate opportunity for all Counterparties to Contracts to raise any objections to the Proposed Assumed Contracts or the proposed Cure Costs. The Assumption and Assignment Procedures comply with the provisions of section 365 of the Bankruptcy Code and Bankruptcy Rule 6006.

J.    <u>Assumption and Assignment Notice</u>. The Assumption and Assignment Notice, the form of which is attached hereto as **Exhibit C**, is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Assumption and Assignment Procedures, as well as any and all objection deadlines related thereto, and no other or further notice shall be required for the Motion and the procedures described therein, except as expressly required herein.

K.    <u>Notice</u>. Good and sufficient notice of the relief sought in the Motion has been provided under the circumstances, and no other or further notice is required, except as set forth in the Bid Procedures and the Assumption and Assignment Procedures. A reasonable opportunity to object and be heard regarding the relief granted herein has been afforded to all parties in interest, including those persons and entities entitled to notice pursuant to Bankruptcy Rule 2002.

L.    Debtor has articulated good and sufficient business reasons for the Court to approve (i) the Bidding Procedures, (ii) the Assumption and Assignment Procedures, (iii) the Stalking Horse Bid Protections, and (iv) the form and manner of notice of the Auction and the Sale Hearing for the Sale Transaction.

SL 5985701.3

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.      The Motion is granted to the extent set forth herein.

2.      All objections to the relief granted herein that have not been withdrawn with prejudice, waived, or settled, and all reservations of rights included in such objections, are hereby overruled.

3.      The Bid Procedures are hereby approved in their entirety, are incorporated herein by reference, and shall govern the bids and proceedings related to the sale of the St. Louis Assets and the Auction. The failure to specifically include or reference any particular provision of the Bid Procedures in the Motion or this Order shall not diminish or otherwise impair the effectiveness of such procedures, it being the Court's intent that the Bid Procedures are approved in their entirety, as if fully set forth in this Order. Debtor is authorized to take all actions necessary or appropriate to implement the Bid Procedures.

**<u>Stalking Horse Bid Protections</u>**

4.      Debtor is authorized to enter into the Stalking Horse Agreement, and the Stalking Horse Bid shall be subject to higher or otherwise better Qualified Bids (as defined herein), in accordance with the terms and procedures of the Bid Procedures.

5.      The Stalking Horse Bid Protections are approved in their entirety, including the Purchaser Reimbursable Expenses (as defined in the Stalking Horse Agreement), payable in accordance with, and subject to the terms of, the Stalking Horse Agreement and the Bid Procedures. The Purchaser Reimbursable Expenses shall not be subject to reduction of any kind. That Purchaser Reimbursable Expenses, if not otherwise paid at the closing of an Alternative Transaction, shall constitute allowed super-priority administrative expense claims against the

7

Debtor's estates pursuant to sections 105(a), 503(b), and 507(a)(2) of the Bankruptcy Code, with priority over all other administrative expenses of the kind, including any claim granted pursuant to any order approving the Debtor's entry into a post-petition financing facility or to continue to access cash collateral following the commencement of the chapter 11 case.

**The Bid Procedures**

6.      The Bid Procedures, attached hereto as **Exhibit A**, are fully incorporated herein and approved, and shall apply with respect to any bids for, and the Auction and sale of, any or substantially all of the Debtor's St. Louis Assets, including the St. Louis Assets set forth in the Stalking Horse Agreement. The procedures and requirements set forth in the Bid Procedures, including those associated with submitting a "Qualified Bid" (as defined herein), are fair, reasonable and appropriate, and are designed to maximize recoveries for the benefit of the Debtor's estate, creditors, and other parties in interest. Debtor is authorized to take all actions necessary or appropriate to implement the Bid Procedures in accordance with the terms of this Order and the Bid Procedures.

7.      The deadline for submitting Qualified Bids ("*Bid Deadline*") is **June 16, 2023, 2023, at 5:00 p.m. (prevailing Central Time)**; provided, that Debtor shall have the right, in consultation with the Investment Banker, to extend the Bid Deadline for any reason whatsoever, in its reasonable business judgment, for all or certain Potential Bidders (as defined in the Bid Procedures), without further order of the Court; provided that any such extension or modification shall not by itself extend any milestone or deadline in the Stalking Horse Agreement and/or DIP Facility. Any party that does not submit a Qualified Bid by the applicable Bid Deadline in accordance with the Bid Procedures will not be allowed to (a) submit any offer after the Bid Deadline or (b) participate in the Auction.

8

SL 5985701.3

8.      The Stalking Horse Bidder is a Qualified Bidder and the bid reflected in the Stalking Horse Bid (including as may be increased at the Auction (if any)) is a Qualified Bid, as set forth in the Bid Procedures.

9.      All Potential Bidders (as defined in Bid Procedures) submitting bids determined by Debtor to be "*Qualified Bids*" in accordance with the Bid Procedures are deemed to have submitted to the exclusive jurisdiction of this Court with respect to all matters related to the Auction and the terms and conditions of the sale or transfer of the St. Louis Assets.

10.     To qualify as a Qualified Bid, each such bid must be accompanied by information supporting the Potential Bidder's ability to comply with the requirements of adequate assurance of future performance under section 365(f)(2)(B) of the Bankruptcy Code ("*Adequate Assurance Information*"), including the Potential Bidder's financial wherewithal and willingness to perform under any Contracts that will be assumed and assigned to such bidder. In addition to the other requirements of a Qualified Bid as set forth in the Bidding Procedures, each such bid must be accompanied by a written statement confirming that (a) the bidder has not engaged in any collusion with respect to the submission of any bid, the bidding, or the Auction and (b) its Qualified Bid is a binding, good faith, and bona fide offer that it intends to consummate if selected as the Successful Bidder.

11.     Debtor shall have the right, as it may reasonably determine to be in the best interests of its estate, to carry out the Bid Procedures including, without limitation, to: (a) determine which bidders are Qualified Bidders; (b) determine which bids are Qualified Bids; (c) determine which Qualified Bid is the highest or otherwise best purchase price and/or terms received prior to the Auction; (d) determine which Qualified Bid(s) is the Successful Bid(s) (as defined herein); (e) designate the second highest or otherwise best bid(s) as Back-Up Bid(s) (as defined herein);

9

(f) reject any bid that is (i) inadequate or insufficient, (ii) not a Qualified Bid or otherwise not in conformity with the requirements of this Order, the Bid Procedures, or the requirements of the Bankruptcy Code, or (iii) contrary to the best interests of the Debtor and its estate; (g) adjourn or cancel the Auction and/or the Sale Hearing in open court without further notice or as provided in the Bid Procedures; and (h) modify the Bid Procedures in a manner consistent with its fiduciary duties and applicable law.

12.     Debtor shall have the right, in its reasonable business judgment, in good faith and in a manner consistent with its fiduciary duties, and applicable law, to modify the Bid Procedures to further the goal of attaining the highest or otherwise best offer for the St. Louis Assets, including by (a) waiving terms and conditions with respect to any Potential Bidder; (b) extending the deadlines set forth in the Bid Procedures; and (c) announcing at the Auction modified or additional procedures for conducting the Auction; provided, that any such waiver, extension, modification, or addition shall not by itself extend any milestone or deadline in the Stalking Horse Agreement and/or DIP Facility. Nothing in this Order or the Bid Procedures shall obligate the Debtor to consummate or pursue any transaction with respect to any St. Louis Asset with a Qualified Bidder.

13.     Debtor shall identify those bids that qualify as Qualified Bids (each bidder that submits such a Qualified Bid being a "*Qualified Bidder*") and shall notify each Qualified Bidder of its status as a Qualified Bidder by **June 19, 2023, 2023, at 5:00 p.m. (prevailing Central Time)**. If more than one Qualified Bid is timely received (including the Stalking Horse Bid), the Auction shall be conducted (i) at the offices of at the offices of Spencer Fane LLP, 1 North Brentwood Boulevard Suite 1200, St. Louis, MO 63105 or (ii) virtually pursuant to procedures to be timely filed by the Debtor on the Bankruptcy Court's docket, or at such other time and location

SL 5985701.3

as determined by the Debtor, after providing notice to the Qualified Bidders, may determine in their reasonable business judgment.

14.    Only Qualified Bidders will be eligible to participate in the Auction, subject to such limitations as the Debtor may impose in good faith. In addition, professionals and/or other representatives of the Debtor, the Stalking Horse Bidder, Qualified Bidders, and of any official committee of unsecured creditors shall be permitted to attend and observe the Auction. Any creditor of the Debtor may attend and observe the Auction; provided, that, the Debtor may, in its sole discretion, establish a reasonable limit on the number of representatives and/or professional advisors that may appear on behalf of or accompany Qualified Bidders or other creditors at the Auction. The proceedings of the Auction shall be transcribed or videotaped, at the Debtor's option.

15.    Absent further order of the Court, no Qualified Bidder (other than the Stalking Horse Bidder solely as provided herein) shall be entitled to any expense reimbursement, break-up fee, termination fee, or other similar fee or payment in connection with any Transaction, and by submitting a bid, such Qualified Bidder is deemed to have waived their right to request or to file with this Court any request for expense reimbursement or any fee of any nature, whether by virtue of section 503(b) of the Bankruptcy Code or otherwise.

16.    If the Debtor does not receive any Qualified Bids (other than the Stalking Horse Bid) for the St. Louis Assets on the same or better terms as provided in the Stalking Horse Bid by the Bid Deadline, the Debtor shall not conduct an Auction and by **June 19, 2023 at 5:00 p.m. (prevailing Central Time)** shall file a notice with the Bankruptcy Court indicating that no Auction will be held and designating the Stalking Horse Bid as the Successful Bid and the Stalking Horse Bidder as the Successful Bidder.

SL 5985701.3

17.     The Debtor may, in the exercise of its business judgment, identify the highest or otherwise best Qualified Bid(s) as the successful bid(s) (a "***Successful Bid***" and, the bidder(s) submitting such bid(s), a "***Successful Bidder***"). The Debtor may also identify which Qualified Bid(s) constitute(s) the second highest or otherwise best bid and deem such second highest or otherwise best bid(s) each a back-up bid (such bid shall be a "***Back-Up Bid***" and, the bidder submitting such bid, a "***Back-Up Bidder***").

18.     Within two (2) calendar days after the conclusion of the Auction, if one is held, or as soon as reasonably practicable thereafter, the Debtor shall file with the Court, serve on the Objection Notice Parties and each Counterparty to a Proposed Assumed Contract included in the Successful Bid(s) and Back-Up Bid(s), a notice containing the results of the Auction ("**Notice of Auction Results**"), which shall (a) identify the Successful Bidder(s) and the Back-Up Bidder(s); (b) provide Adequate Assurance Information for the Successful Bidder (if not the Stalking Horse Bidder); (c) a schedule of all Proposed Assumed Contracts in the Successful Bid(s) and Back-Up Bid(s), if known; (d) identify any known proposed assignees of Proposed Assumed Contracts (if known and if different from the applicable Successful Bidder(s) or Back-Up Bidder(s)); and (e) set forth the deadlines and procedures for filing Sale Objections in response to the Notice of Auction Results.

## Sale Hearing and Sale Objection Deadline

19.     The Sale Hearing for the sale of any St. Louis Assets shall be held before this Court on **June 30, 2023, at [●]:[●] [a/p].m. (prevailing Central Time)**. At the Sale Hearing, the Debtor will seek entry of a Sale Order approving and authorizing the Transaction to the Successful Bidder(s). Notwithstanding the foregoing, the Debtor may (after consultation with the Successful

12

SL 5985701.3

Bidder(s)) seek an adjournment of the Sale Hearing, as the Debtor deems appropriate in the exercise of its reasonable business judgment.

20.     Unless otherwise ordered by the Court, objections to the proposed Transaction, including any objection to the sale of any St. Louis Assets free and clear of liens, claims, encumbrances, and interests pursuant to section 363(f) of the Bankruptcy Code, and entry of an order authorizing the sale of the applicable St. Louis Assets (the "*Sale Order*" and each such objection, a "*Sale Objection*") must: (a) be in writing and specify the nature of such objection; (b) comply with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules of the Bankruptcy Court for the Eastern District of Missouri (the "*Local Rules*"); and (c) be filed with this Court and served on:

(i)     counsel for Debtor, Zachary Fairlie, Spencer Fane LLP, 1000 Walnut, Suite 1400, Kansas City, MO 64106, zfairlie@spencerfane.com;

(ii)     Office of the United States Trustee's Office, 111 South 10th Street Suite 6.353, St. Louis, MO 63102;

(iii)     counsel for the Stalking Horse Bidder, Scott Davidson, King & Spalding LLP, 1185 Avenue of the Americas, 34th Floor, New York, NY 10036, SDavidson@KSLAW.com; Armstrong Teasdale LLP (attn: Erin M. Edelman, Esq. 7700 Forsyth Blvd., Suite 1800, St. Louis, Missouri 63105-1847, eedelman@atllp.com; Michael A. Petrizzo, Jr., 2005 Market Street, 29th Floor, One Commerce Square, Philadelphia, PA 19103, mpetrizzo@atllp.com)

(iv)     proposed counsel to the Official Committee of Unsecured Creditors appointed in the Debtor's chapter 11 case _____;

(v)     the United States Attorney's Office for the Eastern District of Missouri;

(vi)     Blank Rome (Attn: Paige Barr Tinkham, Esq. and Ken Ottaviano, Esq.), as counsel to STERLING COMMERCIAL CREDIT, LLC., as the DIP Facility Lender, paige.tinkham@blankrome.com, ken.ottaviano@blankrome.com.

(collectively, the "*Objection Notice Parties*") by **June 27, 2023, at 5:00 p.m. (prevailing Central Time)** ("*Sale Objection Deadline*")**;** replies to Sale Objections, if any, shall be filed by **June 29, 2023, at 5:00 p.m. (prevailing Central Time).**

21.     The failure of any objecting person or entity to timely file and serve a Sale Objection on the Objection Notice Parties by the applicable Sale Objection Deadline shall be a bar

13

to the assertion, at the Sale Hearing or thereafter, of any objection to the Motion, or to the consummation and performance of the Sale Transaction contemplated by the Stalking Horse Bid or, if the Auction is held, any purchase agreement with the Successful Bidder, including the transfer of the St. Louis Assets to the Stalking Horse Bidder or the Successful Bidder, free and clear of all liens, claims, encumbrances, and interests pursuant to sections 363(f) of the Bankruptcy Code. Failure to object shall constitute consent for the purposes of sections 363(f) of the Bankruptcy Code.

### Notice of Sale Transaction

22.     The Sale Notice, substantially in the form attached hereto as **Exhibit B**, is approved, and no other or further notice of the sale of the St. Louis Assets, the Auction, the Sale Hearing, the Sale Objection Deadline, and the Sale Transaction shall be required if the Debtor serves and publishes such notice in the manner provided in the Bidding Procedures and this Order. The Sale Notice contains the type of information required under Bankruptcy Rule 2002, and complies in all respects with applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

23.     All parties in interest shall receive or be deemed to have received good and sufficient notice of (a) the Motion; (b) the Assumption and Assignment Procedures, including the proposed assumption and assignment of the Proposed Assumed Contracts to the Successful Bidder; (c) the Auction; (d) the Sale Objection Deadline; (e) the Sale Transaction, including the sale of the St. Louis Assets (as set forth under the Stalking Horse Bid); and (f) the Sale Hearing, and no further notice of the foregoing shall be required, if:

> a.     As soon as practicable, but no later than five (5) business days after entry of this Order, the Debtor shall cause the Sale Notice to be filed with this Court and served by email, mail, facsimile, or overnight delivery on: (1) counsel for the Stalking Horse Bidder; (2) all Persons known by the Debtor to have expressed an interest to the St. Louis

14

SL 5985701.3

Assets during the past twelve (12) months; (3) all entities known by the Debtor to have asserted any lien, claim, encumbrance, or other interest in the St. Louis Assets (for which identifying information and addresses are available to the Debtor); (4) all non-Debtor parties to the Contracts (for which identifying information and addresses are available to the Debtor); (5) any Governmental Unit (as defined in section 101(27) of the Bankruptcy Code) known to have a claim in this chapter 11 case; (6) the United States Attorney for the Eastern District of Missouri; (7) the Office of the Attorney General in each state in which the Debtor operates; (8) the Office of the Secretary of State in each state in which the Debtor operates or is organized; (9) the Debtor's known creditors and interest holders (for which identifying information and addresses are available to the Debtor); (10) the United States Environmental Protection Agency; and (11) all other Persons requesting notice under Bankruptcy Rule 2002 or as directed by this Court (for which identifying information and addresses are available to the Debtor) (collectively, the "**Notice Parties**").

### Assumption and Assignment Procedures

24.     The Assumption and Assignment Notice, substantially in the form attached hereto as **Exhibit C**, is reasonable, fair, and appropriate, contains the type of information required under Bankruptcy Rule 2002, and complies in all respects with applicable provisions of the Bankruptcy Code, Bankruptcy Rules, and Local Rules, and no other or further notice to any Counterparty to any known Contracts of the Debtor's proposed Cure Costs relating to the proposed assumption and assignment of such Contracts to the Successful Bidder, shall be required if the Debtor files and serves such notice (and the Notice of Auction Results) in accordance with the Assumption and Assignment Procedures and this Order.

25.     The following Assumption and Assignment Procedures are reasonable and appropriate under the circumstances, fair to all non-Debtor Counterparties, comply in all respects with the Bankruptcy Code, and are approved.

        a.      Not later than five (5) business days after entry of this Order, the Debtor shall file with the Court, serve on all Counterparties to Contracts and the Objection Notice Parties, (1) an initial Assumption and Assignment Notice which shall include a schedule of the Debtor's good faith calculation of the Cure Costs with respect to each Contract; (2) expressly state that assumption or assignment of any Contract is not guaranteed and is subject to Court approval; (3) direct the Counterparty to relevant publicly available financial information regarding the Stalking Horse Bidder for purposes of demonstrating Adequate Assurance Information; (4) prominently display the deadline to file a Cure

15

Objection and an Adequate Assurance Objection (each defined herein); and (5) prominently display the dates, times, and location of the Sale Hearing;

b.      All objections to any proposed Cure Costs (a "***Cure Objection***"), the Adequate Assurance Information (an "***Adequate Assurance Objection***") for the Stalking Horse Bidder, and the potential assumption and assignment of any Contract (an "***Assumption/Assignment Objection***") shall (1) be in writing; (2) comply with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules; (3) state, with specificity, the legal and factual bases thereof, including the cure amount the objecting Counterparty believes is required to cure defaults under the relevant Contract; (4) include any appropriate documentation in support thereof; and (5) be filed with the Court and served on the Objection Notice Parties by the applicable deadline set forth in the applicable notice, which shall be at least fourteen (14) calendar days after service of such notice;

c.      If a timely Cure Objection, Adequate Assurance Objection, or Assumption/Assignment Objection is received and such objection cannot otherwise be resolved by the parties, such objection shall be heard at the Sale Hearing; provided, that a Cure Objection, Adequate Assurance Objection, or Assumption/Assignment Objection may, at the Debtor's discretion (in consultation with the Stalking Horse Bidder, or, if an Auction is held, the Successful Bidder), be adjourned to a subsequent hearing and the Debtor may assign Proposed Assumed Contracts while such objection remains outstanding;

d.      If a Counterparty fails to file with the Court and serve on the Objection Notice Parties a timely Cure Objection, the Counterparty shall be forever barred from asserting any objection regarding the cost to cure any defaults under the applicable Contract. The Cure Costs set forth in each Assumption and Assignment Notice shall be controlling and will be the only amount necessary to cure outstanding defaults under the applicable Contract under Bankruptcy Code section 365(b), notwithstanding anything to the contrary in the Contract, or any other document, and the Counterparty shall be forever barred from asserting any additional cure or other amounts with respect to such Contract against the Debtor, the Successful Bidder, or the property of any of them;

e.      If the Successful Bidder is not the Stalking Horse Bidder, then on the date of service of the Notice of Auction Results (or such other notice identifying a Successful Bidder) or as soon as reasonably practicable thereafter, the Debtor shall serve all Counterparties to any Proposed Assumed Contracts a notice that: (a) sets forth a schedule of Proposed Assumed Contracts to be assumed by the Debtor and assigned to the applicable Successful Bidder, and (b) Adequate Assurance Information for the applicable Successful Bidder;

f.      If the Successful Bidder is not the Stalking Horse Bidder, then any Adequate Assurance Objection to the Successful Bidder's and/or its known proposed assignee's (if different from the Successful Bidder) proposed form of Adequate Assurance Information with respect to such Proposed Assumed Contract shall be filed with the Court and served on the Objection Notice Parties, including the applicable Successful Bidder and any known proposed assignee of such Proposed Assumed Contract (if different from the Successful

16

Bidder) by the applicable deadline set forth in the applicable Assumption and Assignment Notice, which shall be at least five (5) calendar days after the filing of such notice (other than with respect to Adequate Assurance Objections to a Back-Up Bid);

g.      If a Counterparty fails to file with the Court and serve on the Objection Notice Parties, including the applicable Successful Bidder and any known proposed assignee (if different from the Successful Bidder) of the relevant Proposed Assumed Contract, a timely Adequate Assurance Objection, the Counterparty shall be forever barred from asserting any such Adequate Assurance Objection regarding the applicable Proposed Assumed Contract. The Successful Bidder and/or its known proposed assignee of the Proposed Assumed Contract shall be deemed to have provided adequate assurance of future performance with respect to the Proposed Assumed Contract in accordance with Bankruptcy Code section 365(f)(2)(B) notwithstanding anything to the contrary in the Contract or any other document, and the Debtor shall be authorized to assume and assign the applicable Proposed Assumed Contract to the applicable Successful Bidder (or its known proposed assignee) without further notice to any Counterparty or any other party in interest, and without need for further order of the Court, with such assumption and assignment being subject to the terms of the Sale Order;

h.      The Debtor shall have the right to serve a supplemental Assumption and Assignment Notice that modifies the schedule of Proposed Assumed Contracts, including to modify any Cure Amount or add or remove any Contract, until one (1) business day prior to entry of the Sale Order and may allow for certain Contracts to be assumed and assigned following the closing of the Sale Transaction(s) on substantially the terms included in the Stalking Horse Agreement; provided, further, that after the closing of the Sale Transaction, the Debtor shall have the right to serve a supplemental Assumption and Assignment Notice to add Contracts not otherwise rejected or Excluded Assets (as defined in the Asset Purchase Agreement) to the schedule of Proposed Assumed Contracts; provided, that the Debtor promptly serves a revised Assumption and Assignment Notice on each Counterparty affected. To the extent the Debtor lowers the Cure Cost or adds any Contract to the supplemental Assumption and Assignment Notice, such Counterparties shall file any Cure Objection or Adequate Assurance Objection with respect to the revised Assumption and Assignment Notice not later than seven (7) calendar days after the date of filing and service of the revised notice;

i.      The Debtor's assumption and assignment of a Proposed Assumed Contract to a Successful Bidder (or to a designee of the Successful Bidder) is subject to Court approval and consummation of a Sale Transaction with the applicable Successful Bidder. Accordingly, absent the closing of a Sale Transaction, the Proposed Assumed Contract shall not be deemed either assumed or assumed and assigned and shall, in all respects, be subject to further administration under the Bankruptcy Code; and

j.      The inclusion of a Contract or Cure Costs with respect thereto on an Assumption and Assignment Notice or the Notice of Auction Results shall not constitute or be deemed a determination or admission by the Debtor, the Successful Bidders, or any other party in interest that such Contract is an executory contract or an unexpired lease within the meaning of the Bankruptcy Code. The Debtor reserves all rights, claims, and

17

causes of action with respect to each Contract scheduled on any Assumption and Assignment Notice and Notice of Auction Results. The Debtor's inclusion of any Contract on an Assumption and Assignment Notice or Notice of Auction Results shall not be a guarantee that such Contract ultimately will be assumed or assumed and assigned. The initial Assumption and Assignment Notice and any subsequent notice shall be without prejudice to a Successful Bidder's rights under the applicable purchase agreement to subsequently (1) exclude a Contract from the schedule of Proposed Assumed Contracts previously included on such notice or (2) include additional Proposed Assumed Contracts for assumption and assignment in accordance with the applicable Successful Bidder's purchase agreement.

### **General Provisions**

26.     All persons or entities (whether or not Qualified Bidders) that participate in the bidding process, including submitting a bid for any of the St. Louis Assets during the sale process, including at the Auction, shall be deemed to have knowingly and voluntarily (a) submitted to the exclusive jurisdiction of this Court with respect to all matters related to the terms and conditions of the transfer of St. Louis Assets, the Auction, and any Transaction, (b) consented to the entry of a final order by this Court in connection with the Motion or this Order (including any disputes related to the Bid Procedures, the Auction, and/or any Transaction) to the extent that it is later determined that this Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution, and (c) waived any right to jury trial in connection with any disputes relating to the any of the foregoing matters.

27.     Notwithstanding the applicability of any of Bankruptcy Rules 6004(h), 6006(d), 7062, 9014, or any other provisions of the Bankruptcy Rules or the Local Rules or otherwise stating the contrary, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry, and any applicable stay of the effectiveness and enforceability of this Order is hereby waived.

28.     The Debtor is authorized to make non-substantive changes to the Bid Procedures, the Assumption and Assignment Procedures, and any related documents without further order of

18

SL 5985701.3

the Court, including, without limitation, changes to correct typographical and grammatical errors prior to mailing.

29.     To the extent there is any inconsistency between this Order and the Bid Procedures attached hereto, the Bid Procedures shall govern with respect to the conduct of the Auction, and otherwise this Order shall govern.

30.     The Debtor and the Stalking Horse Bidder are authorized to take all steps necessary or appropriate to carry out this Order.

31.     No later than two (2) business days after the date of this Order, the Debtor shall serve a copy of the Order and shall file a certificate of service no later than twenty- four (24) hours after service.

Date: _____, 2023


_____
HONORABLE BRIAN C. WALSH
United States Bankruptcy Judge

SL 5985701.3

**EXHIBIT A TO EXHIBIT 3**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| In re:<br><br>**ALLIED HEALTHCARE PRODUCTS,<br>    INC.,**<br><br>Debtor. | **Chapter 11**<br>**Case No. 23-41607** |

**BID PROCEDURES**

On May 8, 2023, Allied Healthcare Products, Inc. ("Debtor") filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code ("***Bankruptcy Code***") in the United States Bankruptcy Court for the Eastern District of Missouri ("***Bankruptcy Court***"). The Debtor is authorized to continue to operate its business and manage its property as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

The Debtor is seeking to sell substantially all of its assets and operations located at 1720 Sublette Avenue in St. Louis, Missouri ("***St. Louis Assets***"). On May 30, 2023, the Bankruptcy Court entered an order (Docket No. [__]) ("***Bid Procedures Order***"),[1] which, among other things, approved these procedures (these "***Bid Procedures***") for the consideration of the highest or otherwise best offer or combination of offers to acquire the St. Louis Assets on the terms and conditions set forth herein.

Allied Medical, LLC ("***Stalking Horse Bidder***")[2] has submitted a bid and has executed that certain *Asset Purchase Agreement* (together with the schedules and exhibits thereto, and as it may be amended, modified, or supplemented from time to time in accordance with the terms thereof, the "***Stalking Horse Agreement***"), dated May 7, 2023.[3] The Stalking Horse Agreement contemplates, pursuant to the terms and subject to the conditions contained therein, among other things, the sale of

---

[1] Unless otherwise indicated, capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *Motion of Debtor for Entry of an Order (I) Approving (A) Bidding Procedures, (B) Designation of Stalking Horse Bidder and Stalking Horse Bid Protections, (C) Scheduling Auction and Sale Hearing, (D) Form and Manner of Notice of Sale, Auction, and Sale Hearing, and (E) Assumption and Assignment Procedures; (II) Authorizing (A) Sale of Debtor's St. Louis Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (B) Assumption and Assignment of Executory Contracts and Unexpired Leases; and (III) Granting Related Relief ("Motion") (Docket No. [●])* or the Bidding Procedures Order, as applicable.
[2] Allied Medical LLC is not affiliated with Debtor, and upon information and belief, was created as a special purpose entity for purposes of the proposed sale process in this case.
[3] A copy of the Stalking Horse Agreement is attached to the Bid Procedures Order as **Exhibit D**.

the St. Louis Assets (as defined in the Stalking Horse Agreement as the Purchased Assets) and to the Stalking Horse Bidder for the purchase price equal to the sum of: (a) Four Million Five Hundred Thousand Dollars ($4,500,000); plus (b) in the event there is any Initial Overbid and/or any Subsequent Overbids, but Purchaser is the successful bidder at the Auction, the sum of such overbid amounts (net of the amount of the Purchaser Reimbursable Expenses, less payment of the Seller Reimbursable Expenses); plus (c) an amount equal to ninety-five percent (95%) of the aggregate total of the Receivables less the Zero Rated Receivables as of the date of Closing (collectively, the "***Stalking Horse Cash Consideration***"), subject to certain price adjustments as provided in the Stalking Horse Agreement; and (ii) assumption of the Assumed Liabilities (as defined in the Stalking Horse Agreement) (collectively, the "***Stalking Horse Bid***"). The Stalking Horse Bid sets the floor for the sale and is subject to higher or otherwise better offers submitted in accordance with the terms and conditions of these Bid Procedures.

These Bid Procedures describe, among other things: (i) the procedures for bidders to submit bids for the acquisition of the St. Louis Assets, in whole or in part; (ii) the manner in which bidders and bids become Qualified Bidders and Qualified Bids; (iii) the process for negotiating the bids received; (iv) the conduct of the Auction if Qualified Bids are received; (v) the procedure for the selection of any Successful Bidder; and (vi) the process for Bankruptcy Court approval of a Transaction at the Sale Hearing (each as defined herein).

## Summary of Important Dates

These Bid Procedures provide interested parties the opportunity to submit competing bids for all or any portion of the St. Louis Asset, and to participate in an auction to be conducted by the Debtor (the "***Auction***").

The key dates for the sale process are set forth below. Such dates may be extended or otherwise modified by the Debtor by filing a notice of such extension or modification on the Court's docket; provided that any such extension or modification shall not by itself extend any milestone or deadline in the Stalking Horse Agreement and/or DIP Credit Agreement:

| Key Event | Deadline |
|---|---|
| Hearing to consider approval of Bid Procedures and entry of Bid Procedures Order | **May 30, 2023** |
| Deadline for the Debtor to file with the Bankruptcy Court and provide Counterparties with (i) a schedule of all executory contracts and unexpired leases, including those designated as Proposed Assumed Contracts by the Stalking Horse Bidder, (ii) notice of proposed cure costs for all executory contracts and unexpired leases, and (iii) adequate assurance information for the Stalking Horse Bidder | **June 1, 2023** |

2

| | |
|---|---|
| Deadline to object to (i) the Debtor's proposed cure costs in connection with the proposed assumption and assignment of executory contracts and unexpired leases to the Stalking Horse Bidder, (ii) the assumption and assignment of executory contracts and  unexpired leases to the Stalking Horse Bidder, and (iii) adequate assurance of future performance of the Stalking Horse Bidder | **June 15, 2023, at 5:00 (prevailing Central Time)** |
| Deadline to submit Bids | **June 16, 2023, at 5:00 (prevailing Central Time)** |
| Deadline for the Debtor to file notice cancelling the Auction and designating the Stalking Horse Bid as the Successful Bid, if no Qualified Bid is received | **June 19, 2023, at 5:00 p.m. (prevailing Central Time)** |
| Deadline for the Debtor to notify Bidders of (i) status as Qualified Bidders and (ii) of selection of Baseline Bid | **June 19, 2023, at 5:00 p.m. (prevailing Central Time)** |
| Auction (if any) to be held if the Debtor receives more than one Qualified Bid, either (i) at the offices of Spencer Fane LLP, 1 North Brentwood Boulevard, Suite 1200, St. Louis, MO 63105 or (ii) virtually pursuant to procedures to be filed by the Debtor on the Bankruptcy Court's docket prior to the Auction | **June 20, 2023, at 9:00 a.m. (prevailing Central Time)** |
| Deadline for the Debtor to (i) file with the Bankruptcy Court the notice of Auction results and designation of the Successful Bid and Back-Up Bid and (ii) to the extent the Successful Bidder is not the Stalking Horse Bidder, (a) provide Counterparties with adequate assurance information for the Successful Bidder and (b) provide notice to Counterparties of Proposed Assumed Contracts designated by the Successful Bidder for assumption and assignment | **June 22, 2023, at 5:00 p.m. (prevailing Central Time)** |
| Deadline to file objections to Transaction(s) | **June 27, 2023, at 5:00 p.m. (prevailing Central Time)** |
| Deadline to reply to objections to (i) Transaction(s), (ii) cure costs, (iii) the assumption and assignment of executory contracts and unexpired leases and/or (iv) adequate assurance of future performance (if the Auction takes place) | **June 29, 2023, at 5:00 p.m. (prevailing Central Time)** |
| Sale Hearing | **June 30, 2023, at [●]:[●] [a/p].m. (prevailing Central Time)** |

3

## Property to Be Sold

The Debtor seeks to sell all or substantially all of the St. Louis Assets to one or more purchasers (each sale in furtherance of the same, a "***Transaction***").

## Due Diligence

The Debtor has posted copies of all material documents related to the St. Louis Assets to the Debtor's confidential electronic data room ("***Data Room***"). To access the Data Room, an interested party must submit to the Debtor or its advisors the following:

(A)     an executed confidentiality agreement in form and substance that is customary and satisfactory to the Debtor (unless such party is already a party to an existing confidentiality agreement with the Debtor that is acceptable to the Debtor for this due diligence process, in which case such agreement shall govern); and

(B)     sufficient information, as reasonably determined by the Debtor, to allow the Debtor to determine, in its reasonable business judgment, that the interested party (i) has the financial wherewithal to consummate the applicable Transaction and (ii) intends to access the Data Room for a purpose consistent with these Bid Procedures.

Each interested party that meets the above requirements to the satisfaction of the Debtor shall be a "***Potential Bidder***." As soon as practicable, the Debtor will provide each Potential Bidder access to the Data Room; provided, that such access and the availability of additional due diligence will be terminated by the Debtor in its reasonable discretion at any time for any reason whatsoever, including if (i) a Potential Bidder does not become a Qualified Bidder, (ii) these Bid Procedures are terminated, or (iii) the Potential Bidder breaches any obligations under its confidentiality agreement or the Debtor becomes aware that information submitted by the Potential Bidder in connection with requesting access to the Data Room is inaccurate or misleading. The Debtor may restrict or limit the access of a Potential Bidder to the Data Room if the Debtor determines, based on its reasonable business judgment, that certain information in the Data Room is sensitive, proprietary, or otherwise not appropriate for disclosure to such Potential Bidder.

Each Potential Bidder shall comply with all reasonable requests for information and due diligence by the Debtor or its advisors regarding the ability of such Potential Bidder to consummate the applicable Sale Transaction.

Until the Bid Deadline, and except as otherwise provided herein, the Debtor will provide all Potential Bidders with reasonable access to the Data Room and any additional information requested by Potential Bidders (subject to any restrictions pursuant to applicable law or these Bid Procedures) that the Debtor believes to be reasonable and appropriate under the circumstances. All additional due diligence requests shall be directed to the Debtor's advisors, Ravinia Capital, LLC at tgoldblatt@raviniacapitalllc.com.

4

SL 5985701.3

Neither the Debtor nor any of its representatives shall be obligated to furnish any information of any kind whatsoever relating to the St. Louis Assets (i) to any person or entity who (a) is not a Potential Bidder; (b) does not comply with the participation requirements set forth above; or (c) in the case of competitively sensitive information, is a competitor of the Debtor (except pursuant to "clean team" or other information sharing procedures satisfactory to the Debtor) and (ii) to the extent not permitted by law or contract.

### Bid Deadline

A Potential Bidder that desires to make a bid (a "**Bid**") for some or all of the St. Louis Assets shall deliver written and electronic copies of its Bid, so as to be received no later than **June 16, 2023, at 5:00 p.m. (prevailing Central Time)** ("***Bid Deadline***"); provided, that the Debtor may extend the Bid Deadline for any reason whatsoever, in its reasonable business judgment, for all or certain Potential Bidders, without further order of the Bankruptcy Court.

The extension of the Bid Deadline hereunder shall not, by itself, result in an extension of any milestone or deadline under the Stalking Horse Agreement and/or DIP Credit Agreement, as applicable. **The submission of a Bid by the Bid Deadline (as it may be extended in accordance with the foregoing) shall constitute a binding and irrevocable offer to acquire the St. Louis Assets specified in such Bid.** Any party that does not submit a Bid by the Bid Deadline will not be allowed to (i) submit any offer after the Bid Deadline or (ii) participate in any Auction for the applicable St. Louis Assets.

There may not be any communications between and amongst Potential Bidders regarding the Debtor unless the Debtor has previously authorized such communication in writing. The Debtor reserves the right, in its reasonable business judgment to disqualify any Potential Bidders that have communications between and amongst one another.

Bids must be submitted by email to the following Debtor's representatives ("***Bid Notice Parties***"):

**Spencer Fane LLP**
zfairlie@spencerfane.com

**Greensfelder**
jdl@greensfelder.com

**Ravinia Capital, LLC**
tgoldblatt@raviniacapitalllc.com

### Form and Content of Qualified Bids

A Bid must be received by the Bid Notice Parties by the Bid Deadline and contain a signed purchase agreement from a Potential Bidder that identifies the purchaser by its legal name and any

5

other party that will be participating in the Transaction contemplated by the Bid. To constitute a "***Qualified Bid***" a Bid must include, at a minimum, the following:[4]

      A.    <u>Proposed Purchase Agreement</u>. Each Bid must include, in both PDF and MS-WORD format, an executed purchase agreement ("***Proposed Purchase Agreement***") for the acquisition of all, some, or any one of the St. Louis Assets, together with a redline comparing the Proposed Purchase Agreement against the Stalking Horse Agreement, a copy of which is located in the Data Room.

      B.    <u>Bid Requirements</u>. Each Bid must clearly set forth the following in writing in the Proposed Purchase Agreement, as applicable:

      (i)    <u>Purchase Price; Initial Overbid</u>. The price ("***Purchase Price***") proposed to be paid for the specified St. Louis Assets in U.S. Dollars. In addition, (a) a Bid must propose a Purchase Price equal to or greater than the sum of (1) the value of Stalking Horse Bid; (2) an initial overbid ("***Initial Overbid***"), consisting of the sum of the Purchaser Reimbursable Expenses[5] plus an additional cash amount such that the total Initial Overbid Amount shall be equal to a sum greater than or equal to 5.5% of the Initial Stalking Horse Purchase Price.[6]

      (ii)    <u>Acquired Assets</u>. The St. Louis Assets that the Potential Bidder seeks to acquire. For the avoidance of doubt, a Qualified Bid seek to purchase less than all the St. Louis Assets.

      (iii)    <u>Excluded Assets</u>. The St. Louis Assets that the Potential Bidder does not seek to acquire.

      (iv)    <u>Assumed Liabilities</u>. The liabilities the Potential Bidder seeks to assume. For the avoidance of doubt, a Qualified Bid may include assumption of fewer than all or substantially all the Debtor's liabilities.

---

[4] Debtor may waive any of the following requirements for a Bid to constitute a Qualified Bid to the extent reasonably necessary to promote bids and a robust Auction so long as any such waiver is not materially inconsistent with these Bid Procedures. For the avoidance of any doubt, the Stalking Horse Bid is a Qualified Bid.

[5] As defined in the Stalking Horse Agreement, "Purchaser Reimbursable Expenses" means, subject to Purchaser's payment of the Seller Reimbursable Expenses, the reasonable, documented actual costs and expenses incurred and paid by Purchaser with respect to Purchaser's preparation of the Due Diligence Reports (the fees and expenses arising out of or in connection to the preparation and presentation of the said due diligence not to exceed 2.5% of the Aggregate Purchase Price), and the reasonable, documented actual costs and expenses incurred and paid by Purchaser for solicitor and attorney fees [(said solicitor and attorney fees not to exceed 1% of the Aggregate Purchase Price)], which said total Purchaser Reimbursable Expenses shall not exceed 3.5% of the Aggregate Purchase Price. For the avoidance of doubt, the Purchaser Reimbursable Expenses shall not include (i) the actual costs and expenses incurred and paid by Purchaser with respect to preparation of any due diligence reports for non-Purchased Assets; and/or (ii) the actual costs and expenses incurred and paid by Purchaser with respect to preparation of any due diligence reports for which Purchaser has already received reimbursement.

[6] As defined in the Stalking Horse Agreement, "Initial Stalking Horse Purchase Price" means "the sum of: (a) Four Million Five Hundred Thousand Dollars ($4,500,000); plus (b) an amount equal to ninety-five percent (95%) of the aggregate total of the Receivables less the Zero-Rated Receivables as of the date of Closing.

SL 5985701.3

(v)    <u>Excluded Liabilities</u>. The liabilities of the Debtor that the Potential Bidder does not seek to assume.

(vi)    <u>Form of Consideration</u>. Each Bid must (a) indicate whether it is an all cash offer (including confirmation that the cash component of the Bid is based in U.S. Dollars) or consists of certain non-cash components, such as a credit bid pursuant to section 363(k) of the Bankruptcy Code and/or the assumption of liabilities and (b) provide sufficient cash consideration specifically designated for the payment of the Purchaser Reimbursable Expenses.

(vii)    <u>Credit Bid</u>. Persons or entities holding a perfected security interest in any St. Louis Assets of the Debtor may, pursuant to section 363(k) of the Bankruptcy Code, seek to submit a "credit bid" for such St. Louis Assets, to the extent permitted by applicable law, any Bankruptcy Court orders, and the documentation governing the Debtor's prepetition or post-petition secured credit facilities. A credit bid must include a commitment to provide cash consideration sufficient to pay the Purchaser Reimbursable Expenses payable to the Stalking Horse Bidder under the terms of the Stalking Horse Agreement.

C.    <u>Unconditional Offer/No Financial Contingencies</u>. A commitment that the Bid is formal, binding, and unconditional (except for those conditions expressly set forth in the applicable Proposed Purchase Agreement), is not subject to any further due diligence or to any financing contingency, and shall be irrevocable until the Debtor notifies such Potential Bidder that such Bid has not been designated as a Successful Bid or a Back-Up Bid, or with respect to the Back-Up Bid, until the Back-Up Bid Expiration Date (as defined below).

D.    <u>Proof of Financial Ability to Perform</u>. Each Bid must contain such financial and other information that allows the Debtor to make a reasonable determination as to the Potential Bidder's financial and other capabilities to consummate the applicable Transaction, including, without limitation, such financial and other information setting forth adequate assurance of future performance in satisfaction of the requirements under section 365(f)(2)(B) of the Bankruptcy Code, and the Potential Bidder's ability to perform under any executory contracts and unexpired leases (each a "***Contract***") that are assumed and assigned to such party, including an adequate assurance letter which the Debtor is authorized to share with applicable non-Debtor Contract counterparties (each a "***Counterparty***") if such Bid is determined to be the Successful Bid or Back-Up Bid. Without limiting the foregoing, such information must include current financial statements or similar financial information certified to be true and correct as of the date thereof, proof of financing commitments (if needed) to close the applicable Transaction (not subject to any unreasonable conditions, in the Debtor's sole discretion, contact information for verification of such information, including any financing sources, and any other information reasonably requested by the Debtor that is necessary to demonstrate that the Potential Bidder has the ability to close the applicable Transaction in a timely manner.

E.    <u>Designation of Contracts and Leases</u>. Each Bid must identify with particularity each and every Contract, the assumption and assignment of which is contemplated by the applicable Transaction (collectively, "***Proposed Assumed Contracts***"); <u>provided</u>, that the Proposed Purchase

7

Agreement may allow the Potential Bidder to add and remove Contracts from the schedule of Proposed Assumed Contracts any time prior to five (5) business days prior to entry of an order authorizing the Transaction and may allow for certain contracts to be assumed and assigned following the closing of the Transaction on substantially the terms included in the Stalking Horse Agreement; provided, further, that the Proposed Purchase Agreement may allow the Potential Bidder to add Contracts to the schedule of Proposed Assumed Contracts after the closing of the Transaction, if the Contract has not been previously rejected by the Debtor and is not an Excluded Asset (as defined in the Proposed Purchase Agreement), upon written notice to and consent of the Debtor. The Debtor shall provide notice to the applicable Counterparties of such removal and/or addition of such Counterparty's Contract and Lease as soon as reasonably practicable.

F.      Required Approvals. A statement or evidence reflecting (i) the Potential Bidder's plan and ability to obtain all requisite governmental, regulatory, or other third-party approvals and the proposed timing for the Potential Bidder to undertake the actions required to obtain such approvals; and (ii) that the Bid is reasonably likely (based on antitrust or other regulatory issues, experience, and other considerations) to be consummated, if selected as the Successful Bid or the Back-Up Bid, within a time frame acceptable to the Debtor (in consultation with the Consultation Parties). A Potential Bidder further agrees that its attorneys will discuss with and explain to the Debtor's attorneys such Potential Bidder's regulatory analysis, strategy, and timeline for securing all such approvals as soon as reasonably practicable.

G.      Disclosure of Identity and Corporate Authorization. Each Bid must (i) fully disclose, by their legal names, the identity of the Potential Bidder and each entity that will be participating in its Bid (including any equity owners or sponsors, if the Potential Bidder is an entity formed for the purpose of consummating the Transaction), and the complete terms of any such participation, and (ii) include evidence of corporate authorization and approval from the Potential Bidder's board of directors (or comparable governing body), if necessary, with respect to the submission, execution, and delivery of a Bid, participation in the Auction, and closing of the transactions contemplated by the Potential Bidder's Proposed Purchase Agreement in accordance with the terms of the Bid and these Bid Procedures.

H.      Employee Obligations. Each Bid must specify (i) whether the Qualified Bidder intends to hire some or all of the employees employed by the Debtor and (ii) indicate the treatment of the compensation, incentive, retention, bonus or other compensatory arrangements, plans, or agreements, including, offer letters employment agreements, consulting agreements, severance arrangements, retention bonus agreements, change in control arrangements, pension plans, retiree benefits, collective bargaining agreements, and any other employment related agreements of the Debtor (collectively, the "***Employee Obligations***").

I.      No Entitlement to Break-Up Fee, Expense Reimbursement, or Other Amounts. With the exception of the Stalking Horse Bid, each Bid must expressly state that the Bid does not entitle the Potential Bidder to any break-up fee, termination fee, expense reimbursement, or similar type of payment or reimbursement, and a waiver of any substantial contribution administrative expense claims under section 503(b) of the Bankruptcy Code related to the bidding process.

J.     Disclosure of Connections. Each Bid must fully disclose any connections or agreements with the Debtor, any other known Potential Bidder and/or any officer or director of the Debtor.

K.     Joint Bids. The Debtor will be authorized to approve joint Bids, including joint credit bids, in its reasonable discretion on a case-by-case basis.

L.     Representations and Warranties. Each Bid must include the following representations and warranties:

a.   a statement that the Potential Bidder has had an opportunity to conduct any and all due diligence regarding the applicable St. Louis Assets prior to submitting its Bid;

b.   a statement that the Potential Bidder has relied solely upon its own independent review, investigation, and/or inspection of any relevant documents, as well as the St. Louis Assets to be purchased and the liabilities to be assumed (as applicable), in making its Bid and has not relied on any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express or implied, by operation of law or otherwise, regarding such St. Louis Assets or liabilities or the completeness of any information provided in connection therewith, except as expressly stated in the representations and warranties contained in the Potential Bidder's Proposed Purchase Agreement ultimately accepted and executed by the Debtor;

c.   a statement that the Potential Bidder agrees to serve as Back-Up Bidder, if its Bid is selected as the next highest or otherwise best bid after the Successful Bid with respect to the applicable St. Louis Assets;

d.   a statement that the Potential Bidder has not engaged in any collusion with respect to the submission of its Bid;

e.   a statement that all proof of financial ability to consummate the applicable Transaction in a timely manner and all information provided to support adequate assurance of future performance is true and correct; and

f.   a statement that the Potential Bidder agrees to be bound by the terms of these Bid Procedures.

M.     Additional Requirements. A Potential Bidder must also accompany its Bid with:

a.   a good faith cash deposit in the amount of no less than ten percent (10%) of the cash portion of the Purchase Price (a "***Deposit***"), unless otherwise agreed to by the Debtor and a Potential Bidder, which shall be deposited prior to the Bid Deadline with an escrow agent selected by the Debtor (the "***Escrow Agent***") pursuant to an escrow agreement to be entered into between a Debtor and the Escrow Agent; provided, however, that a Potential Bidder submitting a credit bid will not be required to

9

accompany its Bid with a Deposit for any portion of the Purchase Price that is a credit bid, but shall be required to provide a Deposit for any portion of its Bid that is not a credit bid; provided, further, that to the extent a Qualified Bidder increases the cash portion of the Purchase Price before, during, or after the Auction, the Debtor reserves the right to require that such Qualified Bidder adjust its Deposit so that it equals ten percent (10%) of the increased cash portion of the Purchase Price;

b.   the contact information of the specific person(s) whom the Debtor or its advisors should contact in the event that the Debtor has any questions or wish to discuss the Bid submitted by the Potential Bidder;

c.   a covenant to cooperate with the Debtor to provide pertinent factual information regarding the Potential Bidder's operations reasonably required to analyze issues arising with respect to any applicable antitrust laws and other applicable regulatory requirements; and

d.   a detailed analysis of the value of any non-cash component of the Bid, if any, and back-up documentation to support such value.

### Review of Bids; Designation and Notice of Qualified Bids

The Debtor will evaluate all Bids that are timely submitted and may engage in negotiations with Potential Bidders that submit Bids as the Debtor deems appropriate, in the exercise of its business judgment, based upon the Debtor's evaluation of each Bid. A Bid will not be a Qualified Bid if it is materially less favorable than the terms of the Stalking Horse Agreement.

The Debtor shall determine, in its reasonable judgment which of the Bids received by the Bid Deadline qualify as a "*Qualified Bid*" (each Potential Bidder that submits such a Qualified Bid, a "*Qualified Bidder*") and shall notify each Qualified Bidder of its status as a Qualified Bidder by **June 19, 2023, at 5:00 p.m. (prevailing Central Time)** (the "*Qualified Bid Deadline*"). The Stalking Horse Bidder is a Qualified Bidder and the Stalking Horse Bid (including as may be modified in favor of the Debtor at the Auction (if any)) represents a Qualified Bid.

Without the written consent of the Debtor, a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase the Purchase Price or otherwise improve the terms of its Qualified Bid during the period that such Qualified Bid remains binding as specified herein; provided, that any Qualified Bid may be improved at the Auction as set forth in these Bid Procedures. The Debtor reserves the right to work with any Potential Bidder in advance of the Auction to cure any deficiencies in a Bid that is not initially deemed a Qualified Bid and to clarify or otherwise improve such Bid such that it may be designated a Qualified Bid.

In evaluating the Bids, the Debtor may take into consideration the following non-exhaustive factors:

1.   the amount and the form of consideration of the Purchase Price;

2.   the St. Louis Assets and liabilities included in or excluded from the Bid, including any Contracts or other liabilities proposed to be assumed;

10

3. the value to be provided to the Debtor under the Bid, including the net economic effect upon the Debtor's estate; taking into account any Stalking Horse Bidder's right to any Purchaser Reimbursable Expenses;

4. any benefit to the Debtor's bankruptcy estate from any assumption or waiver of liabilities;

5. the transaction structure and execution risk, including conditions to, timing of, and certainty of closing, termination provisions, availability of financing and financial wherewithal to meet all commitments, and required governmental or other approvals;

6. the impact on employees and the proposed treatment of the Employee Obligations, including whether the Potential Bidder has an agreement with the Debtor's labor union regarding post-closing labor relations matters;

7. the impact on trade creditors;

8. the impact on the Debtor's ability to confirm a chapter 11 plan; and

9. any other factors the Debtor may reasonably deem relevant consistent with its fiduciary duties.

On or before the Qualified Bid Deadline, the Debtor shall notify Qualified Bidders of (i) the Bids that the Debtor has determined to be Qualified Bids and (ii) the Bid(s) that the Debtor has determined to be the highest or otherwise best Qualified Bid(s) to serve as the baseline bid(s) at the Auction ("*Baseline Bid*"). For the avoidance of doubt, the Baseline Bid shall equal (or exceed) an amount equal to the value of the Stalking Horse Bid plus the Initial Overbid.

## Failure to Receive Qualified Bids Other Than Stalking Horse Bid

If the Debtor does not receive any Qualified Bids (other than the Stalking Horse Bid) for any of the St. Louis Assets on the same or better terms as provided in the Stalking Horse Bid by the Bid Deadline, the Debtor will not conduct the Auction and shall file a notice with the Bankruptcy Court by **June 19, 2023, at 5:00 p.m.** (**prevailing Central Time**) indicating that no Auction will be held and designating the Stalking Horse Bid as the Successful Bid and the Stalking Horse Bidder as the Successful Bidder.

## Auction Procedures

If the Debtor receives one or more Qualified Bids (other than the Stalking Horse Bid) for any of the St. Louis Assets on the same or better terms as provided in the Stalking Horse Bid by the Bid Deadline, the Debtor will conduct the Auction on **June 20, 2023 beginning at 9:00 a.m.** (**prevailing Central Time) at (i) at the offices of Spencer Fane LLP, 1 North Brentwood Boulevard, Suite 1200, St. Louis, MO 63105 or (ii) virtually pursuant to procedures to be timely filed by the Debtor on the Bankruptcy Court's docket**, or such other date or at such other location as may be determined by the Debtor. Only Qualified Bidders, including the Stalking Horse Bidder, will be eligible to participate in the Auction, subject to such limitations as the Debtor

11

may impose in good faith. In addition, professionals and/or other representatives of the Debtor and Qualified Bidders shall be permitted to attend and observe the Auction. Further, any creditor of the Debtor may attend and observe the Auction; provided that such creditor provides the Debtor with written notice of its intention to attend the Auction on or before one (1) business day prior to the Auction, which written notice shall be sent to proposed counsel for the Debtor via electronic mail at zfairlie@spencerfane.com.

The Debtor may, in the exercise of its reasonable business judgment, adopt rules for the Auction consistent with these Bid Procedures and the Bid Procedures Order that the Debtor reasonably determines to be appropriate to promote a competitive Auction. Any rules developed by the Debtor will provide that all Bids in the Auction will be made and received on an open basis, and all Qualified Bidders participating in the Auction will be entitled to be present for all bidding with the understanding that the true identity of each Qualified Bidder placing a Qualified Bid at the Auction will be fully disclosed to all other bidders participating in the Auction and that all material terms of a Qualified Bid submitted in response to any successive Bids made at the Auction will be disclosed to all other Qualified Bidders. Each Qualified Bidder will be permitted an amount of time that the Debtor reasonably determines to be an appropriate amount of time to respond to the previous bid at the Auction. The Auction will be conducted openly and shall be transcribed or recorded.

At the Auction, Qualified Bidders (including the Stalking Horse Bidder) will be permitted to increase their bids. For each Baseline Bid, bidding will start at the Purchase Price and terms proposed in the applicable Baseline Bid and will proceed thereafter in minimum bid increments of not less than 1.9% of the Initial Stalking Horse Purchase Price (a "***Minimum Overbid Amount***"). The Debtor reserves the right to increase or decrease the Minimum Overbid Amount at any time during the Auction. If the Stalking Horse Bidder bids at the Auction for the applicable St. Louis Assets that are the subject of its Stalking Horse Bid, such Stalking Horse Bidder will also be entitled to include the amount of the Purchaser Reimbursable Expense in its bid, such that the cash and other consideration proposed by the Stalking Horse Bidder plus the Purchaser Reimbursable Expense must exceed the most recent bid by at least the Minimum Overbid Amount.

At the Auction, the Debtor, in its reasonable business judgment, will be permitted to request best and final offers from the Qualified Bidders (including the Stalking Horse Bidder). The Debtor may adopt additional rules for the Auction at any time that the Debtor reasonably determines to be appropriate to promote the goals of maximizing the value of the St. Louis Assets and provided that such rules are not inconsistent with these Bid Procedures.

Absent consent of the Debtor, pursuant to 18 U.S.C. §§ 156 and 157, Potential Bidders and their representatives may not communicate with one another, collude, or otherwise coordinate for purposes of participating in the Auction. Each Potential Bidder participating in an Auction will be required to confirm in writing and on the record at an Auction that (i) it has not engaged in any collusion with respect to the submission of any Bid or the Auction and (ii) its Bid represents a binding, good faith, and bona fide offer to purchase the St. Louis Assets identified in such Bid if selected as the Successful Bidder.

All parties attending the Auction must keep the proceedings and results of the Auction confidential until the Debtor has closed the Auction; provided, that parties may speak with clients

12

or parties necessary to place their Bid or increase it so long as such individuals are advised of the confidentiality restrictions provided hereunder and in the confidentiality agreements.

The Debtor may, in the exercise of its reasonable business judgment, identify the highest or otherwise best Qualified Bid(s) for particular St. Louis Assets as the successful bid(s) (each, a "**Successful Bid**" and, the bidder submitting such bid, a "**Successful Bidder**"). The Debtor may also identify which Qualified Bid(s) constitute the next highest or otherwise best bid(s) and deem such next highest or otherwise best bid(s) each a back-up bid (such bid(s) shall each be a "**Back-Up Bid**" and, the bidder submitting such bid, a "**Back-Up Bidder**"). Back-Up Bid(s) shall remain open and irrevocable until the earliest to occur of (i) the applicable outside date for consummation of the Transaction set forth in the Back-Up Bid, (ii) consummation of the Transaction with a Successful Bidder, and (iii) the release of such Back-Up Bid by the Debtor in writing (such date, the "**Back-Up Bid Expiration Date**"). If a Transaction with a Successful Bidder is terminated prior to the Back-Up Bid Expiration Date, the Back-Up Bidder shall be deemed a Successful Bidder and shall be obligated to consummate the Back-Up Bid as if it were a Successful Bid.

Within one (1) business day after the Auction, or at such later time agreed to by the Debtor in its reasonable business judgment, (i) the Successful Bidder(s) shall submit to the Debtor fully executed documentation memorializing the terms of the Successful Bid(s) and (ii) the Back-Up Bidder(s) shall submit to the Debtor execution versions of the documentation memorializing the terms of the Back-Up Bid(s). Neither a Successful Bid nor a Back-Up Bid may be assigned to any party without the consent of the Debtor.

At any time before entry of an order approving any Transaction, the Debtor reserves the right to and may reject the applicable Qualified Bid (other than the Stalking Horse Bid) if such Qualified Bid, in the Debtor's reasonable business judgment, is: (i) inadequate or insufficient; (ii) not in conformity with the requirements of the Bankruptcy Code, these Bid Procedures, or the terms and conditions of the applicable Transaction; or (iii) contrary to the best interests of the Debtor and its estate.

## Post-Auction Process

Within two (2) calendar days after the conclusion of the Auction, if one is held, or as soon as reasonably practicable thereafter, the Debtor shall file with the Bankruptcy Court a notice containing the results of the Auction (the "**Notice of Auction Results**") that includes (i) the identity of the Successful Bidder(s) and the Back-Up Bidder(s); (ii) adequate assurance of future performance information for the Successful Bidder (if different from Stalking Horse Bidder), (iii) schedule of Proposed Assumed Contracts in the Successful Bid(s) and Back-Up Bid(s), if known, (iv) identify any known proposed assignees of Proposed Assumed Contracts (if known and if different from the applicable Successful Bidder(s) or Back-Up Bidders(s)), and (v) set forth the deadlines and procedures for filing Sale Objections in response to the Notice of Auction Results.

Within seven (7) calendar days after the Auction, if one is held, the Debtor shall direct the Escrow Agent to return the Deposits of all bidders other than the Deposits of the Successful Bidder(s) and Back-Up Bidder(s); provided, for the avoidance of doubt, the return of the Escrow Amount (as defined in the Stalking Horse Agreement) shall be governed by the Stalking Horse

Agreement and any applicable escrow agreement. Within five (5) calendar days after the Back-Up Bid Expiration Date, the Debtor shall direct the Escrow Agent to return the Deposit(s) of the Back-Up Bidder(s). Upon the authorized return of any such Deposits, the Bid associated therewith shall be deemed revoked and no longer enforceable.

Each Successful Bidder's Deposit shall be applied against the cash portion of the Purchase Price of such bidder's Successful Bid upon the consummation of a Transaction. In addition to the foregoing, the Deposit of any Qualified Bidder will be forfeited to the Debtor if (i) the Qualified Bidder attempts to modify, amend, or withdraw its Qualified Bid, except as permitted herein or with the Debtor's written consent, during the time the Qualified Bid remains binding and irrevocable or (ii) except as provided herein, the Qualified Bidder is selected as a Successful Bidder or a Back-Up Bidder and refuses or fails to enter into the required definitive documentation or to consummate a Transaction in accordance with these Bid Procedures, which forfeiture will not limit any other rights and remedies of the Debtor.

### Notices Regarding Assumption and Assignment

The Debtor shall provide all notices regarding the proposed assumption and assignment of Contracts in accordance with the Assumption and Assignment Procedures included in the Bid Procedures Order.

### Sale Objections and Hearing

At the hearing before the Bankruptcy Court, the Debtor will seek entry of an order approving and authorizing, among other things, the Transaction to the Successful Bidder(s) (the hearing, the "*Sale Hearing*"). The Sale Hearing may be adjourned or continued to a later date by the Debtor by sending notice prior to or making an announcement at the Sale Hearing; provided, that any such adjournment shall not by itself extend any milestone or deadline in the Stalking Horse Agreement and/or DIP Credit Agreement. No further notice of any such adjournment or continuance will be required to be provided to any party.

The Debtor will seek entry of an order authorizing and approving, among other things, the applicable Transaction at a Sale Hearing to be held on **June 30, 2023, at [●] [a.m./p.m.] (prevailing Central Time)**.

Objections to the Transaction, including any objection to the sale of any St. Louis Assets free and clear of liens, claims, encumbrances, and other interests (each, a "*Sale Objection*"), shall (i) be in writing; (ii) state the name and address of the objecting party and the amount and nature of the claim or interest of such party; (iii) state with particularity the basis and nature of any objection, and provide proposed language that, if accepted and incorporated by the Debtor, would obviate such objection; (iv) conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court for the Eastern District of Missouri; (v) be filed with the Bankruptcy Court; and (vi) be served upon the Objection Notice Parties (as defined below) by **June 27, 2023, at 5:00 p.m. (prevailing Central Time)** (the "*Sale Objection Deadline*"); provided, that the Debtor may extend the applicable Sale Objection Deadline, as the Debtor deems appropriate in the exercise of its reasonable business judgment. If a timely Sale Objection cannot otherwise be resolved by the parties, such objection shall be heard by the Bankruptcy Court at the Sale Hearing.

14

To the extent a Sale Hearing is necessary and Sale Objections have been filed, each Successful Bidder shall appear at the Sale Hearing and be prepared to have a representative(s) testify in support of its Successful Bid and the Successful Bidder's ability to close in a timely manner and provide adequate assurance of its future performance under the Proposed Assumed Contracts to be assumed and assigned as part of the applicable Sale Transaction.

Any party who fails to file a Sale Objection with the Bankruptcy Court and serve it on the Objection Notice Parties (as defined herein) by the applicable Sale Objection Deadline will be forever barred from asserting, at the Sale Hearing or thereafter, any objection any objection to the relief requested in the Motion with regard to a Successful Bidder, or to the consummation and performance of a Transaction, including the transfer of St. Louis Assets to such Successful Bidder, free and clear of all liens, claims, encumbrances, and other interests pursuant to section 363(f) of the Bankruptcy Code.

### Consent to Jurisdiction and
### Authority as Condition to Bidding

All Potential Bidders (including any Stalking Horse Bidder and any credit bidder) that participate in the bidding process shall be deemed to have (i) consented to the core jurisdiction of the Bankruptcy Court with respect to these Bid Procedures, the bid process, the Auction, any Transaction, the Sale Hearing, and the construction and enforcement of any agreement or any other document relating to a Transaction; (ii) waived any right to a jury trial in connection with any disputes relating to any of the foregoing; and (iii) consented to the entry of a final order or judgment in any way related to any of the foregoing if it is determined that the Bankruptcy Court would lack Article III jurisdiction to enter such a final order or judgment absent the consent of the parties.

### Noticing

Information that must be provided to the "***Objection Notice Parties***" under these Bid Procedures must be provided to each of the following parties:

(i)     counsel for Debtor, Zachary Fairlie, Spencer Fane LLP, 1000 Walnut, Suite 1400, Kansas City, MO 64106, zfairlie@spencerfane.com;

(ii)    Office of the United States Trustee's Office, 111 South 10th Street Suite 6.353, St. Louis, MO  63102;

(iii)   counsel for the Stalking Horse Bidder, Scott Davidson, King & Spalding LLP, 1185 Avenue of the Americas, 34th Floor, New York, NY 10036, SDavidson@KSLAW.com; Armstrong Teasdale LLP (attn: Erin M. Edelman, Esq. 7700 Forsyth Blvd., Suite 1800, St. Louis, Missouri 63105-1847, eedelman@atllp.com; Michael A. Petrizzo, Jr., 2005 Market Street, 29th Floor, One Commerce Square, Philadelphia, PA 19103, mpetrizzo@atllp.com);

(iv)    proposed counsel to the Official Committee of Unsecured Creditors appointed in the Debtor's chapter 11 case _____;

(v)     the United States Attorney's Office for the Eastern District of Missouri;

(vi)    Blank Rome (Attn: Paige Barr Tinkham, Esq. and Ken Ottaviano, Esq.), as counsel to STERLING COMMERCIAL CREDIT, LLC., as the DIP Facility Lender, paige.tinkham@blankrome.com, ken.ottaviano@blankrome.com

15

## <u>Reservation of Rights</u>

The Debtor, in its reasonable business judgment, in a manner consistent with its fiduciary duties and applicable law reserves the right to: (i) modify these Bid Procedures; (ii) waive the terms and conditions set forth herein with respect to all Potential Bidders; (iii) extend the deadlines set forth herein; and (iv) announce at the Auction any modified or additional procedures for conducting the Auction. Nothing in these Bid Procedures shall obligate the Debtor to consummate or pursue any transaction with respect to any St. Louis Asset with a Qualified Bidder.

## <u>Fiduciary Duties</u>

Nothing in these Bid Procedures shall require the Debtor to take any action, or refrain from taking any action to the extent the Debtor determines that refraining from taking such action or taking such action, as applicable, would be inconsistent with applicable law or its fiduciary obligations under applicable law.

16

**EXHIBIT B TO EXHIBIT 3 – Stalking Horse Agreement**

<u>**EXHIBIT C TO EXHIBIT 3 – Assumption Notice**</u>

**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | |
|---|---|
| In re:<br><br>**ALLIED HEALTHCARE PRODUCTS,<br>INC.,**<br><br>Debtor. | **Chapter 11<br>Case No. 23-41607** |

**NOTICE OF CURE COSTS AND PROPOSED ASSUMPTION
AND ASSIGNMENT OF EXECUTORY CONTRACTS AND
<u>UNEXPIRED LEASES IN CONNECTION WITH SALE</u>**

On May 8, 2023, Allied Healthcare Products, Inc. ("***Debtor***") filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code ("***Bankruptcy Code***") in the United States Bankruptcy Court for the Eastern District of Missouri ("***Bankruptcy Court***"). The Debtor is authorized to continue to operate its business and manage its property as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

The Debtor is seeking to sell substantially all of its assets and operations located at 46 New Street, Stuyvesant, St. Louis ("***St. Louis Assets***"). On May 30, 2023, the Bankruptcy Court entered an order (Docket No. [●]) ("***Bid Procedures Order***"),[11] which, among other things (a) approved Bid Procedures, (b) designated a Stalking Horse Bidder and approved Stalking Horse Bid Protections, (c) scheduled an auction and sale hearing, (d) approved form and manner of notice of sale, auction, and sale hearing ("***Bid Procedures***") for the consideration of the highest or otherwise best offer or combination of offers to acquire the St. Louis Assets on the terms and conditions set forth herein; and approved procedures for the assumption and assignment of Contracts (the "***Assumption and Assignment Procedures***").

---

[11] Unless otherwise indicated, capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *Motion of Debtor for Entry of an Order (I) Approving (A) Bidding Procedures, (B) Designation of Stalking Horse Bidder and Stalking Horse Bid Protections, (C) Scheduling Auction and Sale Hearing, (D) Form and Manner of Notice of Sale, Auction, and Sale Hearing, and (E) Assumption and Assignment Procedures; (II) Authorizing (A) Sale of Debtor's St. Louis Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (B) Assumption and Assignment of Executory Contracts and Unexpired Leases; and (III) Granting Related Relief* ("***Motion***") *(Docket No. [●])* or the Bidding Procedures Order, as applicable.

Allied Medical, LLC ("***Stalking Horse Bidder***")[12] has submitted a bid and has executed that certain *Asset Purchase Agreement* (together with the schedules and exhibits thereto, and as it may be amended, modified, or supplemented from time to time in accordance with the terms thereof, the "***Stalking Horse Agreement***"), dated May 8, 2023.[13] The Stalking Horse Agreement contemplates, pursuant to the terms and subject to the conditions contained therein, among other things, the sale of the St. Louis Assets (as defined in the Stalking Horse Agreement as the Purchased Assets) and to the Stalking Horse Bidder for the purchase price equal to the sum of: (a) Four Million Five Hundred Thousand Dollars ($4,500,000); plus (b) in the event there is any Initial Overbid and/or any Subsequent Overbids, but Purchaser is the successful bidder at the Auction, the sum of such overbid amounts (net of the amount of the Purchaser Reimbursable Expenses, less payment of the Seller Reimbursable Expenses); plus (c) an amount equal to ninety-five percent (95%) of the aggregate total of the Receivables less the Zero Rated Receivables as of the date of Closing (collectively, the "***Stalking Horse Cash Consideration***"), subject to certain price adjustments; and (ii) assumption of the Assumed Liabilities (as defined in the Stalking Horse Agreement) (collectively, the "***Stalking Horse Bid***"). The Stalking Horse Bid sets the floor for the sale and is subject to higher or otherwise better offers submitted in accordance with the terms and conditions of the Bid Procedures.

You are receiving this Notice because you may be a Counterparty to a Contract of the Debtor that potentially could be assumed and assigned the Stalking Horse Bidder or one or more other Qualified Bidder(s) in connection with a sale of the St. Louis Assets.

## A.  Cure Objection.

In accordance with the Assumption and Assignment Procedures and the Bid Procedures Order, the Debtor may, in connection with a Transaction with a Successful Bidder (as defined in the Bid Procedures), seek to assume and assign to the Successful Bidder(s) (or its designated affiliate assignee, if applicable) certain Contracts of the Debtor.

Each of the Contracts that may be assumed and assigned in connection with a Transaction with a Successful Bidder and the Debtor's calculation of the Cure Costs with respect thereto are set forth on **Exhibit A** hereto.

Any objection to the proposed assumption, assignment, or potential designation of a Contract identified on **Exhibit A**, the subject of which objection is the Debtor's proposed Cure Costs ("***Cure Objection***"), must be (i) filed in accordance with the Bid Procedures Order; (ii) filed with the Bankruptcy Court; and (iii) served on the Objection Notice Parties (as defined below) by no later than **June 15, at 5:00 p.m. (prevailing Central Time).**

**IF A COUNTERPARTY FAILS TO FILE WITH THE BANKRUPTCY COURT AND SERVE ON THE OBJECTION NOTICE PARTIES A TIMELY CURE OBJECTION, THE COUNTERPARTY SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION WITH REGARD TO THE AMOUNT TO CURE ANY DEFAULT UNDER THE APPLICABLE EXECUTORY CONTRACT OR UNEXPIRED LEASE. THE CURE COSTS SET FORTH ON <u>EXHIBIT A</u> ANNEXED HERETO SHALL BE CONTROLLING**

---

[12] Allied Medical LLC is not affiliated with Debtor, and upon information and belief, was created as a special purpose entity for purposes of the proposed sale process in this case.

13 A copy of the Stalking Horse Agreement is attached to the Bid Procedures Order as **Exhibit D**.

SL 5985701.3

**AND WILL BE THE ONLY AMOUNT NECESSARY TO CURE OUTSTANDING DEFAULTS UNDER THE APPLICABLE EXECUTORY CONTRACT OR UNEXPIRED LEASE UNDER BANKRUPTCY CODE SECTION 365(b), NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE EXECUTORY CONTRACT OR UNEXPIRED LEASE, OR ANY OTHER DOCUMENT, AND THE APPLICABLE COUNTERPARTY SHALL BE FOREVER BARRED FROM ASSERTING ANY ADDITIONAL CURE OR OTHER AMOUNTS WITH RESPECT TO SUCH EXECUTORY CONTRACT OR UNEXPIRED LEASE AGAINST THE DEBTOR, ANY SUCCESSFUL BIDDER, OR THE PROPERTY OF ANY OF THEM.**

### B. Adequate Assurance Objection

Upon request by a Counterparty, the Debtor shall direct the Counterparty to counsel to the Stalking Horse Bidder or Successful Bidder, as the case may be, for the purposes of demonstrating adequate assurance information of future performance by the Stalking Horse Bidder or Successful Bidder. At the Sale Hearing, the Stalking Horse Bidder or Successful Bidder may provide additional financial and commercial information to the extent required by the Bankruptcy Court to demonstrate adequate assurance information of future performance by the Stalking Horse Bidder or Successful Bidder.

Any objection to the proposed assumption or assignment of a Contract identified on Exhibit A annexed hereto, the subject of which is the Stalking Horse Bidder's (or its known assignee's) proposed form of adequate assurance of future performance with respect to such Contract (an "***Adequate Assurance Objection***"), must be (i) filed in accordance with the Bid Procedures Order; (ii) filed with the Bankruptcy Court; and (iii) served on the Objection Notice Parties by no later than **June 15, 2023, at 5:00 p.m. (prevailing Central Time).**

**IF A COUNTERPARTY FAILS TO FILE WITH THE BANKRUPTCY COURT AND SERVE ON THE OBJECTION NOTICE PARTIES A TIMELY ADEQUATE ASSURANCE OBJECTION, THE COUNTERPARTY SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION WITH REGARD TO ADEQUATE ASSURANCE OF FUTURE PERFORMANCE OF THE APPLICABLE EXECUTORY CONTRACT OR UNEXPIRED LEASE. THE SUCCESSFUL BIDDER (OR ITS DESIGNATED ASSIGNEE, IF APPLICABLE) SHALL BE DEEMED TO HAVE PROVIDED ADEQUATE ASSURANCE OF FUTURE PERFORMANCE WITH RESPECT TO THE APPLICABLE CONTRACT OR UNEXPIRED LEASE IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 365(f)(2)(B), NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE EXECUTORY CONTRACT OR UNEXPIRED LEASE, OR ANY OTHER DOCUMENT.**

### C. Assumption/Assignment Objection

Any objection to the proposed assumption or assumption and assignment of a Contract identified on **Exhibit A** annexed hereto (an "***Assumption/Assignment Objection***"), other than Cure Objections or Adequate Assurance Objections, must be (i) filed in accordance with the Bid Procedures Order; (ii) filed with the Bankruptcy Court; and (iii) served on the Objection Notice Parties by no later than **June 15, 2023, at 5:00 p.m. (prevailing Central Time).**

20

**IF A COUNTERPARTY FAILS TO FILE WITH THE BANKRUPTCY COURT AND SERVE ON THE OBJECTION NOTICE PARTIES A TIMELY ASSUMPTION /ASSIGNMENT OBJECTION, THE COUNTERPARTY SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION WITH REGARD TO THE MOTION, THE SALE ORDER, THE TRANSACTION, OR THE DEBTOR'S CONSUMMATION OF THE STALKING HORSE AGREEMENT OR ANY OTHER PURCHASE AGREEMENT EXECUTED BY THE DEBTOR AND A SUCCESSFUL BIDDER, INCLUDING, WITHOUT LIMITATION, THE DEBTOR'S ASSUMPTION OR ASSUMPTION AND ASSIGNMENT OF THE APPLICABLE EXECUTORY CONTRACT OR UNEXPIRED LEASE, FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS.**

### D.  Objection Notice Parties

The "***Objection Notice Parties***" as used herein means:

(i)     counsel for Debtor, Zachary Fairlie, Spencer Fane LLP, 1000 Walnut, Suite 1400, Kansas City, MO 64106, zfairlie@spencerfane.com;

(ii)    Office of the United States Trustee's Office, 111 South 10th Street Suite 6.353, St. Louis, MO  63102;

(iii)   counsel for the Stalking Horse Bidder, Scott Davidson, King & Spalding LLP, 1185 Avenue of the Americas, 34th Floor, New York, NY 10036, SDavidson@KSLAW.com; Armstrong Teasdale LLP (attn: Erin M. Edelman, Esq. 7700 Forsyth Blvd., Suite 1800, St. Louis, Missouri 63105-1847, eedelman@atllp.com; Michael A. Petrizzo, Jr., 2005 Market Street, 29th Floor, One Commerce Square, Philadelphia, PA 19103, mpetrizzo@atllp.com);

(iv)    proposed counsel to the Official Committee of Unsecured Creditors appointed in the Debtor's chapter 11 case _____;

(v)     the United States Attorney's Office for the Eastern District of Missouri;

(vi)    Blank Rome (Attn: Paige Barr Tinkham, Esq. and Ken Ottaviano, Esq.), as counsel to STERLING COMMERCIAL CREDIT, LLC., as the DIP Facility Lender, paige.tinkham@blankrome.com, ken.ottaviano@blankrome.com

The Debtor requests that if you have a Cure Objection, Adequate Assurance Objection, and/or Assumption/Assignment Objection, you contact the Debtor prior to **June 12, 2023, at 5:00 p.m. (prevailing Central Time)** to attempt to resolve such dispute consensually. The Debtor's contact for such matters is Zachary Fairlie, Esq., at zfairlie@spencerfane.com. If such dispute cannot be resolved consensually prior to **June 15, 2023, at 5:00 p.m. (prevailing Central Time)**, you must file and serve an objection by the deadlines set forth above and in accordance with the procedures set forth in this Notice to preserve your right to object.

### E.  Sale Hearing

A hearing to approve and authorize the sale of the St. Louis Assets to the Successful Bidder (which may be the Stalking Horse Bidder) will be held before the Court on or before **June 30, 2023, at [●] [a/p].m. (prevailing Central Time)**; provided, that the Debtor may reschedule or

21

adjourn the Sale Hearing, in compliance with the applicable noticing requirements in the Bid Procedures. If a timely Cure Objection, Adequate Assurance Objection, or Assumption/ Assignment Objection is received and such objection cannot otherwise be resolved by the parties, such objection shall be heard at the Sale Hearing or such later date as the Debtor determines.

## Additional Information

Electronic copies of the Motion, the Bid Procedures Order, and the Bid Procedures, as well as all related exhibits, including the Stalking Horse Agreement and all other agreements filed with the Court, may be obtained free of charge from Debtor's proposed counsel at zfairlie@spencerfane.com.

## Other

The inclusion of any Contract on **Exhibit A** shall not constitute or be deemed a determination or admission by the Debtor that a particular Contract is an executory contract or unexpired lease within the meaning of the Bankruptcy Code or require or guarantee that such Contract ultimately will be assumed or assigned. All rights of the Debtor with respect thereto are reserved.

Notwithstanding the inclusion of any Contract on **Exhibit A**, a Successful Bidder is not bound to accept assignment of any Purchased Contract.

In accordance with the terms of the Bid Procedures Order, the Debtor may until five (5) business days prior to entry of the order approving the Transaction, add or remove Contracts to the Proposed Assumed Contracts, by filing and serving upon the Counterparties to such Contracts a supplemental Assumption and Assignment Notice, which will be deemed to update any previously filed Assumption and Assignment Notice, including this Assumption and Assignment Notice. In addition, after the Transaction closes, the Debtor may continue adding Contracts to the Proposed Assumed Contracts, by filing and serving upon the Counterparties to such Contracts a supplemental Assumption and Assignment Notice.

SL 5985701.3

**EXHIBIT 4 – Proposed Sale Order**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| | Case No. 23-41607 |
| **ALLIED HEALTHCARE PRODUCTS, INC.,** | |
| Debtor. | |

**ORDER (A) APPROVING PURCHASE AGREEMENT; (B) AUTHORIZING SALE OF
DEBTOR'S ST. LOUIS ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS,
RIGHTS,  ENCUMBRANCES AND OTHER INTERESTS PURSUANT TO
BANKRUPTCY CODE SECTIONS 105, 363(B), 363(F) AND 363(M);
(C) AUTHORIZING THE ASSUMPTION, ASSIGNMENT, AND SALE OF CERTAIN
EXECUTORY  CONTRACTS AND UNEXPIRED LEASES PURSUANT TO
BANKRUPTCY CODE SECTIONS 363 AND 365; AND (D) GRANTING RELATED
RELIEF**

Upon the motion ("***Motion***")[1] of the above-captioned debtor and debtor in possession

("***Debtor***") for the entry of an order ("***Order***") pursuant to sections 105, 363, and 365 of title 11 of

the United States Code ("***Bankruptcy Code***") and Rules 2002, 6004, 6006, and 9014 of the Federal

Rules of Bankruptcy Procedure ("***Bankruptcy Rules***"), and applicable local rules (a) authorizing

the sale of certain assets known as the St. Louis Assets, as defined in that certain asset purchase

agreement attached hereto as **Exhibit 1** ("***Agreement***"), to the highest or otherwise best bidder at

auction; (b) approving the Agreement; (c) authorizing the assumption and assignment of certain

executory contracts and unexpired leases to the Purchaser (as defined below); and (d) granting

related relief; and this Court having entered an order dated ____ 2023 [Docket No. ___] ("***Bid***

---

1   All capitalized terms used but not defined in this Order have the meaning ascribed to such terms in the Motion
or, if not defined in the Motion, in the Agreement (as defined below).

*Procedures Order*" and, attached as Exhibit 1 thereto, the "*Bid Procedures*"), authorizing the Debtor to conduct, and approving the terms and conditions of, the Auction and Bid Procedures to consider the highest or otherwise best offers for the St. Louis Assets, establishing a date for the Auction, and approving, among other things, (x) the Bid Procedures in connection with the Auction; (y) the form and manner of notice of the Auction and Sale Hearing; and (z) the Bid Protections; and the Debtor having determined that the highest or otherwise best offer for the St. Louis Assets was made by _____ (together with its assignees, in accordance with the Agreement, the "*Purchaser*") in the form of the Agreement among the Purchaser, on the one hand, and Debtor, on the other hand, dated as of __ 2023 (which was presented to the parties and the Court at the Sale Hearing); and the Auction having been held on __ 2023, pursuant to which the Purchaser was selected as the winning bidder; and the Court having established the date of the Sale Hearing and having conducted the Sale Hearing on _ 2023; and the Court having jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334; and consideration of the Motion, the relief requested therein, and the responses thereto being a core proceeding in accordance with 28 U.S.C. § 157(b)(2); and the appearance of all interested parties and all responses and objections, if any, to the Motion having been duly noted in the record of the Sale Hearing; and upon the record of the Sale Hearing, and all other pleadings and proceedings in this case, including the Motion; and it appearing that the relief requested in the Motion is in the best interests of the Debtor, its estate, its creditors, and all other parties in interest; that reasonable and adequate notice of the Motion, the Bid Procedures Order, and the transactions contemplated by the Agreement, this Order, and the Sale Hearing have been provided to all persons required to be served in accordance with the Bankruptcy Code and the Bankruptcy Rules; and after due deliberation and sufficient cause appearing therefor;

2

SL 5985698.2

**IT IS HEREBY FOUND, DETERMINED, AND CONCLUDED THAT**:[2]

A.      The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding by Bankruptcy Rule 9014.

B.      To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

C.      The Court has jurisdiction over this matter, the property of the Debtor's estate, including the St. Louis Assets to be sold, transferred, or conveyed pursuant to the Agreement, and the Debtor's estate pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of this chapter 11 case and of the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

D.      This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Order, and expressly directs entry of judgment as set forth herein.

E.      The statutory predicates for the relief sought in the Motion and the basis for the approvals and authorizations herein are (i) sections 105, 363, and 365 of the Bankruptcy Code, and (ii) Bankruptcy Rules 2002, 6004, 6006, and 9014.

F.      On May 8, 2023 ("**_Petition Date_**"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Since the Petition Date, the Debtor has continued in

---

[2]      All findings of fact and conclusions of law announced by the Court at the Sale Hearing in relation to the Motion are hereby incorporated herein to the extent not inconsistent herewith.

SL 5985698.2

possession and management of its business and properties as a debtor in possession pursuant to

sections 1107(a) and 1108 of the Bankruptcy Code.

G.       As evidenced by the certificates of service filed with the Court, proper, timely,

adequate, and sufficient notice of the Motion, the Auction, and the Sale Hearing have been

provided in accordance with sections 102(1) and 363(b) of the Bankruptcy Code, Bankruptcy

Rules 2002, 6004, 9006, 9007, 9008, and 9014, the local rules of this Court, and the procedural

due process requirements of the United States Constitution, and as required by the Bid Procedures

Order. The Debtor also gave due and proper notice of the assumption, sale, and assignment of each

contract and lease proposed to be assumed and assigned pursuant to the Agreement ("***Assumed***

***Contracts***") through the cure notices [Docket Nos. ____] (collectively, the "***Cure Notices***") given

to each non-Debtor party under each such Assumed Contract. Such notice was good, sufficient,

and appropriate under the particular circumstances. No other or further notice of the Motion, the

Auction, the Sale Hearing, the assumption and assignment of the Assumed Contracts, or of the

entry of this Order is necessary or shall be required.

H.       Actual written notice of, and a reasonable opportunity to object or be heard

regarding the requested relief has been afforded to all interested persons and entities as required

by the Bid Procedures Order, including, without limitation, (a) the U.S. Trustee; (b) counsel to the

Debtor-in-possession lender ("***DIP Lender***"); (c) counsel to the Committee; (d) all parties known

to assert a lien on any of the St. Louis Assets and who would appear as potentially holding a lien

on any search conducted to determine who asserts a lien on the Debtor's assets; (e) all known

counterparties to any Assumed Contracts; (f) all entities known to have expressed an interest in

bidding on the St. Louis Assets; (g) the United States Attorney's office for the Eastern District of

Missouri; (h) all state attorney generals in states in which the Debtor does business; (i) state taxing

4

authorities in the states in which the Debtor does business and the Internal Revenue Service; (j) environmental authorities in the states or smaller applicable jurisdictions in which the Debtor does business; (k) counsel to the Purchaser; (l) the Department of Justice; and (m) all other parties that had filed a notice of appearance and demand for service of papers in these bankruptcy cases. Other parties interested in bidding on the St. Louis Assets were provided, upon request, sufficient information to make an informed judgment on whether to bid on the St. Louis Assets.

I.      The Debtor has demonstrated a sufficient basis and compelling circumstances permitting it to enter into the Agreement, sell the St. Louis Assets free and clear of all Liens (as defined below) (other than Assumed Liabilities), and assume and assign the Assumed Contracts under sections 363 and 365 of the Bankruptcy Code, and such actions are appropriate exercises of the Debtor's business judgment and in the best interests of the Debtor, its estate, and its creditors and other parties in interest. Such business reasons include, but are not limited to, the facts that (i) the Agreement and the Closing (as defined in the Agreement) will present the best opportunity to realize the Debtor's value on a going concern basis; (ii) there is substantial risk of deterioration of the St. Louis Assets' value if the sale is not quickly consummated; (iii) the Agreement constitutes the highest and best offer for the St. Louis Assets; and (iv) any other transaction, including pursuant to any currently viable plan of reorganization, would not have yielded as favorable an economic result.

J.      The Bid Procedures set forth in the Bid Procedures Order were non-collusive, and substantively and procedurally fair to all parties.

K.      The disclosures made by the Debtor concerning the Agreement, the Auction, and the transactions contemplated by the Agreement and the Sale Hearing were good, complete, and adequate.

SL 5985698.2

L.      The Debtor and its professionals have complied, in good faith, in all respects with the Bid Procedures Order. As demonstrated by any testimony and other evidence proffered or adduced at the Sale Hearing and the representations of counsel made on the record at the Sale Hearing, and through the marketing efforts and competitive sale process conducted in accordance with the Bid Procedures Order, the Debtor (i) afforded interested potential purchasers a full, fair, and reasonable opportunity to qualify as bidders and submit their highest or otherwise best offer to purchase the St. Louis Assets, (ii) provided potential purchasers, upon request, sufficient information to enable them to make an informed judgment on whether to bid on the St. Louis Assets, and (iii) considered any bids submitted on or before the Bid Deadline.

M.     The Debtor conducted the Auction on _____ 2023, and selected the Purchaser as the winning bidder.  The Purchaser submitted the highest or otherwise best offer, and the Purchaser is the Successful Bidder for the Assets in accordance with the Bid Procedures Order. ____ was selected as the Back-Up Bidder at the Auction. The Purchaser and its professionals have complied, in good faith, in all respects with the Bid Procedures Order. The Bid Procedures obtained the highest value for the St. Louis Assets for the Debtor and its estate.  No other entity or group of entities has offered to purchase the St. Louis Assets for greater economic value to the Debtor's estate than the Purchaser. The Debtor's determination that the Agreement constitutes the highest or otherwise best offer for the St. Louis Assets constitutes a valid and sound exercise of the Debtor's business judgment.

N.      The offer of the Purchaser, upon the terms and conditions set forth in the Agreement, including the form and total consideration to be realized by the Debtor pursuant to the Agreement, (i) is the highest or otherwise best offer received by the Debtor, (ii) is fair and reasonable, (iii) is in the best interests of the Debtor's estate, creditors, and other parties in interest,

6

and (iv) constitutes full and adequate consideration and reasonably equivalent value for the St. Louis Assets.

O.     The Purchaser is not an "insider" or an "affiliate" of the Debtor as those terms are defined in the Bankruptcy Code. The Purchaser is a buyer in good faith, as that term is used in the Bankruptcy Code and the decisions thereunder, and the Purchaser is therefore entitled to all of the protections of section 363(m) and (n) of the Bankruptcy Code with respect to all of the St. Louis Assets.

P.     The Agreement was negotiated and entered into in good faith, based on arm's-length bargaining, and without collusion or fraud of any kind.  Neither the Debtor nor the Purchaser engaged in any conduct that would prevent the application of section 363(m) of the Bankruptcy Code or cause the application of or implicate section 363(n) of the Bankruptcy Code to the Agreement or to the consummation of the sale transaction and transfer of the St. Louis Assets and the Assumed Contracts to the Purchaser.  Accordingly, the Purchaser is entitled to all the protections and immunities of section 363(m) of the Bankruptcy Code.

Q.     The Debtor is authorized to execute the Agreement and all other documents contemplated thereby, and to promptly consummate the transactions contemplated by the Agreement. No consents or approvals, other than as may be expressly provided for in the Agreement, are required by the Debtor to consummate such transactions.

R.     The Debtor has advanced sound business reasons for seeking to enter into the Agreement and to sell the St. Louis Assets and assume and assign the Assumed Contracts, as more fully set forth in the Motion, the Agreement, and as demonstrated at the Sale Hearing, and it is a reasonable exercise of the Debtor's business judgment to sell the St. Louis Assets and to consummate the transactions contemplated by the Agreement. Notwithstanding any requirement

7

for approval or consent by any person, the transfer of the St. Louis Assets to the Purchaser and the assumption and assignment of the Assumed Contracts is a legal, valid and effective transfer of the Assets and any Assumed Contracts.

S.    The terms and conditions of the Agreement, including the consideration to be realized by the Debtor pursuant to the Agreement, is fair and reasonable, and the transactions contemplated by the Agreement are in the best interests of the Debtor's estate.

T.    Except as otherwise provided in the Agreement and to the extent permitted by the Bankruptcy Code, the St. Louis Assets shall be sold free and clear of any lien (statutory or otherwise), Claim (as defined in the Agreement) hypothecation, encumbrance, security interest, mortgage, pledge, restriction, charge, instrument, license, preference, priority, security agreement, easement, covenant, encroachment, option, or other interest in the subject property, including any right of recovery, tax (including foreign, federal, state, and local tax), order or decree of any court or foreign or domestic Governmental Authority, or other claim with respect thereto, of any kind or nature (including without limitation (i) any conditional sale or other title retention agreement and any lease having substantially the same effect as any of the foregoing, (ii) any assignment or deposit arrangement in the nature of a security device, (iii) any pension liabilities, retiree medical benefit liabilities, liabilities related to the Employee Retirement Income Security Act of 1974 ("ERISA"), liabilities related to the Internal Revenue Code, or any other liability relating to Debtor's current and former employees, including any withdrawal liabilities (under any multiemployer pension plans or otherwise) or liabilities under any collective bargaining agreement or labor practice agreement, retiree healthcare or, life insurance claims, (iv) any claims based on any theory that the Purchaser or its affiliates is a successor, transferee, or continuation of the Debtor or the St. Louis Assets, whether in law or equity, under any law, statute, rule, or regulation of the

8

SL 5985698.2

United States, any state, territory, or possession thereof or the District of Columbia, and (iv) any leasehold interest, license, or other right, in favor of a person or entity other than the Purchaser, to use any portion of the St. Louis Assets), whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown (collectively, "*Liens*") with such Liens to attach to the consideration to be received by the Debtor in the same priority and subject to the same defenses and avoidability, if any, as before the Closing. For purposes of this paragraph, the term "affiliate" shall mean each entity that is treated as a single employer with the Purchaser for purposes of Section 414 of the Internal Revenue Code.

U.      The Agreement is a valid and binding contract among the Debtor and the Purchaser, which is and shall be enforceable according to its terms.

V.      The transfer of the St. Louis Assets to the Purchaser is a legal, valid, and effective transfer of all the St. Louis Assets, and, except as may otherwise be provided in the Agreement, shall vest the Purchaser with all right, title, and interest of the Debtor in and to the St. Louis Assets free and clear of all Liens.  Except as specifically provided in the Agreement or this Order, the Purchaser shall not assume or become liable for any Liens relating to the St. Louis Assets.

W.      The Debtor, acting by and through its existing secretary, any assistant secretary, agents, representatives, and officers, has full corporate power and authority to execute and deliver the Agreement and all other documents contemplated thereby, including, without limitation, authority to effect the name changes set forth in the Agreement, and no further consents or approvals are required for the Debtor to consummate the transactions and any related actions contemplated by the Agreement, except as otherwise set forth in the Agreement.

9

SL 5985698.2

X.      The Debtor may sell the St. Louis Assets free and clear of all Liens of any kind or nature whatsoever because, in each case, one or more of the standards set forth in section 363(f) of the Bankruptcy Code has been satisfied. Those holders of Liens from which the St. Louis Assets are to be sold free and clear (including, to the extent applicable, the non-Debtor parties to Assumed Contracts) who did not object, or who withdrew their objections, to the sale of the St. Louis Assets and the Motion are deemed to have consented pursuant to Bankruptcy Code § 363(f)(2).  All objections to the Motion have been resolved or overruled. Those holders of Liens who did object fall within one or more of the other subsections of Bankruptcy Code § 363(f) and are adequately protected by having their Liens if any, attach to the proceeds of the sale of the St. Louis Assets ultimately attributable to the property against or in which they claim or may claim any Liens.

Y.      Not selling the St. Louis Assets free and clear of all Liens would adversely affect the Debtor's estate, and any sale of the St. Louis Assets other than one free and clear of all Liens would be of substantially less value to the Debtor's estate.

Z.      If the sale of the St. Louis Assets to the Purchaser were not free and clear of all Liens, or if the Purchaser would, or in the future could, be liable for any Liens, the Purchaser would not have entered into this Agreement and would not consummate the sale or the transactions contemplated by the Agreement, thus adversely affecting the Debtor, its estate, and its creditors.

AA.     The Debtor and the Purchaser have, to the extent necessary, satisfied the requirements of section 365 of the Bankruptcy Code, including sections 365(b)(1)(A), (B) and 365(f) of the Bankruptcy Code, in connection with the sale and the assumption and assignment of the Assumed Contracts.  The Purchaser has demonstrated adequate assurance of future performance with respect to all Assumed Contracts pursuant to section 365(b)(1)(C) of the Bankruptcy Code.  The assumption and assignment of the Assumed Contracts pursuant to the terms

10

SL 5985698.2

of this Order is integral to the Agreement and is in the best interests of the Debtor, its estate, its creditors, and other parties in interest, and represents the exercise of sound and prudent business judgment by the Debtor.

BB.     The Assumed Contracts are assignable notwithstanding any provisions contained therein to the contrary, or providing for the termination thereof upon assignment or the insolvency or commencement of the Debtor's chapter 11 case.  The Debtor has provided for appropriate cures or other payments or actions required for the Debtor to assume and assign the Assumed Contracts to the Purchaser.  The Purchaser has provided adequate assurance of future performance under all Assumed Contracts.

CC.     In the absence of a stay pending appeal, the Purchaser is acting in good faith, pursuant to section 363(m) of the Bankruptcy Code, in closing the transactions contemplated by the Agreement at any time on or after the entry of this Order and cause has been shown as to why this Order should not be subject to the stay provided by Bankruptcy Rules 6004(h) and 6006(d).

DD.     The transactions contemplated under the Agreement do not amount to a consolidation, merger, or *de facto* merger of the Purchaser or its affiliates and the Debtor or the Debtor's estate, there is not substantial continuity between the Purchaser or its affiliates and the Debtor, there is no common identity between the Debtor and the Purchaser or its affiliates, there is no continuity of enterprise between the Debtor and the Purchaser or its affiliates, neither the Purchaser nor any of its affiliates is a mere continuation of the Debtor or its estate, and neither the Purchaser nor any of its affiliates constitutes a successor to the Debtor or its estate. For purposes of this paragraph, the term "affiliate" shall mean each entity that is treated as a single employer with the Purchaser for purposes of Section 414 of the Internal Revenue Code.

11

EE.     The sale of the St. Louis Assets outside of a plan of reorganization pursuant to the Agreement neither impermissibly restructures the rights of the Debtor's creditors nor impermissibly dictates the terms of a liquidating plan of reorganization for the Debtor. The sale does not constitute a *sub rosa* chapter 11 plan.

FF.     The Agreement was not entered into, and none of the Debtor or the Purchaser, have entered into the Agreement or proposed to consummate the transactions contemplated thereby, for the purpose of hindering, delaying, or defrauding the Debtor's present or future creditors.  The total consideration provided by the Purchaser for the St. Louis Assets is the highest or otherwise best offer received by the Debtor, and the Purchase Price constitutes (i) reasonably equivalent value under the Bankruptcy Code and the Uniform Fraudulent Transfer Act, (ii) fair consideration under the Uniform Fraudulent Conveyance Act and (iii) reasonably equivalent value, fair consideration, and fair value under any other applicable laws of the United States, any state, territory, or possession, or the District of Columbia, for the St. Louis Assets.

GG.     Time is of the essence in consummating the transactions contemplated by the Agreement. To maximize the value of the St. Louis Assets and preserve the viability of the Debtor's business as a going concern, it is essential that the sale of the St. Louis Assets occur within the time constraints set forth in the Agreement. Accordingly, there is cause to determine inapplicable the stays contemplated by Bankruptcy Rules 6004 and 6006.

HH.     The Purchaser has not agreed to assume and shall have no obligation with respect to any liabilities of the Debtor or its affiliates other than as expressly set forth in the Agreement. Other than the Assumed Liabilities, and except as expressly provided for by the terms of the Agreement, the Purchaser or any of its affiliates (i) shall have no obligations with respect to any Excluded Liabilities, (ii) shall acquire all the St. Louis Assets free and clear of the Excluded

12

Liabilities to the extent they constitute a Lien and (iii) is released by the Debtor with respect to such Excluded Liabilities.

II.     The Debtor, in connection with offering products or services, did not disclose any policy prohibiting the transfer of personally identifiable information and, therefore, the sale of the St. Louis Assets may be approved pursuant to section 363(b)(1)(A) of the Bankruptcy Code without the appointment of a consumer privacy ombudsman as defined in section 363(b)(1) of the Bankruptcy Code.

JJ.     Other than claims arising under the Agreement, the Debtor agrees and acknowledges that it has no claims against the Purchaser.

KK.     The consummation of the transactions contemplated by the Agreement is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(m), 365(b), and 365(f) of the Bankruptcy Code, and all of the applicable requirements of such sections have been complied with in respect of the transactions.

**NOW, THEREFORE, BASED UPON ALL OF THE FOREGOING, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1.     The relief requested in the Motion is **GRANTED** in its entirety as reflected in this Court's statements on the record, subject to the terms and conditions contained herein. The Motion complies with all aspects of applicable local rules.

2.     All objections, responses, and requests for continuance concerning the Motion are resolved in accordance with the terms of this Order and as set forth on the record of the Sale Hearing. To the extent any such objection, response, or request for continuance was not otherwise withdrawn, waived, or settled, it, and all reservations of rights contained therein, is overruled and denied with prejudice.

13

SL 5985698.2

3.       Notice of the Sale Hearing was fair, equitable, and proper under the circumstances and complied in all respects with section 102(1) of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006, as required by the Bid Procedures Order.

*Approval of Sale*

4.       The sale of the St. Louis Assets, the terms and conditions of the Agreement (including all schedules and exhibits affixed thereto and all other ancillary documents), the bid by the Purchaser, and the transactions contemplated thereby and all of the terms and conditions thereof, are the highest or otherwise best offer for the St. Louis Assets and hereby are authorized and approved in all respects.

5.       The sale of the St. Louis Assets and the consideration provided by the Purchaser under the Agreement is fair and reasonable and shall be deemed for all purposes to constitute a transfer for reasonably equivalent value and fair consideration under the Bankruptcy Code and any other applicable law.

6.       The Purchaser is hereby granted and is entitled to all the protections provided to a good-faith buyer under section 363(m) of the Bankruptcy Code, including with respect to the transfer of the Assumed Contracts as part of the sale of the St. Louis Assets pursuant to section 365 of the Bankruptcy Code and this Order.

7.       Pursuant to section 363(m) of the Bankruptcy Code, if any or all of the provisions of this Order are hereafter reversed, modified, or vacated by a subsequent order of this Court or any other court, such reversal, modification, or vacatur shall not affect the validity and enforceability of any transfer under the Agreement or obligation or right granted pursuant to the terms of this Order (unless stayed pending appeal), and notwithstanding any reversal, modification,

14

or vacatur shall be governed in all respects by the original provisions of this Order and the Agreement, as the case may be.

8.     The Debtor is hereby authorized to fully perform under, consummate, and implement the terms of the Agreement, together with any and all additional instruments and documents that may be reasonably necessary or desirable to implement and effectuate the terms of the Agreement, this Order, and sale of the St. Louis Assets contemplated thereby, including, without limitation, deeds, assignments, stock powers, and other instruments of transfer, and to take all further actions as may be reasonably necessary for the purpose of assigning, transferring, granting, conveying, and conferring to the Purchaser, or reducing to possession any or all of the St. Louis Assets or Assumed Liabilities, as may be necessary or appropriate to the performance of the Debtor's obligations as contemplated by the Agreement, forthwith and without any further corporate action or orders of this Court.  Neither the Purchaser nor the Debtor shall have any obligation to proceed with the Closing of the Agreement unless and until all conditions precedent to the Purchaser's and the Debtor's respective obligations thereunder have been met, satisfied, or waived by the Purchaser or the Debtor, as the case may be and in accordance with the Agreement.

9.     The Debtor and each other person or entity having duties or responsibilities under the Agreement, any agreements related thereto, or this Order, and their respective directors, officers, employees, members, agents, representatives, and attorneys, are authorized and empowered, subject to the terms and conditions contained in the Agreement:  (a) to carry out all of the provisions of the Agreement and any related agreements; (b) to issue, execute, deliver, file, and record, as appropriate, the documents evidencing and consummating the Agreement, and any related agreements; (c) to take any and all actions contemplated by the Agreement, any related agreements, or this Order; and (d) to issue, execute, deliver, file, and record, as appropriate, such

15

other contracts, instruments, releases, indentures, mortgages, deeds, bills of sale, assignments, leases, or other agreements or documents and to perform such other acts and execute and deliver such other documents, as are consistent with, and necessary or appropriate to implement, effectuate, and consummate, the Agreement, any related agreements, this Order, and the transactions contemplated thereby and hereby, forthwith and all without further application to, or order of, the Court.

10.     The secretary, any assistant secretary, agent, representative or officer of the Debtor shall be, and hereby is, authorized to certify or attest to any of the foregoing actions (but no such certification or attestation shall be required to make any such action valid, binding, and enforceable).  The Debtor is further authorized and empowered to cause to be filed with the secretary of state of any state or other applicable officials of any applicable governmental units any and all certificates, agreements, or amendments necessary or appropriate to effectuate the transactions contemplated by the Agreement, any related agreements, and this Order, including amended and restated certificates or articles of incorporation and bylaws or certificates or articles of amendment, and all such other actions, filings, or recordings as may be required under appropriate provisions of the applicable laws of all applicable governmental units or as any of the officers of the Debtor may determine are necessary or appropriate.  The execution of any such document or the taking of any such action shall be, and hereby is, deemed conclusive evidence of the authority of such person to so act.  Without limiting the generality of the foregoing, this Order shall constitute all approvals and consents, if any, required by the corporation laws of the State of Delaware and the State of Missouri, and all other applicable business corporation, trust, and other laws of the applicable governmental units, including for the change of the Debtor's corporate

16

name, with respect to the implementation and consummation of the Agreement, any related agreements, and this Order, and the transactions contemplated thereby and hereby.

11.      Effective as of the Closing, (a) the sale of the St. Louis Assets by the Debtor to the Purchaser shall constitute a legal, valid, and effective transfer of the St. Louis Assets notwithstanding any requirement for approval or consent by any person and vests the Purchaser with all right, title, and interest of the Debtor in and to the St. Louis Assets, free and clear of all Liens of any kind, pursuant to section 363(f) of the Bankruptcy Code, and (b) the assumption of any Assumed Liabilities by the Purchaser constitutes a legal, valid, and effective delegation of any such Assumed Liabilities to the Purchaser and divests the Debtor of all liability with respect to any such Assumed Liabilities.

12.      Neither the Debtor nor the Purchaser has engaged in any conduct that would cause or permit the Agreement to be avoided or costs and damages to be imposed under section 363(n) of the Bankruptcy Code. Accordingly, the Agreement and the transactions thereby shall not be avoidable under section 363(n) of the Bankruptcy Code, and no party shall be entitled to any damages or other recovery pursuant to section 363(n) of the Bankruptcy Code in respect of the Agreement or the transactions contemplated thereby.

### *Transfer of Assets*

13.      Except to the extent specifically provided in the Agreement, upon the Closing, the Debtor shall be, and hereby is, authorized and empowered, pursuant to sections 105, 363(b), and 363(f) of the Bankruptcy Code, to sell the St. Louis Assets to the Purchaser.  The sale of the St. Louis Assets vests the Purchaser with all right, title, and interest of the Debtor in and to the St. Louis Assets free and clear of any and all Liens, with all such Liens to attach only to the proceeds of the sale with the same priority, validity, force, and effect, if any, as they now have in or against

17

the St. Louis Assets, subject to all claims and defenses the Debtor may possess with respect thereto. The Motion or notice thereof is deemed to have provided sufficient notice as to the sale of the St. Louis Assets free and clear of Liens.  Following the Closing Date, no holder of any Liens on the St. Louis Assets shall have any basis to interfere with the Purchaser's use and enjoyment of the St. Louis Assets based on or related to such Liens, or any actions that the Debtor may take in its chapter 11 case, and no person may take any action to prevent, interfere with, or otherwise impair consummation of the transactions contemplated in or by the Agreement or this Order.

14.    The provisions of this Order authorizing the sale of the St. Louis Assets free and clear of Liens, other than the Assumed Liabilities, shall be self-executing, and neither the Debtor nor the Purchaser shall be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate, and implement the provisions of this Order.  However, the Debtor and the Purchaser, and each of their respective officers, employees, and agents are hereby authorized and empowered to take all actions and execute and deliver any and all documents and instruments that either the Debtor or the Purchaser deem necessary or appropriate to implement and effectuate the terms of the Agreement and this Sale Order.

15.    To the greatest extent available under applicable law and to the extent provided for under the Agreement, the Purchaser shall be authorized, as of the Closing Date, to operate under any license, permit, registration, and governmental authorization or approval of the Debtor with respect to the St. Louis Assets, and, to the greatest extent available under applicable law and to the extent provided for under the Agreement, all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been transferred to the Purchaser as of the Closing Date.

18

SL 5985698.2

16.     All of the Debtor's interests in the St. Louis Assets to be acquired by the Purchaser under the Agreement shall be, as of the Closing Date and upon the occurrence of the Closing, transferred to and vested in the Purchaser, free and clear of all Liens (other than Assumed Liabilities).  Upon the occurrence of the Closing, this Order shall be considered and constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of the St. Louis Assets acquired by the Purchaser under the Agreement and/or a bill of sale or assignment transferring good and marketable, indefeasible title and interest in the St. Louis Assets to the Purchaser.

17.     Upon consummation of the transactions set forth in the Agreement, if any person or entity that has filed financing statements, mortgages, mechanic's liens, *lis pendens*, or other documents or agreements evidencing Liens against or in the St. Louis Assets shall not have delivered to the Debtor prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfactions, releases of all Liens that the person or entity has with respect to the St. Louis Assets (unless otherwise assumed in the Agreement), or otherwise, then (a) the Debtor is hereby authorized to execute and file such statements, instruments, releases, and other documents on behalf of the person or entity with respect to the St. Louis Assets and (b) the Purchaser is hereby authorized to file, register, or otherwise record a certified copy of this Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Liens in the St. Louis Assets of any kind or nature. For the avoidance of doubt, to the extent necessary, upon consummation of the transactions set forth in the Agreement, the Purchaser is authorized to file termination statements, lien terminations, or other amendments in any required jurisdiction to remove and record, notice filings or financing statements recorded to attach, perfect, or otherwise notice any lien or

19

encumbrance that is extinguished or otherwise released pursuant to this Order under section 363 of the Bankruptcy Code and any other provisions of the Bankruptcy Code.

18.     All persons or entities, presently or on or after the Closing Date, in possession or control of some or all of the St. Louis Assets are directed to surrender possession or control of the St. Louis Assets to the Purchaser on the Closing Date or at such later time as the Purchaser may request.

19.     All entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Debtor to sell and transfer the St. Louis Assets to the Purchaser in accordance with the terms of the Agreement and this Order.

20.     This Order is and shall be binding upon and govern the acts of all entities, persons, governmental units (as defined in sections 101(27) and 101(41) of the Bankruptcy Code) and all holders of the Liens, including without limitation, federal, state, and local governmental agencies or departments, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Agreement.

21.     Except as expressly provided in the Agreement, the Purchaser is not assuming and is not deemed to assume, and the Purchaser shall not be, nor shall any affiliate of Purchaser be, in any way liable for or responsible for, as a successor or otherwise, for any liabilities, claims, debts,

SL 5985698.2

or obligations of the Debtor in any way whatsoever relating to or arising from the Debtor's ownership, possession, control, or use of the St. Louis Assets prior to the consummation of the transactions contemplated by the Agreement, or any liabilities calculable by reference to the Debtor or their operations or to any or all of the St. Louis Assets, or relating to continuing or other conditions existing on or prior to consummation of the transactions contemplated by the Agreement, which liabilities, claims, debts, and obligations are hereby extinguished insofar as they may give rise to liability, successor or otherwise, against the Purchaser or any of its affiliates.

***Payment and Allocation of Sale Proceeds***

22.    Promptly following the Closing, the cash proceeds of the sale ("***Cash Proceeds***") shall be paid by the Debtor as follows:

a.    Debtor shall apply the net sale proceeds of the sale of the St. Louis Assets, including after payment of any Court-approved commission and payment of the Purchaser Reimbursable Expenses (to the extent payable pursuant to the Agreement and the Bid Procedures Order), consistent with the terms of the DIP Order, to pay all outstanding DIP obligations, if any; and

b.    Remainder shall be retained by the Debtor pending further order of the Court.

***Assumed Contracts***

23.    Subject to the terms of the Agreement and the occurrence of the Closing Date, the assumption by the Debtor of Assumed Contracts and the assignment of all such Assumed Contracts to the Purchaser, as provided for or contemplated by the Agreement, is hereby authorized and approved pursuant to sections 363 and 365 of the Bankruptcy Code.

24.    The Debtor shall have the right to designate additional Contracts to be assumed and assigned following the closing of the transaction(s) set forth in the Agreement on substantially the

21

terms included in the Agreement; provided that after the closing, the Debtor shall serve a supplemental Assumption and Assignment Notice to add Contracts not otherwise rejected or designated as Excluded Assets to the schedule of Assumed Contracts, provided, that the Debtor promptly serves a revised Assumption and Assignment Notice on each counterparty affected. After the Closing Date, to the extent the Debtor adds any Assumed Contract which was not previously listed in the prior Assumption and Assignment Notice, such counterparty shall file any Cure Objection or Adequate Assurance Objection with respect to the revised Assumption and Assignment Notice not later than seven (7) calendar days after the date of filing and service of the revised Assumption and Assignment Notice. If a counterparty fails to timely file with the Court and serve the Cure Objection or Adequate Assurance Objection on the Objection Notice Parties, the counterparty shall be forever barred from asserting any objection with regard to Cure Costs or to adequate assurance of future performance of the applicable Assumed Contract.

25.    The Assumed Contracts shall be deemed valid and binding and in full force and effect and assumed by the Debtor and assigned to the Purchaser at the Closing, pursuant to sections 363 and 365 of the Bankruptcy Code, subject only to the payment of all Cure Costs (as defined below) by the Debtor required to assume and assign the Assumed Contracts to the Purchaser, and, subject to the payment of such Cure Costs, non-Debtor parties to such Assumed Contracts are without basis to assert against the Purchaser, among other things, defaults, breaches, or claims of pecuniary losses existing as of the Closing or by reason of the Closing. The Debtor is hereby authorized in accordance with sections 105(a), 363, and 365 of the Bankruptcy Code to (a) assume and assign to the Purchaser, effective upon the Closing Date of the sale of the St. Louis Assets, the Assumed Contracts free and clear of all Liens of any kind or nature whatsoever (unless otherwise expressly assumed by the Purchaser in the Agreement) and (b) execute and deliver to

22

SL 5985698.2

the Purchaser such documents or other instruments as may be necessary or appropriate to assign and transfer the Assumed Contracts to the Purchaser.

26.     Subject to the terms of the Agreement and upon the Closing, in accordance with sections 363 and 365 of the Bankruptcy Code, the Purchaser shall be fully and irrevocably vested with all right, title, and interest in and to each Assumed Contract. The Debtor is authorized to take all actions reasonably necessary to effectuate the foregoing.

27.     Pursuant to sections 365(b)(l)(A) and (B) of the Bankruptcy Code, and except as otherwise provided in this Order, the Debtor, shall promptly pay or cause to be paid to the parties to any Assumed Contracts the requisite cure amounts, if any, set forth in the Cure Notices served by the Debtor on each of the parties to the Assumed Contracts ("*Cure Costs*"), with respect to the assumption and assignment thereof.  The Cure Costs are hereby fixed at the amounts set forth in the Cure Notices served by the Debtor, or the amounts determined on the record of the Sale Hearing, as the case may be, and all non-Debtor parties to the Assumed Contracts are forever bound by such Cure Costs and shall not take any action against the Purchaser or the St. Louis Assets with respect to any claim for cure under any Assumed Contract.

28.     All defaults or other obligations under the Assumed Contracts arising prior to the Closing (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall be deemed cured by payment of the Cure Costs and the non-Debtor parties to such contracts shall be forever barred and estopped from asserting or claiming against the Debtor or the Purchaser that any additional amounts are due or other defaults exist.  Each non-Debtor party to the Assumed Contracts is forever barred, estopped, and permanently enjoined from asserting against the Debtor or Purchaser, their affiliates, successors, or assigns, or the property of any of them, any default existing as of the date of the Sale Hearing

23

if such default was not raised or asserted prior to or at the Sale Hearing. To the extent a non-Debtor party to the Assumed Contracts failed to timely file an objection, such Cure Cost has been and shall be deemed to be finally determined and any such non-Debtor party shall be prohibited from challenging, objecting to, or denying the validity and finality of the Cure Cost at any time.

29.    Any provision in any Assumed Contract that purports to declare a breach, default, or payment right as a result of an assignment or a change of control in respect of the Debtor is unenforceable, and all Assumed Contracts shall remain in full force and effect, subject only to payment of the appropriate Cure Cost, if any.  No sections or provisions of any Assumed Contract that purports to provide for additional payments, penalties, charges, or other financial accommodations in favor of the non-Debtor third party to the Assumed Contracts shall have any force or effect with respect to the transactions contemplated by the Agreement and assignments authorized by this Order, and such provisions constitute unenforceable anti-assignment provisions under Bankruptcy Code § 365(f) or are otherwise unenforceable under section 365(e) of the Bankruptcy Code, and no assignment of any Assumed Contract pursuant to the terms of the Agreement in any respect constitutes a default under any Assumed Contract.  In the absence of objection, the non-Debtor party to each Assumed Contract shall be deemed to have consented to such assignment under section 365(c)(1)(B) of the Bankruptcy Code, and the Purchaser shall enjoy all of the rights and benefits under each such Assumed Contract as of the applicable date of assumption without the necessity of obtaining such non-Debtor party's written consent to the assumption or assignment thereof.  Any party having the right to consent to the assumption or assignment of any Assumed Contract that failed to object to such assumption or assignment is deemed to have consented to such assumption and assignment as required by section 365(c) of the Bankruptcy Code.

SL 5985698.2

30.     The Purchaser has satisfied any and all requirements under sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code to provide adequate assurance of future performance under all Assumed Contracts. The Purchaser shall not be required to provide any further evidence of any adequate assurance to any counterparty of an Assumed Contract.

31.     The Debtor and its estate shall be relieved of any liability for any breach of any of the Assumed Contracts occurring from and after Closing, pursuant to and in accordance with Bankruptcy Code § 365(k).

32.     Non-Debtor parties to Assumed Contracts shall be prohibited from charging any rent acceleration, assignment fees, increases, or other fees to the Purchaser as a result of the assumption and assignment of any Assumed Contracts.

***Additional Provisions***

33.     Each and every federal, state, and local governmental agency or department is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Agreement and this Order.

34.     To the maximum extent permitted by section 525 of the Bankruptcy Code, no governmental unit may revoke or suspend any permit or license relating to the operation of the St. Louis Assets sold, transferred, or conveyed to the Purchaser on account of the filing or pendency of the Debtor's chapter 11 case or the consummation of the transactions contemplated by the Agreement.

35.     The Purchaser has not assumed or is otherwise not obligated for any of the Debtor's obligations, debts (as defined in section 101(12) of the Bankruptcy Code), Claims (as defined in the Agreement) or liabilities (including, without limitation, the Excluded Liabilities) other than the Assumed Liabilities and as otherwise expressly provided by the Agreement, and the Purchaser has

25

SL 5985698.2

not purchased any of the Excluded Assets. Except as expressly permitted or otherwise specifically provided by the Agreement or this Order, all persons and governmental units (as defined in Bankruptcy Code §§ 101(27) and 101(41)) and all holders of Liens based on, arising out of, or related to liabilities retained by the Debtor shall not take any action against the Purchaser or the St. Louis Assets, including asserting any right of setoff, subrogation, or recoupment of any kind, to recover any Liens or on account of any liabilities of the Debtor other than Assumed Liabilities pursuant to the Agreement. All persons holding or asserting any Liens in the Excluded Assets shall not assert or prosecute such Liens or cause of action against the Purchaser or the St. Louis Assets for any liability associated with the Excluded Assets.

36.     Neither the Purchaser  nor any of its affiliates is a "successor" to the Debtor or its estate by reason of any theory of law or equity, and the Purchaser shall not assume, be deemed to assume, or in any way be responsible for any liability, debt (as defined in Bankruptcy Code § 101(12)), Claims (as defined in the Agreement) or obligation of the Debtor or its estate, including, without limitation, pursuant to any bulk sales law, successor liability, or other theory of liability or responsibility for any claim against the Debtor, against an insider of the Debtor, against the St. Louis Assets, or similar liability except as otherwise expressly provided in the Agreement. The Motion contains sufficient notice of such limitations in accordance with any Local Rules. Except to the extent the Purchaser expressly assumes the Assumed Liabilities pursuant to the Agreement, neither the purchase of the St. Louis Assets by the Purchaser or its affiliates, nor the fact that the Purchaser or its affiliates are using any of the St. Louis Assets previously owned, used, or operated by the Debtor, will cause the Purchaser or any of its affiliates to be deemed a successor to, or be otherwise liable in any respect on account of the Debtor's business (a) within the meaning of any foreign, federal, state, or local revenue, pension, ERISA, tax, labor, employment, antitrust,

26

regulatory, investigatory, safety, consumer protection, patent or intellectual property, business practices, environmental, or other law, regulation, rule, guideline, or other doctrine (including, without limitation, filing requirements under any such laws, regulations, rules, guidelines, or other doctrines); (b) under any products liability or product warranty law, regulation, rule, guideline, or other doctrine with respect to the Debtor's actual or potential liability under such law, regulation, rule, guideline, or doctrine; and (c) any liabilities, debts, commitments, or obligations for any taxes relating to the operation of the St. Louis Assets prior to Closing. For purposes of this paragraph, the term "affiliate" shall mean each entity that is treated as a single employer with the Purchaser for purposes of Section 414 of the Internal Revenue Code.

37.     Except to the extent expressly included in the Assumed Liabilities or to enforce the Agreement, pursuant to sections 105 and 363 of the Bankruptcy Code, all persons and entities, including, but not limited to, the Debtor, the Committee, debt security holders, equity security holders, the Debtor's employees or former employees, governmental, tax and regulatory or investigatory authorities of any sort (including, without limitation, environmental and product safety regulators or investigators), lenders, parties to or beneficiaries under any benefit plan, trade and other creditors asserting or holding a Lien or other claim of any kind or nature whatsoever against, in, or with respect to the Debtor or all or any part of the St. Louis Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated), arising under or out of, in connection with, or in any way relating to the Debtor, all or any part of the St. Louis Assets, the operation of the Debtor's business prior to the Closing Date, or the transfer of the St. Louis Assets to the Purchaser, shall be forever barred, estopped, and permanently enjoined from asserting, prosecuting, or otherwise pursuing such Lien or other claim,

27

whether by payment, setoff, or otherwise, directly or indirectly, against the Purchaser or any affiliate, successor, or assign thereof, or against the St. Louis Assets.

38.     The Purchaser is hereby generally released by the Debtor and its estate from any and all claims that the Debtor or any party claiming derivatively through the Debtor may have against the Purchaser, other than claims against the Purchaser arising under the Agreement or as otherwise provided in this Order.

39.     Subject to the terms of the Agreement, the Agreement and any related agreements may be waived, modified, amended, or supplemented by agreement of the Debtor and the Purchaser, without further action or order of the Court; provided that any such waiver, modification, amendment, or supplement substantially conforms to, and effectuates, the Agreement and any related agreements.

40.     The failure specifically to include any particular provisions of the Agreement or any related agreements in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court, the Debtor, and the Purchaser that the Agreement and any related agreements are authorized and approved in their entirety with such amendments thereto as may be made by the parties in accordance with this Order prior to Closing.

41.     No bulk sale law or any similar law of any state or other jurisdiction shall apply in any way to the sale and the transactions contemplated by the Agreement.

42.     To the extent any provisions of this Order conflicts with the terms and conditions of the Agreement, this Order shall govern and control.

43.     This Order and the Agreement shall be binding upon and govern the acts of all persons and entities, including without limitation, the Debtor, the Purchaser, and their respective successors and permitted assigns, including, without limitation, any chapter 11 trustee hereinafter

SL 5985698.2

appointed for the Debtor's estate or any trustee appointed in a chapter 7 case if this case is converted from chapter 11, all creditors and shareholders of the Debtor (whether known or unknown), filing agents, filing officers, title agents, recording agencies, secretaries of state, and all other persons and entities who may be required by operation of law, the duties of their office or contract, to accept, file, register, or otherwise record or release any documents or instruments or who may be required to report or insure any title in or to the St. Louis Assets.

44.     The provisions of this Order are non-severable and mutually dependent.

45.     Nothing in any order of this Court or contained in any plan of reorganization or liquidation confirmed in this chapter 11 case, or in any subsequent or converted case of the Debtor under chapter 7 or chapter 11 of the Bankruptcy Code, shall conflict with or modify the provisions of the Agreement or the terms of this Order.

46.     The Purchaser shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the Agreement or any other sale-related document; provided that none of the Purchaser's substantive rights under the Agreement and other sale-related documents are expanded or supplemented hereby. The automatic stay imposed by section 362 of the Bankruptcy Code is hereby modified to the extent necessary to implement the preceding sentence.

47.     Should the Purchaser fail to close on the sale pursuant to the Agreement, and without further order from this Court, the Debtor is authorized and empowered to sell the St. Louis Assets to the Back-Up Bidder and execute and deliver the agreements contemplated herein and to implement and consummate all of the transactions and perform all obligations contemplated by the Back-Up Bidder's back-up bid at the Auction and this Order as if the Back-Up Bidder were

29

the Purchaser and the Back-Up Bidder shall be entitled to all of the findings and protections of this Order provided to the Purchaser.

48.     With respect to any real or personal property subject to any executory contract or unexpired lease to which Debtor is a party and that is not an Assumed Contract as of the date of this Order, the Debtor shall grant, and the Purchaser will have, a general license to, in Purchaser's reasonable discretion, access, use, and otherwise exercise control over any such real or personal property, in any case solely to the extent of the Debtor's rights to so access, use, and otherwise exercise control over such property and, except as otherwise ordered by the Court with respect to any such property, through the date of effectiveness of the rejection (if any) of any such executory contracts and unexpired leases; provided that the Debtor shall not seek to have any such executory contracts or unexpired leases rejected earlier than _____, 2023.  Any access, use, or exercise of control by the Purchaser pursuant to this paragraph after the Closing Date will be at Purchaser's sole expense and at no liability to the Debtor or its estate.  Debtor makes no representation or warranty regarding the condition or suitability of such real or personal property and Purchaser assumes all risks in connection with its access, use, and/or control of such property.  Purchaser shall be responsible for any damage to any of such real or personal property after the Closing Date and shall indemnify, defend and hold Debtor, its officers, directors, employees, agents and representatives harmless from any claims, liabilities or obligations arising from or in connection with such access, use, and/or control.

49.     The Debtor is authorized and directed to take all actions necessary to implement and effectuate the relief granted in this Order in accordance with the Agreement.

50.     Notwithstanding Bankruptcy Rules 6004, 6006, and 7062, this Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing, and

SL 5985698.2

the Motion or notice thereof shall be deemed to provide sufficient notice of the Debtor's request for waiver of the otherwise applicable stay of the Order.  In the absence of any person or entity obtaining a stay pending appeal, the Debtor and the Purchaser are free to close under the Agreement at any time, subject to the terms of the Agreement. The Purchaser has acted in "good faith," and, in the absence of any person or entity obtaining a stay pending appeal, if the Debtor and the Purchaser close under the Agreement, then the Purchaser shall be entitled to the protections of section 363(m) of the Bankruptcy Code as to all aspects of the transactions under and pursuant to the Agreement if this Order or any authorization contained herein is reversed or modified on appeal.

51.     This Court shall retain exclusive jurisdiction to enforce the terms and provisions of this Order, the Bid Procedures Order, and the Agreement in all respects and to decide any disputes concerning this Order and the Agreement, or the rights and duties of the parties hereunder or thereunder or any issues relating to the Agreement and this Order including, but not limited to, the interpretation of the terms, conditions, and provisions hereof and thereof, the status, nature, and extent of the Assets and any Assumed Contracts, and all issues and disputes arising in connection with the relief authorized herein, inclusive of those concerning the transfer of the assets free and clear of all Liens.

Date: _____, 2023

_____
Honorable Brian C. Walsh
United States Bankruptcy Judge

SL 5985698.2

**EXHIBIT 5 - Proposed Transaction Notice**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| In re:<br><br>**ALLIED HEALTHCARE PRODUCTS,<br>    INC.,**<br><br>Debtor. | **Chapter 11**<br>**Case No. 23-41607** |

**NOTICE OF THE SALE, BID PROCEDURES, AUCTION, AND SALE HEARING**

**TO ALL PERSONS RECEIVING THIS NOTICE, PLEASE TAKE NOTICE OF THE FOLLOWING:**

1.    On May 8, 2023, the above-captioned debtor ("***Debtor***") filed its Motion for Entry of Orders: (i) Approving (a) Bidding Procedures, (b) Designation of Stalking Horse Bidder and Stalking Horse Bid Protections, (c) Scheduling Auction and Sale Hearing, (d) Form and Manner of Notice of Sale, Auction, and Sale Hearing; and (e) Assumption and Assignment Procedures and form and manner of notice thereof; and (ii) Authorizing (a) Sale of St. Louis Assets Free and Clear of All Liens, Interests, Claims, and Encumbrances; and (iii) Granting Related Relief [Docket No. _____] ("***Motion***").

2.    In the Motion, among other things, Debtor seeks an order of the Bankruptcy Court authorizing it to sell, pursuant to Bid Procedures set forth in **Exhibit A** hereto, outside the ordinary course of business and free and clear of all liens, claims, encumbrances, and interests, all of Debtor's right, title and interest to substantially all of the St. Louis Assets to the Successful Bidder(s)[14] and otherwise granting all necessary and appropriate related relief. A copy of the Motion, the Bid Procedures Order identified below and other pleadings in the bankruptcy case can be obtained from Debtor's proposed bankruptcy counsel, Spencer Fane LLP at zfairlie@spencerfane.com.

3.    A binding stalking horse bid ("***Stalking Horse Bid***") has been submitted by Allied Medical, LLC ("***Stalking Horse Bidder***"). The Stalking Horse Bidder has executed an asset purchase agreement ("***Stalking Horse Agreement***") for the purchase of substantially all of the St.

---

[14]  Capitalized terms not defined herein shall have the meanings ascribed to them in the Motion and Bid Procedures.

24

Louis Assets ("***Stalking Horse Bid***"). The Stalking Horse Bid is subject to higher or otherwise better offers submitted in accordance with the terms and provisions of the Bid Procedures.

**The Sale Process**

4.      The Bid Procedures Order sets forth the following dates in connection with the transactions contemplated in the Motion:

| Event | Date and Time (if applicable) |
|---|---|
| Bid Deadline | **June 16, 2023, at 5:00 (prevailing Central Time)** |
| Auction | **June 20, 2023, at 9:00 a.m. (prevailing Central Time)** |
| Sale Hearing Objection Deadline | **June 27, 2023, at 5:00 p.m. (prevailing Central Time)** |
| Sale Hearing | **June 30, 2023** |
| Sale Order | **Within fourteen (14) days after Auction** |

5.      An initial hearing on the Motion, focusing on approval of the bid procedures and selection of any Stalking Horse Bidder, including any related Bid Protection, occurred on May 30, 2023. Thereafter, the Bankruptcy Court entered that certain Order Approving (a) Bidding Procedures, (b) Designation of Stalking Horse Bidder and Stalking Horse Bid Protections, (c) Scheduling Auction and Sale Hearing, (d) Form and Manner of Notice of Sale, Auction, and Sale Hearing [Docket No. ___] ("***Bid Procedures Order***").

6.      Pursuant to the Bid Procedures Order, if more than one Qualified Bid has been submitted for the St. Louis Assets on or before **June 16, 2023,** in accordance with the Bid Procedures attached as Exhibit A, the Debtor will conduct an auction ("***Auction***") on **June 20, 2023, at 9:00 a.m. (prevailing Central Time)**, with respect to such Qualified Bids in order to determine the Successful Bid(s) to submit for approval by the Bankruptcy Court at the Final Hearing. Qualified Bidders seeking to participate as a bidder at the Auction must comply with the Bid Procedures.

7.      The Final Hearing on the Sale Motion shall be held on **June 30, 2023, at [●]:[●] [a/p].m. (prevailing Central Time)**, in the Courtroom 5 North before the Honorable Brian C. Walsh, United States Bankruptcy Judge, at the United States Bankruptcy Court, Eastern District of Missouri, 111 S 10th St #4, St. Louis, MO 63102.

**Additional Information Regarding Any Objection**

8.      Objections, if any, to all or any part of the Motion shall be filed on the docket of the Bankruptcy Court and served such that each objection is actually received by the following parties on or before the relevant objection deadline specified above: (a) proposed counsel for Debtor, Zachary Fairlie, Spencer Fane LLP, 1000 Walnut, Suite 1400, Kansas City, MO 64106,

25

zfairlie@spencerfane.com; (b) Office of the United States Trustee's Office, 111 South 10th Street Suite 6.353, St. Louis, MO 63102; (c) counsel for the Stalking Horse Bidder, Scott Davidson, King & Spalding LLP, 1185 Avenue of the Americas, 34th Floor, New York, NY 10036, SDavidson@KSLAW.com; Armstrong Teasdale LLP (attn: Erin M. Edelman, Esq. 7700 Forsyth Blvd., Suite 1800, St. Louis, Missouri 63105-1847, eedelman@atllp.com; Michael A. Petrizzo, Jr., 2005 Market Street, 29th Floor, One Commerce Square, Philadelphia, PA 19103, mpetrizzo@atllp.com).

9.      Any person failing to timely file an objection to the Motion shall be barred from objecting to the Motion, including the sale of the St. Louis Assets free and clear of any and all liens, claims, encumbrances, and interests and will be deemed to consent to the Transaction(s), including the sale of the St. Louis Assets free and clear of any and all liens, claims, encumbrances, and interests.

10.     Copies of the Motion, the Bid Procedures, the Bid Procedures Motion, and the Bid Procedures Order, together with all exhibits, schedules, and attachments thereto, may be obtained from Debtor's proposed bankruptcy counsel, Spencer Fane LLP at zfairlie@spencerfane.com.

## Reservation of Rights

Except as otherwise set forth herein and in the Bid Procedures, the Debtor reserves the right to, in its reasonable business judgment, in a manner consistent with its fiduciary duties and applicable law to modify the Bid Procedures; waive terms and conditions set forth therein with respect to all Potential Bidders; extend the dates and deadlines set forth therein; announce at the Auction any modified or additional procedures for conducting the Auction; provided, that the Debtor shall not be authorized to make material modifications to the Bid Procedures without further order of the Court. The Debtor may provide reasonable accommodations to any Potential Bidder(s) with respect to such terms, conditions, and deadlines of the bidding and Auction process to promote further bids on the Debtor's business, in each case, to the extent not materially inconsistent with the Bid Procedures and the Bid Procedures Order. All parties reserve their rights to seek Bankruptcy Court relief with regard to the Auction, the Bid Procedures, and any related items (including, if necessary, to seek an extension of the Bid Deadline).

**FAILURE TO ABIDE BY THE BID PROCEDURES, THE BID PROCEDURES ORDER, OR ANY OTHER ORDER OF THE BANKRUPTCY COURT IN THIS CHAPTER 11 CASE MAY RESULT IN THE REJECTION OF YOUR BID. THE FAILURE OF ANY PERSON OR ENTITY TO FILE AND SERVE AN OBJECTION IN ACCORDANCE WITH THE BID PROCEDURES ORDER BY THE SALE OBJECTION DEADLINE SHALL FOREVER BAR SUCH PERSON OR ENTITY FROM ASSERTING ANY OBJECTION TO THE MOTION, THE SALE ORDER, THE PROPOSED TRANSACTION, OR THE DEBTOR'S CONSUMMATION OF THE STALKING HORSE AGREEMENT OR ANY OTHER PURCHASE AGREEMENT EXECUTED BY THE DEBTOR AND A SUCCESSFUL BIDDER AS A RESULT OF THE AUCTION.**

SL 5985701.3

Respectfully submitted,

**SPENCER FANE LLP**

/s/      *draft*
Eric C. Peterson MO #62429
Ryan C. Hardy MO #62926
1 North Brentwood Boulevard
Suite 1200
St. Louis, MO 63105
(314) 863-7733
(314) 862-4656 – Fax
epeterson@spencerfane.com
rhardy@spencerfane.com

- and -

Zachary Fairlie MO #68057
1000 Walnut Street
Suite 1400
Kansas City, MO 64106
(816) 292-8223
zfairlie@spencerfane.com

*Proposed Counsel to the Debtor and
Debtor-in-Possession*

27

**EXHIBIT A TO EXHIBIT 5**

**[Bid Procedures]**

28

SL 5985701.3